UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PROTOSTORM, LLC  and
PETER FAULISI,

                             Plaintiffs,      :

                                       :       08 Civ. 931 (NGG) (JO)

        - against -            :

ANTONELLI, TERRY, STOUT & KRAUS, LLP  :
DALE HOGUE and FREDERICK D. BAILEY,

                                       :

                      Defendants.

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT BY ALL DEFENDANTS

Dated: New York, New York
      February 27, 2009

                                   Arthur M. Handler
                                   Robert S. Goodman
                                   MOUND COTTON WOLLAN
                                   & GREENGRASS
                                   One Battery Park Plaza
                                   New York, New York 10004
                                   Telephone: (212) 804-4200

                                         -and-

                                   Jonathan E. Moskin
                                   WHITE & CASE LLP
                                   1155 Avenue of the Americas
                                   New York, New York 10036
                                   Telephone: (212) 819-8200

                                   Attorneys for Plaintiffs

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

FACTS ................................................................................................................... 3

JURISDICTIONAL FACTS.................................................................................. 9

ARGUMENT ........................................................................................................ 12

POINT I      THIS COURT HAS JURISDICTION OVER DEFENDANTS
             ATS&K AND BAILEY.............................................................. 12

        A.   There Is Diversity Jurisdiction And It Is Properly Pleaded ..................... 12

        B.   Legal Standard On A Motion To Dismiss For
             Lack Of Personal Jurisdiction.................................................................. 12

        C.   Because ATS&K And Bailey Transacted Business In New York,
             They Are Subject To Jurisdiction Under CPLR § 302(a)(1) .................... 13

             1.  ATS&K And Bailey Transacted Business In New York
                 By Reason Of Their Joint Representation With Hogue
                 Of Protostorm............................................................................... 14

                 a.  Hogue Concedes That His New York Contacts
                     Invoke This Court's Jurisdiction ................................... 14

                 b.  Hogue's New York Contacts Are Attributable
                     To ATS&K And Bailey ................................................ 16

             2.  ATS&K And Bailey Admit Contacts With New York
                 Which Subject Them To This Court's Jurisdiction............................ 18

        D.   Defendants ATS&K And Bailey's Tort Outside New York
             Caused Injury Within New York And Therefore Jurisdiction
             Is Proper Under 302(a)(3)(ii) .................................................................. 21

             1.  The Appropriate Test Shows That The Situs Of
                 Plaintiffs' Injury Is New York........................................................... 21

i

       2.  ATS&K And Bailey Derive Substantial Revenue From Their National And International Practice And Should Have Expected Their Acts To Have Consequences in New York ............... 22

  E.  Jurisdiction At Bar Comports With Requirements Of Due Process ........... 24

POINT II      PLAINTIFFS' MALPRACTICE CLAIM IS TIMELY ................................... 25

  A.  The Strict Standards For Summary Judgment ........................................... 25

  B.  Defendants' Continuing Attorney-Client Relationship With Plaintiffs Tolled The Statute Of Limitations ..................................... 26

      1.  The Statute Of Limitations Is Tolled Under New York Law .............. 28

      2.  The Statute Of Limitations Is Tolled Under Virginia Law ................. 31

      3.  The Statute Of Limitations Is Tolled Under California Law .............. 32

  C.  Defendants Actively Concealed Their Malpractice And Therefore The Doctrine Of Equitable Estoppel Bars Their Statute Of Limitations Defense ......................................................... 35

      1.  New York's Equitable Estoppel Law Bars The Statute Of Limitations Defense ............................................................................ 37

      2.  Virginia's Equitable Estoppel Law Bars The Statute Of Limitations Defense ............................................................................ 39

      3.  Under California Law, The Statute Of Limitations Has Been Tolled And/Or Hogue Is Estopped From Asserting A Statute Of Limitations Defense ....................................... 40

POINT III     DEFENDANTS DID NOT REQUIRE A PCT POWER OF ATTORNEY .......................................................................................... 42

POINT IV     HOGUE'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED ....................................................................... 46

  A.  There Is No Agreement To Arbitrate Legal Malpractice claims .............. 46

  B.  It Is Inappropriate Under California Law To Compel Arbitration Of Plaintiffs' Claims Which Are The Subject Of This Pending Action ......... 48

CONCLUSION ................................................................................................... 50

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

A.I. Trade Finance, Inc. v. Petra Bank,
989 F.2d 76 (2d Cir. 1993)............................................................................13

Babcock v. Jackson,
12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963) ..........................................................26

Bank Brussels Lambert v. Fiddler, Gonzalez & Rodriguez,
171 F.3d 779 (2d Cir. 1999)............................................................................21

Bank Brussels Lambert v. Fiddler, Gonzalez & Rodriguez,
2005 U.S. Dist. LEXIS 5484 (S.D.N.Y. 2005),
adhered to on reconsid., 2005 U.S. Dist. LEXIS 12983 (S.D.N.Y. 2005)............................37

Barry v. Donnelly,
781 F.2d 1040 (4th Cir. 1986) ......................................................................39, 40

Best Interiors, Inc. v. Millie and Severson, Inc.,
161 Cal.App.4th 1320, 75 Cal.Rptr.3d 1  (Ca. Ct. App.2d Dist. 2008)................................48, 49

Cassidy v. Day,
39 Va. Cir. 272 (Va. Cir. Ct. Fairfax Co. 1996) ......................................................31

Cavu Releasing, LLC v. Fries,
419 F.Supp.2d 388 (S.D.N.Y. 2005)..............................................................13, 17, 20

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S.Ct. 2548 (1986)..................................................................25

Cronus Investments Inc. v. Concierge Services,
35 Cal.4th 376, 25 Cal.Rptr.3d 540 (2005)............................................................49

Cutco Indus. Inc. v. Naughton,
806 F.2d 361 (2d Cir. 1986)........................................................................12, 16, 17

Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,
7 N.Y.3d 65, 818 N.Y.S.2d 164, cert. denied, 2006 US LEXIS 9475 (2006)......................13

Fishbarg v. Doucet,
9 N.Y.3d 375, 849 N.Y.S.2d 501 (2007) ..........................................................20, 21, 24

Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan,
2008 U.S. Dist. LEXIS 47613 (S.D.N.Y. 2008)......................................................38

Friedson v. Lesnick,
1992 U.S. Dist. LEXIS 2773 (S.D.N.Y. 1992) ..................................................16

Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
756 F.2d 230 (2d Cir. 1985)..........................................................................25

General Stencils Inc. v. Chiappa,
18 N.Y.2d 125, 272 N.Y.S.2d 337 (1966) ..........................................................37

Gonzalez v. Kalu,
140 Cal. App. 4th 21, 43 Cal. Rptr. 3d 866 (Ca. Ct. App. 4th Dist. 2006)...........33

Gotay v. Breitbart,
2008 NY Slip Op 8432, 866 N.Y.S.2d 638 (1st Dep't 2008) ..................................30, 31

Gurkewitz v. Haberman,
137 Cal. App.3d 328, 187 Cal.Rptr. 14 (Ca. Ct. App.2d Dist. 1982) ..............................32, 33, 34

Hargrave v. Oki Nursery, Inc.,
636 F.2d 897 (2d Cir. 1980)..........................................................................22, 24

Harris v. Dobrusin,
73 U.S.P.Q.2d 1537 (B.P.A.I. 2004)...............................................................44

Hawk v. The State Bar of California,
45 Cal.3d 589, 247 Cal. Rptr. 599 (1988)........................................................46

Ingraham v. Carroll,
90 N.Y.2d 592, 665 N.Y.S.2d 10 (1997) .........................................................23

Kanter v. Pieri,
11 A.D.3d 912, 783 N.Y.S.2d 181 (4th Dep't 2004) ........................................29

Keller v. Denny,
232 Va. 512, 352 S.E.2d 327 (1987).............................................................31, 32

Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,
313 U.S. 487, 61 S.Ct. 1020 (1941)..............................................................25-26

Kreutter v. McFadden Oil Co., Inc.,
71 N.Y.2d 460, 527 N.Y.S.2d 195 (1988) .......................................................15, 16

Lawrence v. Walzer & Gabrielson,
207 Cal.App.3d 1501, 256 Cal.Rptr. 6 (Ca. Ct. App. 2d Dist. 1989),
pet. review denied, 1989 Cal. LEXIS 4710 (1989)...........................................46, 47, 48

iv

Leasequip, Inc. v. Dapeer,
103 Cal. App. 4th 394, 126 Cal.Rptr.2d 782 (Ca. Ct. App. 2d Dist. 2002),
pet. review denied, 2003 Cal. LEXIS 250 (2003)...................................................................41, 42

Lockney v. Vroom,
61 Va. Cir. 359, 2003 Va. Cir. LEXIS 263 (Va. Cir. Ct. Norfolk 2003)..............................40

Mayes v. Leipziger,
674 F.2d 178 (2d Cir. 1982)....................................................................................................21

McGowan v. Smith,
52 N.Y.2d 268, 437 N.Y.S.2d 643 (1981) ....................................................................19-20

National Union Fire Insurance Co. of Pittsburgh, PA v. BP Amoco P.L.C.,
319 F.Supp.2d 352 (S.D.N.Y. 2004).......................................................................................13

Palace Exploration Co. v. Petroleum Development Company,
41 F.Supp.2d 427 (S.D.N.Y. 1998) ................................ ..........................................21-22, 24

Parke-Bernet Galleries, Inc. v. Franklyn,
26 N.Y.2d 13, 308 N.Y.S.2d 337 (1970) ...............................................................................18

Powers v. Dickson, Carlson & Campillo,
54 Cal.App.4th 1102, 63 Cal.Rptr.2d 261 (Ca. Ct. App. 2d Dist. 1997)........................47, 48

SEC v. Tandem Mgmt., Inc.,
2001 WL 1488218 (S.D.N.Y. 2001).......................................................................................25

Seiko Epson Corp. v. Nu-Kote Int'l, Inc.,
190 F.3d 1360 (Fed. Cir. 1999)..............................................................................................43

Shapero v. Fliegel,
191 Cal.App.3d 842, 236 Cal.Rptr. 696 (Ca. Ct. App. 2d Dist. 1987)............................33, 34

Shipman v. Kruck,
267 Va. 495, 2004 Va. LEXIS 39 ...........................................................................................32

Shumsky v. Eisenstein,
96 N.Y.2d 164, 726 N.Y.S.2d 365........................................................................................28, 29

Simmons v. Carnival Cruise Lines,
2003 U.S. Dist. LEXIS 19034 (J. Garaufis) ...........................................................................38

Stephens v. American Risk Management,
1993 U.S. Dist. LEXIS 1786 (S.D.N.Y. 1993)........................................................................17

Sykes v. Apfel,
1998 WL 338104 (S.D.N.Y. 1998)........................................................................25

Village Nurseries, L.P. v. Greenbaum,
101 Cal.App.4th 26, 123 Cal.Rptr.2d 555 (Ca. Ct. App. 4th Dist. 2002).......................33, 34

Volt Information Sciences, Inc. v.
Board of Trustees of the Leland Stanford Junior University,
489 U.S. 468,  109 S.Ct. 1248 (1989) ...................................................................48

**Rules & Statutes**

Cal. Code Civ. Proc. § 340.6(a)(3) ..............................................................40, 41, 42

Ca. Code Civ. Proc. §1281.2(c) ......................................................................48, 49

CPLR § 302........................................................................................................13

CPLR § 302(a)(1) .........................................................................................passim

CPLR §302 (a)(3)(ii)....................................................................21, 22, 23, 24

Fed.R.Civ.P. 56(c) .............................................................................................25

Patent Office Rule 1.34, 37 CFR 1.34 .............................................................44-45

Patent Office Rule 10.40, 37 CFR 1040 .......................................................26, 29, 45

PCT Rule 26.5......................................................................................................43

PCT Rule 90.4(c) .................................................................................................43

## PRELIMINARY STATEMENT

Although defendants initially informed the Court that they intended to move to dismiss the complaint and they sought and procured an order permitting discovery limited to such a motion, each has now also filed a motion for summary judgment. The summary judgment motions must be denied because they do not even begin to demonstrate the absence of material issues of fact and the motions to dismiss must likewise be denied as a matter of law.

Most notably, defendants' motions fail to address the basic acts of malpractice that form the heart of the case (of which there are at least four), much less seek to explain their concealment of such malpractice for many years until some 39 days before this action was commenced. Defendants' acts of malpractice are evidenced by documentary evidence, totally ignored by defendants' motions. First, on June 25, 2001, defendants filed an international application under the Patent Cooperation Treaty ("PCT"), and designated for patent protection every country listed in such form (more than 100 in all), except the United States, Mongolia and Zimbabwe, in contravention of explicit instructions from the plaintiffs that patent protection in the United States was plaintiffs' principal goal. Second, although by operation of law, defendants had the statutory right to correct their erroneous omission by September 27, 2001, they failed to do so. Third, defendants failed to pursue the patent application in any of the foreign jurisdictions they did designate (including in particular Japan, Canada and Mexico, where Protostorm had expressed particular interest in obtaining patent protection). Fourth, defendants failed to file a new United States application, which they could have been done as late as January 27, 2003, one year after publication of the PCT application.

Examination of the defendants' motion papers do not reveal any discussion of these issues. Instead, the motions are premised on numerous false legal and factual premises

which seek to obfuscate defendants' failures to represent their client in a competent professional manner. For example, they argue they were unable to act on behalf of plaintiffs because they lacked a power of attorney. Such a defense itself raises myriad factual and legal issues. As a matter of law, the execution of the form was a mere administrative matter, the absence of which had no substantive consequences unless and until the PCT declared the application withdrawn (which never happened). Moreover, the facts concerning the executed power of attorney are disputed since Protostorm did furnish ATS&K with the requested executed form (Faulisi Decl., ¶ 22, 40). Defendants also argue that their representation of plaintiffs with respect to the filing and prosecution of the patent was not one representation but a series of four separate representations so that any malpractice committed in connection with the drafting of the various patent applications was somehow separate and apart from the filings with the U.S. Patent Office and separate from the professional duties required in patent prosecution. This "slice the salami" approach would according to defendants excuse them from any professional responsibility to monitor and complete the prosecution process in the U.S. Patent Office ("PTO"), a conclusion rebutted by the terms of the written retainer agreement and the fact that defendants at no time withdrew from their representation of plaintiffs. No witness for any of the defendants actually endorses this wild hypothesis.

Nor do defendants' motions address their affirmative acts to conceal their malpractice. The limited permitted discovery incident to these motions reveals that none of the defendants seem to remember anything about this entire affair, and are thus unable to contradict, among other things, plaintiffs' evidence regarding defendants' affirmative representations to Protostorm on December 12, 2001, in which defendants expressly represented to Protostorm that everything was fine with the patent filing; that a U.S. and international application had been

filed, and that everything was in good order.  For years, in reliance on these assurances (and advice from defendant Hogue that it would likely be 3-4 years before anything happened in the PTO), Protostorm continued to devote time and effort to marketing its invention believing the patent application was in good order.  Protostorm reasonably relied on these representations, unaware until shortly before filing the complaint of the extent of the malpractice and the cover-up engaged in by defendants.  Not until defendant ATS&K finally sent plaintiffs a January 25, 2008 letter containing information showing defendants' error in not designating the United States was the malpractice revealed.  Protostorm promptly filed suit only 39 days later.  Any statute of limitations defense under the facts of this case has been tolled as a matter of law and fact by the doctrines of continuous representation and equitable estoppel.

Consistent with their ostrich like defense, ATS&K's jurisdictional arguments fail to address the many contacts with New York which demonstrate that defendants ATS&K and Bailey, like defendant Hogue, are subject to jurisdiction in New York for the acts of malpractice they committed in representing their New York client.  Nor is the juridical existence of Protostorm as a Delaware LLC subject to question.

<u>FACTS</u>

In April 2000, plaintiffs retained defendant ATS&K to represent them in preparing, filing and then prosecuting one or more patent applications for a series of valuable inventions (collectively, the "Invention").  Defendant Hogue was then "Of Counsel" to ATS&K, and defendant Bailey was the ATS&K attorney principally responsible for carrying out these professional duties.  The Invention, concerning, inter alia, a method of targeting advertising to email communications, was created by plaintiff Faulisi and his co-inventor, the rights to which were thereafter assigned by the Inventors to Protostorm (Faulisi Decl., ¶ 22).

Plaintiffs retained defendants as specialized patent counsel because they held themselves out as expert in that field; because of the requirement that an attorney be a member of a specialized patent bar to prosecute patent applications; and because of the technical nature, specialized rules and particular docketing requirements of patent prosecution (Faulisi Decl. ¶ 11; Genova Decl. ¶ 9).

On June 27, 2000 defendants ATS&K and Bailey filed with the PTO a provisional application (No. 60/214,552), disclosing the Invention.  Under applicable patent law, to obtain the benefit of the priority date of the provisional application, the parties had one year from the filing of the provisional application to file a non-provisional application setting forth, inter alia, the specific subject matter in the Invention disclosed in the provisional application that was claimed to be patentable (Faulisi Decl., ¶ 10, 11).

In connection with the work already undertaken and to be undertaken by ATS&K and Hogue, plaintiffs entered a written retainer agreement dated May 17, 2001, prepared by Hogue, which agreement confirmed that Hogue would continue to work with ATS&K to jointly represent plaintiffs to secure protection for the Invention and complete the prosecution of the patent application for the Invention already filed by ATS&K (Faulisi Decl., ¶¶ 13, 14, Plaintiffs' Exhibit ("Pl. Exh.") 30).

On June 20, 2001, Hogue completed the non-provisional application for filing in the PTO and forwarded it (with a copy to plaintiffs) to defendants ATS&K and Bailey for filing on or before the June 27, 2001 deadline (Pl. Exh. 48).  Rather than simply file the non-provisional application in the United States, the country of principal interest to Protostorm for protecting the Invention, on June 25, 2001, defendants filed an international application for the Invention, Application No. PCT/USO1/20173, pursuant to the PCT with the PTO as the

receiving office for said application ("the PCT Application").  The PCT Application designated more than 100 PCT member countries in which plaintiffs might wish to obtain patent protection for the Invention (Pl. Exh. 55).  Although defendants could have designated the United States, a member of the PCT,  simply by checking an appropriate box on the applicable form, the United States was one of only three countries defendants failed to designate, the others being Mongolia and Zimbabwe (Pl. Exh. 55 at AN00075).  Defendants' failure to designate the United States in the PCT Application was contrary to explicit instructions from the plaintiffs and was contrary to the known interests of plaintiffs who wanted to secure U.S. patent protection for the Invention (Pl. Exh. 52).

Immediately after failing to designate the United States in the PCT Application, defendants commenced steps to conceal their failure from plaintiffs.  On June 27, 2001, defendants wrote a letter to plaintiffs' New York corporate counsel advising of the June 25, 2001 filing, but failing to disclose that the United States had not been designated in said application. The defendants' letter indicated only that a copy of the PCT Application as filed was enclosed (Pl. Exh. 59).  In fact, the page of the PCT Application containing the form for designating the countries in which patent protection could be sought was not included in the copy of the PCT Application transmitted by defendants with the June 27, 2001 letter (Pl. Exh. 59, missing p.3).

Despite failing to designate the United States in the filed PCT Application, defendants had an additional three months, to September 27, 2001, to correct their error.  Shortly before this suit was filed, defendants' contended they had specifically docketed the date to fix the problem, and indeed their docketing system shows they had docketed August 27, 2001 as the date to "verify designations" (Pl. Exh. 5).  However, in this litigation, defendants contend to the contrary they were unaware of the error until November 2007 (Pl. Exh. 85).  Defendants

5

nevertheless failed to advise plaintiffs of this deadline and compounded their concealment by failing to correct the error by the September 27, 2001 deadline (Faulisi Decl., ¶ 21).

Further concealing of their error, on August 21, 2001, defendants sent an email to an outside corporate attorney for plaintiffs, advising that ATS&K had received a routine "invitation to correct defects" (dated July 23, 2001 and received by ATS&K by July 25, 2001), in connection with the filing of the PCT Application. Although defendants requested in that August 21, 2001 email that plaintiffs' corporate counsel provide a power of attorney, the email did not disclose why the power of attorney was needed; did not disclose why defendants did not previously prepare and have plaintiffs execute a power of attorney with the filing of the PCT Application back on June 25, 2001 and did not disclose any deadline by which the undisclosed error of failing to designate the United States needed to be corrected (Pl. Exh. 65).

The August 21, 2001 email did state that the power of attorney was due 2 days later, by August 23, 2001, but that defendants could obtain an extension of time until September 23, 2001. Defendants obtained the extension, but made no further filing with the PTO to preserve the plaintiffs' right or ability to obtain patent protection in the United States (Pl. Exh. 8). In fact, plaintiffs sent a power of attorney to defendants in August 2001 (Faulisi Decl., ¶30). Nevertheless, defendants failed to file the power of attorney, failed to seek any further extensions of time to file a power of attorney after September 23, 2001 and did not take any steps to remedy their previous failure to designate the United States by the September 27, 2001 deadline (Pl. Exh. 8). Plaintiffs were never advised of this deadline by defendants.

Not only did defendants fail to timely alert plaintiffs of the September 27 deadline, they purport to have sent to plaintiffs and their New York corporate counsel a letter on October 1, 2001, after the deadline for correcting the failure to designate the United States had

6

already passed, warning of a possible <u>future</u> abandonment and thus giving the impression that the PCT Application was still fully viable.  Defendants' October 1, 2001 letter, which plaintiffs dispute having received, failed to disclose that defendants had failed to designate the United States in the PCT Application; that defendants had not timely sought to remedy their error and that consequently all rights to pursue patent protection in the United States based upon the June 27, 200 provisional application had already been abandoned (see ATS&K Exh. 17).  Defendants have failed to respond to plaintiff's discovery requests seeking metadata confirming when the letter actually was created (Moskin Decl. ¶ 9).  Shortly before October 1, 2001, ATS&K's staff was instructed to take no further action on the PCT Application (Pl. Exh. 64).

As a result of defendants' malpractice, plaintiffs' U.S. patent application fell abandoned and all U.S. patent rights based upon the June 27, 2000 provisional application were lost.  At no point did defendants inform plaintiffs that their patent rights had been lost (Faulisi Decl., ¶ 32).

Defendants specifically misled plaintiffs in December 2001 that the filing was OK.  In response to plaintiffs' inquiry as to why they were unable to locate the patent application in the PTO, on December 12, 2001, defendants expressly represented to plaintiffs that the PCT Application had been filed; that the filing was OK; that it was both a U.S. and international application; that some things needed to be done, but that defendants would take care of them (Pl. Exh. 13 at 12/12/01, Pl. Exh. 89, 84:8-20).  By such representations, defendants continued to conceal from plaintiffs the true status of the PCT Application and the material fact that defendants had failed to designate the United States.  This advice was knowingly or recklessly false, and plaintiffs relied upon it to their detriment.

As a result of the foregoing advice, and defendants' prior assurances it would likely take up to four years for the application to "meander" through the PTO, plaintiffs had no reason to believe there were any problems with the PCT Application or that defendants had committed any malpractice with respect to such application which threatened a loss of patent protection. Until shortly before commencing suit, plaintiffs still believed the PCT Application remained pending Defendants further misled plaintiffs as to the true status of the PCT Application by continuing, until June 2003, to send plaintiffs routine status reports concerning a trademark application (also relating to the Invention) filed by ATS&K in May, 2001, shortly before filing the PCT Application (Pl. Exh. 74; Faulisi Decl., ¶ 43).

The failure to inform plaintiffs of the true status of the PCT Application was, moreover, contrary to the express provision of the parties' May 17, 2001 retainer agreement that counsel "will apprise you regularly of progress on any matter that I am instructed to undertake" and the undertaking in the June 27, 2001 letter to "keep you [plaintiffs] abreast of further developments in this application, as they occur" (Pl. Exh. 29). At no time after defendants' retention as counsel did any of defendants purport to terminate the retainer agreement or to withdraw as counsel with respect to the PCT Application (Faulisi Decl., ¶ 28).

Not only did defendants fail to perfect plaintiffs' United States patent application and conceal the same from plaintiffs, defendants also failed to pursue patent protection in any of the foreign countries designated in the PCT Application and failed to take steps to file a new United States patent application concerning the Invention, which could have been done up to a year following publication of the PCT Application in 2002 (Genova Decl., ¶ 20).

Despite defendants' written assurance they would regularly keep plaintiffs apprised of the status of the PCT application, it was not until plaintiff Faulisi discovered a third

8

party promoting a product that he believed infringed on his Invention that he had reason to inquire as to the status of his patent application (Faulisi Decl., ¶ 45). Such third-party use has demonstrated, moreover, that the Invention has enormous commercial value, of many millions of dollars (Faulisi Decl., ¶ 45).

Following discovery of the potential infringement, plaintiff Faulisi repeatedly contacted ATS&K to learn the status of the patent application but received no satisfactory response (Faulisi Decl., ¶¶ 45-48). It was not until shortly before the commencement of this action, at the request of counsel for plaintiffs investigating the matter, that ATS&K provided copies of the WIPO filings that established and proved defendants' failure to designate the United States (Faulisi Decl. ¶ 50; Moskin Decl. ¶ 6).

<u>JURISDICTIONAL FACTS</u>

Defendant Hogue has not moved to dismiss on jurisdictional grounds, thereby conceding jurisdiction is proper. Notably absent from Hogue's or ATS&K's motions are any facts contradicting the point that they were working together in the joint representation of plaintiffs during the period Hogue was "of counsel" at ATS&K and after he formed his own practice. The following facts demonstrate that Hogue, ATS&K and Bailey were engaged in a joint representation of plaintiffs.

ATS&K's relevant contacts with New York began in April 2000 when Hogue, then "Of Counsel" to the firm, conducted a patentability search on the Invention, as reflected in the letter and invoice ATS&K sent to plaintiffs' counsel in New York (Pl. Exh. 15).

ATS&K's work to secure intellectual property rights to the Invention continued through the Spring of 2000 while preparing a provisional patent application. During the drafting, ATS&K had ongoing discussions with Shakespeare in New York, including contacting

Shakespeare by email and telephone call on or about June 20, 2000 (Pl. Exh. 18), and by faxing comments and revisions on the application to Shakespeare in New York (Pl. Exh. 17). Thereafter, ATS&K sent letters to plaintiffs' counsel in New York, reporting that the provisional application was filed with the PTO (Pl. Exh. 20) and reporting on its efforts to correct problems with the application and forwarding communications from the PTO (Pl. Exh. 22, 23).

ATS&K's work included obtaining trademark protection for components of the Invention.  During its work on this aspect of plaintiffs' intellectual property, ATS&K emailed plaintiffs in New York to counsel them on certain potential difficulties (Pl. Exh. 38), and, by letters to plaintiffs' New York counsel, reported on the trademark application's status (Pl. Exh. 26, 27, 28, 30, 63, 67, 73) and advised on its communications with the PTO regarding the trademark application (Pl. Exh. 74).

ATS&K faxed plaintiffs' New York counsel on May 14, 2001 as a reminder that the final date for filing a non-provisional application was approaching (Pl. Exh. 25).  Hogue and Protostorm entered into the retainer agreement which was signed on May 21, 2001 in New York by Protostorm (Pl. Exh. 29).  Work on the final patent application began the same day (Pl. Exh. 32).  The non-provisional, or "final" application claimed priority, from the provisional application to which ATS&K was already attorney of record and which ATS&K had been monitoring all year on its docketing system.  On behalf of ATS&K, Hogue had various contacts with Shakespeare in New York during this time as they worked together to draft the final application.  Hogue spoke with Shakespeare by telephone (Pl. Exh. 32, 33) and email, requesting that Shakespeare, in New York, collect data for the application (Pl. Exh. 32, 34, 36), asked Shakespeare to draft narrative portions of the application (Pl. Exh. 40, 43) and prepare and revise drawings and diagrams for the application (Pl. Exh. 39, 40, 42, 45, 47).  Via email to

10

Shakespeare in New York, Hogue requested that Shakespeare provide additional information for the application (Pl. Exh. 43).    Through telephone and email conversations, Hogue and Shakespeare with the assistance of Worthington made revisions to the application (Pl. Exh. 44, 45).   Hogue provided ongoing updates on the status of his work on the application (Pl. Exh. 34, 40, 42, 43, 47, 48, 51).   He gave legal advice, explaining his decisions with respect to the claims included in the application (Pl. Exh. 49) and advised on Protostorm's ability to file a second non-provisional application, if necessary (Pl. Exh. 46).

On behalf of ATS&K and in furtherance of their representation of plaintiffs, Hogue traveled to New York and met with plaintiffs in New York on June 4, 2001 to prepare the non-provisional patent application (Pl. Exh. 90, 69:21- 73:2; Faulisi Dec. ¶16).   After Hogue provided ATS&K with the final patent application, ATS&K emailed plaintiffs in New York on June 25, 2001 requesting that they sign an assignment form in New York (Pl. Exh. 57). Plaintiffs immediately complied, faxing the signed Assignment back to ATS&K on June 26 (Pl. Exh. 58).   On June 27, 2001, ATS&K sent a letter to plaintiffs' New York counsel advising that the final patent application had been filed and providing legal advice concerning the next steps in the application process and work to be performed by the patent office (Pl. Exh. 59).

Hogue again traveled to New York on July 16, 2001 to meet with plaintiffs regarding their intellectual property rights to the Invention (Faulisi Dec. ¶19; Pl. Exh. 13 at 7/16/01).

On December 12, 2001, Hogue and ATS&K together communicated with Protostorm in New York by telephone regarding the patent application's status -- falsely assuring plaintiffs that the application was properly filed (Faulisi Decl. ¶¶ 38, 39; Pl. Exh. 13 at 12/12/01).

Throughout this period, ATS&K and Hogue sent letters, invoices and emails into New York seeking payment for their services (Pl. Exh. 15, 21, 31, 35, 54, 68). With the exception of two disputed bills representing a small part of the overall charges, Protostorm, from New York, paid all amounts due (Faulisi Decl. ¶ 29).

ARGUMENT

POINT I

THIS COURT HAS JURISDICTION OVER DEFENDANTS ATS&K AND BAILEY

A.      There Is Diversity Jurisdiction And It Is Properly Pleaded

Defendant ATS&K and Bailey argue there is no diversity jurisdiction because plaintiff Faulisi's citizenship and the citizenship of the members of plaintiff Protostorm, a limited liability company, must be alleged.  To the extent any further allegations were appropriate, an amended complaint was served as of right on February 13, 2009 (see Pl. Exh. 1, ¶1).  The citizenship of all defendants is also alleged (Pl. Exh. 1, ¶¶3, 4 and 5).  There is complete diversity:  plaintiffs are citizens of Connecticut and New York; defendants are citizens of Virginia, North Carolina and South Carolina.

B.      Legal Standard On A Motion To Dismiss For Lack Of Personal Jurisdiction

In a federal diversity case, issues of personal jurisdiction are governed by the law of the state in which the district court sits. Cutco Indus. Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).  Thus, New York law governs the instant jurisdictional analysis.  Id.  To defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction where, as here, the parties have conducted jurisdictional discovery but there has been no evidentiary hearing, plaintiffs need only make a *prima facie* showing that the court has jurisdiction over the moving defendants.  Id.  The court must construe the pleadings and affidavits in the light most favorable to plaintiffs, Cutco,

12

806 F.2d at 365, and all "doubts are resolved in the plaintiff[s'] favor, notwithstanding a controverting presentation by the moving part[ies]." A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993).

Plaintiffs have properly submitted facts on this motion showing that this Court has jurisdiction over ATS&K and Bailey pursuant to New York's long arm statute, CPLR § 302 et seq. By contrast, ATS&K's motion does not address any of the facts showing the repeated and ongoing contacts with its New York client and fails to address the admission by Hogue, its co-counsel in the joint representation of plaintiffs, that jurisdiction is proper.

C.      Because ATS&K And Bailey Transacted Business In New York,
        They Are Subject To Jurisdiction Under CPLR § 302(a)(1)

New York's long-arm statute provides for jurisdiction over a non-domiciliary defendant "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR §302(a)(1). Where such acts were purposeful and there is a substantial relationship between the business transacted and plaintiff's claim, jurisdiction is proper. Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, cert. denied, 2006 US LEXIS 9475 (2006); Cavu Releasing, LLC v. Fries, 419 F.Supp.2d 388, 392 (S.D.N.Y. 2005). A non-domiciliary "transacts business in New York within the meaning of §302(a)(1) when it 'purposefully avails itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws.'" National Union Fire Insurance Co. of Pittsburgh, PA v. BP Amoco P.L.C., 319 F.Supp.2d 352, 358 (S.D.N.Y. 2004), quoting McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34 (1967).

13

1.    ATS&K And Bailey Transacted Business In New York By
       Reason Of Their Joint Representation With Hogue Of Protostorm

All three defendants jointly represented Protostorm for the common purpose of obtaining patent (and trademark) protection for the Invention in an arrangement akin to a partnership (Pl. Exh. 1, ¶11; Pl. Exh. 29; Faulisi Decl. ¶9, 25).  It is undisputed that Hogue, "of counsel" to ATS&K until December, 2000 (Pl. Exh. 90, 14:6), continued to work together with ATS&K to represent their client, Protostorm, after leaving the firm (Faulisi Decl., ¶ 13; Pl. Exh. 89, 35:6-22, 152:21- 153:7, 203:7-10).   Hogue never fully explained to plaintiffs how his association with ATS&K had changed (Faulisi Decl., ¶13, Pl. Exh. 89, 190:7-20, 203:7-10; Pl. Exh. 90, 134:11-18), and they continued their coordinated conduct on behalf of Protostorm including December 12, 2001, when they jointly misled Protostorm as to the status of the patent application.

      a.    Hogue Concedes That His New York Contacts
       Invoke This Court's Jurisdiction

Hogue does not and cannot challenge that his contacts with New York sustain personal jurisdiction over him, and thereby, over ATS&K and Bailey.  Hogue's relevant contacts with New York began in the Spring of 2000, while he was "of counsel" to ATS&K and was hired by plaintiffs to protect their intellectual property in the Invention beginning with a patentability search (Faulisi Dec. ¶8; Pl. Exh. 15).  Hogue's representation continued through the following Spring, when he suggested that plaintiffs obtain trademark protection for key terms in the Invention (Faulisi Dec. ¶9; Pl. Exh. 13 at 6/4/01) and when he began work on the final patent application (Faulisi Dec. ¶¶13, 14; Pl. Exh. 24).  As part of the joint representation, both the trademark and patent applications were filed by ATS&K.  Hogue traveled to New York twice, on June 4, 2001 and July 16, 2001, to meet with Faulisi and Shakespeare to review the Invention

14

and discuss the patent process (Faulisi Dec. ¶¶ 16, 19; Pl. Exh. 90, 69:21- 73:2).   These meetings, alone, sustain jurisdiction.  New York's long-arm statute is a "single act statute" so that "proof of one transaction in New York is sufficient to invoke jurisdiction . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim."  Kreutter v. McFadden Oil Co., Inc., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195,  198-99 (1988).

Hogue had other significant contacts with New York.  He mainly conducted his attorney-client relationship with plaintiffs through telephone calls, emails and letters projected into New York.  Specifically, he entered into a written retainer with plaintiffs, who were in New York (Pl. Exh. 29) and emailed Shakespeare and plaintiffs' corporate counsel in New York regarding his retainer (Pl. Exh. 34).  Hogue spoke with Shakespeare by telephone (Pl. Exh. 32, 33) and email, requesting that Shakespeare, in New York, collect data to be included in the application (Pl. Exh. 32, 34, 36).  Hogue divided up the work to be done on the application between himself and Shakespeare.  He had Shakespeare collect "the documentation of the system architecture . . . by the developers" (Pl. Exh. 34), draft narrative portions of the application (Pl. Exh. 40, 43) and prepare and revise the drawings (Pl. Exh. 39, 40, 42, 45, 47).  Via email, Hogue also made requests for additional information (Pl. Exh. 43) gave updates on his work on the application (Pl. Exh. 34, 40, 42, 43, 47, 48, 49) communicated with Shakespeare about their ongoing drafting and revising of the application (Pl. Exh. 40, 42, 43, 47, 51) and gave legal advice (Pl. Exh. 49).

The June and July, 2001 meetings in New York with plaintiffs, the work done by Shakespeare in New York at Hogue's request, and Hogue's ongoing communications with

Shakespeare throughout their preparation of the application were all coordinated with ATS&K's patent and trademark filings and all sustain this Court's jurisdiction.

      b.    Hogue's New York Contacts Are Attributable To ATS&K And Bailey

Apart from ATS&K's own client contacts with Protostorm as a result of their joint representation with Hogue, Hogue's New York contacts are attributable to ATS&K and Bailey. The law is clear that in a partnership, each general partner is the agent of every other general partner and of the partnership, <u>Friedson v. Lesnick</u>, 1992 U.S. Dist. LEXIS 2773, *5 (S.D.N.Y. 1992), and the jurisdictional contacts of one general partner are attributable to the others. <u>Id</u>.

This general principle of law has been extended to apply even where there is no formal partnership or agency arrangement -- none of which is necessary in order to attribute the jurisdictional contacts of one individual to another as an "agent" for purposes of CPLR 302(a)(1)). <u>Kreutter</u>, 71 N.Y.2d at 467, 527 N.Y.S.2d at 199 (1988). In <u>Cutco</u>, the Second Circuit made clear that in analyzing jurisdictional contacts under New York's long arm statute, courts "[focus] on the realities of the relationship in question rather than the formalities of agency law." 806 F.2d at 366 (no formal agency or partnership arrangement needed to attribute one business associate's jurisdictional contacts with New York to another business associate).

Here, Hogue, ATS&K and Bailey jointly represented Protostorm, acting together for a single purpose to protect Protostorm's intellectual property (Pl. Exh. 1, ¶11; Pl. Exh. 29). Thus, it was through Hogue, when he was "of counsel" to ATS&K, that ATS&K was first hired in April 2000 to represent plaintiffs. When Hogue signed a May 17, 2001 retainer agreement to represent plaintiffs he specifically referenced ATS&K as the attorneys who would work with him to attend to the filing and thus undertook to oversee ATS&K's work (Pl. Exh. 29). Hogue

advised ATS&K as early as May of 2001 that he would be working with them in this matter (Pl. Exh. 90, 101:12-102:5). Numerous emails, phone calls and Hogue's 6/4/01 and 7/16/01 visits to Protostorm's New York offices then followed and Hogue advised plaintiffs that after ATS&K filed the patent application, plaintiffs would hear from ATS&K except where there were corrections, as to which he (Hogue) would be involved (Pl. Exh. 89, 201:4-15).

The reality of this combined effort is that it was a common enterprise, akin to a partnership or joint venture, in which the contacts of joint venturers and members of unincorporated associations are attributable to other participants in a joint endeavor. Hogue's contacts with New York are thus as a matter of law attributable to ATS&K and Bailey. Cutco, 806 F.2d at 366; see generally Stephens v. American Risk Management, 1993 U.S. Dist. LEXIS 1786 (S.D.N.Y. 1993).[1]

While Hogue concedes he is amenable to suit here, ATS&K denies jurisdiction based on a post hoc contrived theory (not supported any testimony) which ignores the nature and purpose of their retention as counsel, and instead argues that the single professional attorney-client relationship with plaintiffs should be construed as four separate and unrelated professional retainers. This theory is at odds with the terms of the parties' written retainer agreement, the record facts, and common sense. A patent law firm retained for the purpose of securing patent protection for a client undertakes more than serving in a clerical filing capacity. ATS&K's own website describes its function and practice as being one of "guid[ing] you through the patent process from the initial patentability study through the grant of patent rights and its enforcement"

---

[1] Even if defendants now deny that they participated in a joint endeavor, this Court must accept plaintiffs' allegations as true and read them in the light most favorable to plaintiffs, who need only make a *prima facie* showing that because of their joint representation of Protostorm, Hogue was effectively an agent of ATS&K and Bailey. Cavu Releasing, LLC v. Fries, 419 F.Supp.2d 388 (S.D.N.Y. 2005) (attributing the jurisdictional contacts of one individual to another despite their vigorous denial of the existence of a joint venture or agency relationship and denying a motion to dismiss for lack of personal jurisdiction where plaintiff adequately alleged the existence of an agency relationship).

(Pl. Exh.12).  Moreover, ATS&K has admitted in discovery that the final patent application was a continuation of the representation on the previously filed provisional patent application (Pl. Exh. 91, 96:13- 97:20)

Plaintiffs' papers before this Court properly put forward substantial jurisdictional facts, thereby satisfying their burden.  Because Hogue, ATS&K and Bailey jointly represented Protostorm for the common purpose of obtaining an issued patent (Pl. Exh. 1, ¶ 11; Pl. Exh. 29; Faulisi Decl. ¶¶ 8-9), all of Hogue's aforementioned contacts with New York are attributable to ATS&K and Bailey and sustain this Court's jurisdiction over them.

2.    ATS&K And Bailey Admit Contacts With New York
         Which Subject Them To This Court's Jurisdiction

Both ATS&K and Bailey had sufficient contacts with New York to sustain jurisdiction under CPLR §302(a)(1).  As New York courts have acknowledged time and time again, the realities of modern communication make physical presence in the State unnecessary to be subject to jurisdiction under §302 as "one can be engaged in extensive purposeful activity here without actually setting foot in the State."  Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337 (1970).

In their moving papers, ATS&K and Bailey admit jurisdictional contacts with New York showing a continuing attorney-client relationship in New York.  Among other things, ATS&K admits that its contacts with New York include "[r]eporting on the status at the USPTO by letter," "transmitt[ing] copies of bills, the IA (International Patent Application) and filings" and mailing "letters to Protostorm's New York counsel and the Co-Inventors" (ATS&K brief, p. 11).  In addition to these admitted contacts, legal work was performed for plaintiffs in New York at ATS&K's request and for its benefit, including preparation of the Assignment (Pl. Exh. 57,

18

58), and ATS&K sent into New York various other communications concerning the application which was the subject of its representation (Pl. Exh. 25, 59).

   ATS&K and Bailey had additional relevant contacts with New York regarding the Invention.  Among other things, ATS&K and Bailey prepared and filed a provisional patent application for the Invention, which was essentially a preliminary step prior to filing the final patent application (Pl. Exh. 19, 21).  ATS&K and Bailey communicated with Shakespeare in New York by telephone, fax and email in preparing and revising the provisional application (Pl. Exh. 17, 18); reported on its status to New York (Pl. Exh. 20, 23); and kept plaintiffs apprised of their actions to correct problems with the application (Pl. Exh. 22, 23).  Via email and letter, ATS&K advised plaintiffs on potential difficulties regarding trademark protection for components of the Invention (Pl. Exh. 38); and, by letters to plaintiffs' New York counsel, reported on the trademark application's status (Pl. Exh. 26, 27, 28, 30, 63, 67, 73) and advised on its communications with the PTO regarding the trademark application (Pl. Exh. 74).

   All of ATS&K and Bailey's New York contacts with respect to their work on the Invention, including the provisional and final patent applications and trademark application, must be evaluated in the instant jurisdictional analysis.  New York law contradicts defendants' position that this one attorney-client relationship should now be treated as four relationships for jurisdictional purposes in order to avoid the consequences of their malpractice.  ATS&K's and Bailey's post-hoc fiction, to avoid this Court's jurisdiction, has no basis and is contradicted by testimony of ATS&K's 30(b)(6) witness, who admitted that ATS&K's work on  the final patent was merely a continuation from the provisional application (Pl. Exh. 91, 96:13- 97:20).

   All of ATS&K and Bailey's purposeful contacts with New York are relevant to the instant jurisdictional analysis as <u>all</u> meet the "substantial relationship" test.  See <u>McGowan v.</u>

19

Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643 (1981); Cavu Releasing, LLC v. Fries, 419 F.Supp.2d 388, 392 (S.D.N.Y. 2005).   There is indeed a substantial relationship between plaintiffs' claims of malpractice against ATS&K and Bailey, and ATS&K and Bailey's ongoing representation of Protostorm with respect to its intellectual property, which included work on the trademark applications and the provisional and final patent applications.   All of ATS&K's and Bailey's contacts with New York arising out of the representation of Protostorm with respect to these intellectual property matters must to be considered in a jurisdictional analysis.

Since defendants' detailed contacts with New York "form the basis of this action and, indeed, plaintiff[s'] claims for legal [malpractice] are directly dependent upon them," they are substantially related to plaintiffs' claims for §302(a)(1) purposes and sustain jurisdiction over defendants ATS&K and Bailey.   Fishbarg v. Doucet, 9 N.Y.3d 375, 385, 849 N.Y.S.2d 501 (2007).

These contacts constitute the transaction of business under CPLR §302(a)(1) and sustain this Court's jurisdiction.   The New York Court of Appeals has held that jurisdictional contacts by non-domiciliaries during the course of an ongoing attorney-client relationship, similar to those of ATS&K and Bailey here, sustain jurisdiction.   In Fishbarg, a case factually analogous to the instant matter, the telephone calls, emails and faxes between a New York attorney and California clients established the "transaction of business" in New York, even though the California clients never entered New York.   As detailed above, ATS&K and Bailey engaged in this type of communication; they conducted their attorney-client relationship with Protostorm primarily through telephone calls, emails and faxes.   Fishbarg explains that contacts such as these, arising out of an ongoing attorney-client relationship, are the type and quality of contacts that sustain jurisdiction under § 302(a)(1).   9 N.Y.3d at 380-81, 880 N.E.2d 501.

Defendants' reliance on <u>Mayes v. Leipziger</u>, 674 F.2d 178 (2d Cir. 1982), as the principal support for their position that they did not transact business in New York, is misplaced. Where the federal court's jurisdiction is based on diversity, the federal court must determine whether New York's highest court would exercise jurisdiction in these circumstances. <u>Id</u>. at 185. Here, the New York Court of Appeals has specifically spoken on this issue in its opinion in <u>Fishbarg</u>, decided twenty five years after <u>Mayes</u>.  <u>Fishbarg</u> is the controlling precedent and warrants finding jurisdiction over defendants ATS&K and Bailey.

D.    Defendants ATS&K And Bailey's Tort Outside New York Caused Injury Within
      <u>New York And Therefore Jurisdiction Is Proper Under 302(a)(3)(ii)</u>

New York's long-arm statute also provides jurisdiction over a non-domiciliary "who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . if he expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce" CPLR §302(a)(3)(ii).  Generally, in determining where the injury occurred, a court will apply "a situs-of injury test, which asks [the court] to locate 'the original event which caused the injury.'"  <u>Bank Brussels Lambert v. Fiddler</u>, 171 F.3d 779, 791 (2d Cir. 1999), quoting <u>Hermann v. Sharon Hosp., Inc.</u>, 135 A.D.2d 682, 683, 522 N.Y.S.2d 581 (2d Dep't 1987).

1.    <u>The Appropriate Test Shows That The Situs Of Plaintiffs' Injury Is New York</u>

A modified test applies in cases such as here where the tort committed outside New York involves misrepresentations made by defendants.  In such cases, the court will look to the location of the "original reliance or other first event causing the injury in New York." <u>Bank Brussels Lambert v. Fiddler</u>, 171 F.3d at 792.  It is well settled that "the law of this Circuit is that plaintiff's reliance in New York on defendants' misrepresentations fixes the situs of the injury in New York."  <u>Palace Exploration Co. v. Petroleum Development Company</u>, 41 F.Supp.2d 427,

435 (S.D.N.Y. 1998); Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 900 (2d Cir. 1980) (holding that misrepresentations made in California which were relied upon by plaintiffs in New York in their decision to purchase plants from defendants, caused injury in New York).

Plaintiffs relied on defendants' misrepresentations that they were obtaining patent protection for the Plaintiffs' Invention; that their patent application had been filed according to plaintiffs' instructions (Faulisi Decl. ¶¶ 38, 39; Pl. Exh. 13 at 12/12/01; Pl. Exh. 38).  Relying on these misrepresentations, plaintiffs took no further steps to seek patent protection (Faulisi Dec. ¶41).  Plaintiffs did not question defendants' purported expertise or their representations that the filing was in good order (Faulisi Dec. ¶41).  Plaintiffs' reliance was in New York and its direct result was the loss of plaintiffs' patent rights to the Invention.  Thus, under the appropriate test, the situs of plaintiffs' injury was New York.  Hargrave, 636 F.2d at 900.  In the words of Judge Nickerson, in Hargrave, "the alleged false representations injured plaintiff in no other state than New York" and "the only state in which plaintiffs had 'property' which could sustain injury was New York."  Id. at 900.

2.    ATS&K And Bailey Derive Substantial Revenue From Their
      National And International Practice And Should Have Expected
      Their Acts To Have Consequences In New York

The "Interstate Commerce" and "Substantial Revenue" requirements of CPLR 302(a)(3)(ii) are satisfied at bar.  ATS&K admits to engaging in extensive business activities on an interstate and international level (Pl. Exh. 91, 54:3-21).  In fact, ATS&K actively solicits business from new clients by touting its national and international practice.  ATS&K's website proclaims that it has "a far-reaching network of international contacts", and boasts that the firm has "a diverse client base of national and international companies" (Pl. Exh. 12).  ATS&K's website flatly contradicts its self-serving characterization in its moving papers of an isolated,

local Virginia law firm.   The firm's financial documents further prove the national and international scope of its practice (Pl. Exh. 9, 10, 11).  In 2001, ATS&K represented clients from 29 states and 20 countries (Pl. Exh. 9).  Less than 1.3% of its work in 2001 came from Virginia (Pl. Exh. 9), the only state in which ATS&K apparently argues it should be subject to jurisdiction.[2]  In the case cited by defendants Ingraham v. Carroll, "[t]he substantial interstate commerce revenue component . . . [is] a 'bigness requirement' designed to assure that the defendant is 'economically big enough' to defend suit in New York."  90 N.Y.2d 592, 599, 665 N.Y.S.2d 10, 13 (1997).  Defendants' website and financial documents certainly show "bigness" sufficient to satisfy this element of CPLR §302(a)(3)(ii).

In Ingraham, relied upon by defendants, the court declined to find that a Vermont doctor, who treated all of his patients in Vermont, some of whom who had traveled from out of state, had engaged in interstate commerce.  Id. at 599-60, 665 N.Y.S.2d at 13-14.  The court focused on two critical facts:  (1) that the patients traveled to Vermont for treatment, and that (2) the patients were unsolicited by the doctor.  Id.  Clearly, such facts are not present here. Plaintiffs never traveled to Virginia for ATS&K and Bailey's legal services.[3]  Second, unlike Ingraham, ATS&K and Bailey actively solicit national and international clients (Pl. Exh. 12). Ingraham thus does not support the conclusion at bar that ATS&K and Bailey have not engaged in interstate or international commerce.

In 2001, defendants had $3,429,336.33 in national revenues and $5,921,069.92 in international revenues.  Such revenues satisfy § 302(a)(3)(ii) (Pl. Exh. 1, ¶ 8).  To determine

---

[2] As a practical matter, to accept ATS&K and Bailey's argument that the firm is a local business not subject to personal jurisdiction in the states (and countries) where the firm's clients are located, would force the vast majority of their clients to travel across the country (or world) for redress of ATS&K and Bailey's malpractice, effectively insulating them from any malpractice liability.

[3] Based on ATS&K and Bailey's characterization of their practice as mere middlemen in the filing of patent applications with the USPTO, we presume that the vast majority of ATS&K and Bailey's national and international clients never traveled to Virginia during the course of their representation.

whether revenue is "substantial," a court may analyze defendants revenues from interstate and international commerce "on relative and absolute scales . . . [either] as a percentage of total revenues or as an absolute number." Palace Exploration Co., 41 F.Supp at 436. In 2001 ATS&K derived only $44,155.44 in local revenue from Virginia clients, but $9,306,250.81 from its national and international clients (Pl. Exh. 9); this number is substantial under either a "relative" or "absolute" test.

Finally, ATS&K and Bailey should have expected that their malpractice would have consequences in New York State (Pl. Exh. 1, ¶ 8). They had an ongoing attorney-client relationship in New York with a New York client concerning patent protection for an Invention developed in New York. Indeed, defendants could not have expected their actions to have consequences anywhere but New York. See Hargrave, 636 F.2d at 900; Palace Exploration Co., 41 F.Supp at 436. Jurisdiction under §302(a)(3)(ii) is clearly proper.

E.      Jurisdiction At Bar Comports With Requirements Of Due Process

Requiring defendants to defend this suit in New York accords with due process as defendants purposefully availed themselves of New York clientele by engaging in a continuing attorney-client relationship with plaintiffs in New York. This suit arises out of defendants' contacts here. As the Court of Appeals found in Fishbarg, under circumstances indistinguishable from the instant case, "[r]equiring them to defend the present suit properly comports with traditional notions of fair play and substantial justice." 9 N.Y.3d at 385, 880 N.E.2d 501.

POINT II

PLAINTIFFS' MALPRACTICE CLAIM IS TIMELY

A.      The Strict Standards For Summary Judgment

Defendants' statute of limitations defense requires the resolution of disputed facts. The grant of summary judgment is a "[d]rastic remedy that cuts off the right to have one's day in court." Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir. 1985).   The legal standard for summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show . . . that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986).   "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." SEC v. Tandem Mgmt., Inc., 2001 WL 1488218, *7 (S.D.N.Y. 2001) (quoting SEC v. Todt, 2000 WL 223836 (S.D.N.Y. 2000), aff'd, 2001 WL 345151 (2d Cir. 2001)).   When a court determines a motion for summary judgment it "must resolve all ambiguities and draw all reasonable inferences against the moving party." Sykes v. Apfel, 1998 WL 338104, *1 (S.D.N.Y. 1998).   Moreover, it is the burden of the moving party to demonstrate the absence of any material factual issue in dispute.  Id. at *2. Properly applying these standards, defendants' motions for summary judgment should be denied.

While the retainer agreement prepared by Hogue provides that California law governs (Pl. Exh. 29), plaintiffs' malpractice claims (and the appropriate statute of limitations period for plaintiffs' claims against ATS&K and Bailey) are governed by New York law.  New York's choice of law rules apply to this diversity action. Klaxon Co. v. Stentor Elec. Mfg. Co.,

25

Inc., 313 U.S. 487, 61 S.Ct. 1020 (1941).  According to New York law, this Court ought to apply "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."  Babcock v. Jackson, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 748 (1963).  At bar, New York's interests far outweigh Virginia's or California's interests.  This was a New York attorney-client relationship between a law firm whose practice is national and international, involving a New York client and two New York inventors, including meetings in New York, significant amounts of work done in New York on behalf of and at the request of defendants and repeated and ongoing contacts with New York.  Plaintiffs, never once set foot in Virginia or California.  New York has a strong interest in protecting its citizens against wrongdoing by out of state attorneys and in regulating attorneys who project themselves into New York by meetings, emails, letters and phone calls to represent New York clients.  Thus, New York law governs plaintiffs' malpractice claim and the statute of limitations analysis.  Even if Virginia or California law were to apply, the result is the same.

B.       Defendants' Continuing Attorney-Client Relationship
         With Plaintiffs Tolled The Statute Of Limitations

Defendants argue that plaintiffs' malpractice claims are barred by the New York, California or Virginia statute of limitations.  Yet, the law of each of these states tolls the statute of limitations where, as here, there was a continuing attorney-client relationship.  The facts show that defendants ATS&K, Bailey and Hogue never terminated their attorney-client relationship with Protostorm.  As explained more fully below, ATS&K and Bailey, to this day, remain counsel of record with the PTO in connection with the PCT application.  They never attempted to comply with Patent Office Rule 10.40 for withdrawal as counsel of record – precisely because doing so would have alerted Protostorm there was a problem with the application, contrary to

their representations on December 12, 2001 that there was a U.S. and international filing and the filing was OK (Pl. Exh. 13 at 12/12/01).  Nor did they ever alert plaintiffs they were terminating the relationship.[4]

Similarly, Hogue never terminated his attorney-client relationship with plaintiffs and never attempted to comply with the requirements of his own retainer letter, which required written notice to withdraw as counsel (Faulisi Decl. ¶28; Pl. Exh. 29; Pl. Exh. 90, 58:8-12, 60:13-16; Pl. Exh.  89, 206:19-207:9).  To the contrary, defendants assured plaintiffs that the patent was pending review by the PTO, a process which defendants explained would take many years (Faulisi Dec. ¶¶38, 39, 41; Pl. Exh. 90, 73:13- 75:3; Pl. Exh. 13 at 12/12/01), thereby creating an expectation of further work.  Defendants owed continuing duties to plaintiffs, and plaintiffs relied, to their detriment, on reassurances that defendants were still attending to those duties.

Under the law of either New York, California or Virginia, the statute of limitations on plaintiffs' claim was tolled by defendants' continuous representation.  This action is timely.  The statute of limitations was tolled until January 25, 2008, when defendants first revealed the problems with the patent application by disclosing the page 3 form of the PCT application showing that the U.S. was not a designated country.  This action was commenced on March 4, 2008, only 39 days later.

---

[4]   The most ATS&K sought to do was to claim they were suspending work pending payment of a bill.  Protostorm disputes the letter was sent until June 2007.  Even after October 1, 2001, ATS&K represented to Protostorm that everything was fine in December 2001, thus undermining any suggestion that the October 1, 2001 letter ended the relationship.  ATS&K also continued work on Protostorm's trademark application and continued reporting the status to Protostorm, contradicting any suggestion it viewed the relationship as ended.

1.      The Statute Of Limitations Is Tolled Under New York Law

Defendants ATS&K and Bailey correctly contend that under New York law, the doctrine of continuous representation tolls a statue of limitations where "both attorney and client believe that additional work -- contemplated in the original retention -- still needs to be completed" (ATS&K brief p. 21). For this proposition, defendants cite Shumsky v. Eisenstein, a New York Court of Appeals decision applying the doctrine of continuous representation to deny a motion for summary judgment on statute of limitations grounds. 96 N.Y.2d 164, 726 N.Y.S.2d 365. Shumsky actually supports plaintiffs' position in the instant case.

In Shumsky, plaintiffs retained an attorney in 1993 to bring an action for breach of contract. Plaintiffs learned in 1997, after the applicable statute of limitations had run, that the attorney never commenced suit. The defendant attorney moved for summary judgment dismissing the malpractice action arguing that the malpractice claim was time barred. The court denied the motion, holding that even though the defendant attorney performed no work on their behalf, the statute of limitations had been tolled by the doctrine of continuous representation because "[p]laintiffs retained defendant for the sole purpose of pursing their specific contract claim" and, thereby, both parties "explicitly anticipate[d] continued representation." 96 N.Y.2d at 170, 726 N.Y.S.2d at 370.

Plaintiffs here retained ATS&K, Bailey and Hogue for a very specific purpose -- to obtain an issued patent (Pl. Exh. 29) and, just as in Shumsky, "plaintiffs were left with the reasonable impression that defendant[s] [were], in fact, actively addressing their legal needs." 96 N.Y.2d at 170, 726 N.Y.S.2d at 370. As the Court of Appeals in Shumsky made clear, it is the client's reliance on the attorney that triggers the tolling, regardless whether the attorney actually performs work during the tolled period. At bar, plaintiffs were relying on defendants, patent law

28

experts, to obtain patent protection for the Invention and trusted that defendants were advancing their legal interests. This continuing trust and confidence by a client in its attorneys is the very underpinning of the continuous representation doctrine. See Kanter v. Pieri, 11 A.D.3d 912, 913, 783 N.Y.S.2d 181, 182 (4th Dep't 2004). Because of this relationship of trust and confidence a client "realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." Shumsky, 96 N.Y.2d at 167, 726 N.Y.S.2d at 368. The Court of Appeals analysis in Shumsky requires the finding at bar that the statute of limitations was tolled by defendants' continuing representation.

Defendants ATS&K and Bailey never withdrew as plaintiffs' counsel and therefore never terminated the attorney-client relationship. ATS&K remained plaintiffs' attorney of record with the PTO and never sought to withdraw pursuant to the applicable Patent Office Rule 10.40, 37 C.F.R. 1040. At the commencement of this litigation, defendants ATS&K and Bailey remained plaintiffs' attorneys with the PTO and WIPO (Pl. Exh. 80).

Contrary to defendants' argument, an October 1, 2001 letter, which ATS&K alleges sending to plaintiffs but which plaintiffs deny receiving until June 2007, regarding a small amount of unpaid fees did not, and could not, have terminated the attorney-client relationship. A threat to stop work for unpaid bills is not the same as withdrawal as counsel from a representation in a public forum and final termination of the attorney-client relationship. An ATS&K partner admitted this important difference (Pl. Exh. 88, 68:7-10). Defendants' purported notice of withdrawal is insufficient under New York law which allows:

> no room for uncertainty on these matters, especially where, as here, attorneys deal with laypersons unversed in the nuances and intricacies of legal practice and expression; what may seem crystal clear to a lawyer may be utterly lost upon the client. If the attorney-client relationship has come to an end, that fact should be absolutely clear to all parties involved.

Gotay v. Breitbart, 2008 NY Slip Op 8432, *4, 866 N.Y.S.2d 638, 641 (1st Dep't 2008).   At

best such purported "notice of termination" is disputed[5] and precludes summary judgment.

Defendants' conduct after October 1, 2001 confirms that the attorney-client

relationship had not terminated but rather was continuing.   Defendants discussed the PCT

Application with plaintiffs in December 2001, months after the date of the October 1 letter,

falsely representing to plaintiffs that the application included the U.S. and was "OK" and spoke

of ongoing procedural matters (Faulisi Dec. ¶¶38, 39, 41; Pl. Exh. 13 at 12/12/01), thereby

negating any possibility of termination of the relationship.   Defendants' own docketing sheets

also show that ATS&K continued to do some monitoring of the matter through November 1,

2002 (Pl. Exh. 8).[6]   ATS&K also continued contacts with Protostorm related to this matter until

June 2003, as it continued to send reminders to Protostorm regarding the status of the trademark

application the firm filed in connection with the Invention (Pl. Exh. 74).   The contrast between

the conscientious job ATS&K did alerting Protostorm of deadlines concerning the trademark and

its complete silence regarding the more important patent application is telling.

Defendants never gave the unambiguous notice of attorney withdrawal required

under New York law.   As explained in Gotay, "[a]n attorney is required to provide reasonable

notice to the client when withdrawing from representation . . . and no definition of reasonable

notice would require a client to infer, from ambiguous action or inaction on the part of her

attorneys . . . that she is no longer represented."   2008 NY Sip Op 8432 at *4, 866 N.Y.S.2d at

641.   Particularly where, as here, plaintiffs were informed that there would be years of inactivity

---

[5] As noted, defendants have not even complied with  plaintiffs' discovery requests for metadata showing when the
October 1, 2001 letter was created.
[6] Hence, printouts from the docket system (Pl. Exh. 7, 8) reveal that the records were modified on October 5 and
November 1, 2002, respectively.

by the PTO regarding the application, withdrawal must be unequivocal.  Gotay, 2008 NY Sip Op
8432, *4, 866 N.Y.S.2d at 642.  There was no such withdrawal.

        2.     The Statute Of Limitations Is Tolled Under Virginia Law

For the reasons discussed above, Plaintiffs contend that New York law is
controlling and tolls the statue of limitations.  However, the Virginia Supreme Court similarly
has held that "when malpractice is claimed to have occurred during the representation of a client
by an attorney with respect to a particular undertaking or transaction, the breach of contract or
duty occurs and the statute of limitations begins to run when the attorney's services rendered in
connection with that particular undertaking or transaction have terminated."  Keller v. Denny,
232 Va. 512, 518, 352 S.E.2d 327, 330 (1987).  Just as in New York, the underpinning of
Virginia's continuing representation rule is the understanding of the attorney-client relationship
as one of "special trust and confidence . . . which commands the highest fidelity to a most solemn
trust, for the lawyer is the expert and the client is utterly dependent upon his knowledge, his skill,
and his honor."  Id. at 505, 593 S.E.2d at 324.

The statute of limitations for a legal malpractice claim is tolled where, as here, the
attorney's retention requires the "continuing or recurring course of services over a period of
time," as distinguished from representation which consists of a single, isolated act.  Id. at 518-19,
352 S.E.2d at 331.  The statute of limitations will be tolled until completion of "the whole
undertaking for which defendants were retained to represent plaintiff.  Cassidy v. Day, 39 Va.
Cir. 272, 274 (Va. Cir. Ct. Fairfax Co. 1996).

Just as in Keller, the nature of the work for which ATS&K and Bailey were
retained inherently involved continuing duties; the physical filing of a patent application is just
an initial step in obtaining an issued patent, a process that PTO statistics shows, takes as many as

five years on average for cases such as this (Genova Decl. 12)  It is undisputed that defendants' own internal docketing system showed a continuing duty to monitor the status of the application with the PTO (Pl. Exh. 5, 8). It is also undisputed that ATS&K, to this day, continues to be listed as attorney of record with the PTO (Pl. Exh. 80).  Just as in <u>Keller</u>, these facts indicate defendants' duty to "give recurring attention to the matter" and keep plaintiffs "advised of potential advantages and pitfalls in the matter," facts which the Supreme Court has found compel finding that the attorney-client relationship is continuing, thereby tolling the statute of limitations on any claims for malpractice. <u>Keller</u>, 232 Va. at 519, 352 S.E.2d at 331.

Furthermore, as already shown, defendants never withdrew as plaintiffs' counsel. Virginia law holds that where, as here, there is continuing representation, it is not the date of the act of malpractice, but rather, "[t]he date the alleged negligent attorney's representation of the client terminate[d] [which] is the relevant date which commences the running of the statute of limitations." <u>Shipman v. Kruck</u>, 267 Va. 495, 506, 2004 Va. LEXIS 39, *16.  Thus, under Virginia law, this action has been timely commenced.

3.      The Statute Of Limitations Is Tolled Under California Law

As defendant Hogue concedes, California's "continuous representation tolling provision in §340.6 is substantially similar to the rule created by the New York courts" (Hogue Mem. at. 10).  In <u>Gurkewitz v. Haberman</u>, cited by Hogue, the California court adopts New York law on continuous representation and holds that under Cal. Code Civ. Proc. § 340(6)(a), continuous representation will be found where "unsettled matters" remain on the matter for which the attorney was retained. 137 Cal. App.3d 328, 333, 187 Cal.Rptr. 14, 17 (Ca. Ct. App.2d Dist. 1982).  The court further explained that the tolling will continue until "the attorney's duty to advise the [client] . . . ha[s] ceased." <u>Id</u>. at 333-334, 187 Cal.Rptr. at 18.  An attorney-client

32

relationship ends "when the client discharges the attorney or consents to a withdrawal . . . or upon completion of the tasks for which the client retained the attorney." Gonzalez v. Kalu, 140 Cal. App. 4th 21, 28, 43 Cal. Rptr. 3d 866, 870 (Ca. Ct. App. 4th Dist. 2006).

In the retainer agreement, Hogue pledged to "secur[e] protection for [plaintiffs'] inventions" (Pl. Exh. 29). According to Hogue's own testimony, securing protection for an invention means obtaining an issued patent (Pl. Exh. 90, 51:8- 52:16). Here, as in Gurkewitz, there were "unsettled matters" relating to Hogue's representation of plaintiffs in securing patent protection for the Invention, including responding to PTO office actions; possibly filing continuation, divisional or other applications; keeping the client apprised of developments; and similarly overseeing prosecution abroad, as he promised Faulisi he would do (Pl. Exh. 89, 201:4- 15). This is exactly the type of ongoing duty owed by an attorney to a client which calls for a tolling the statute of limitations. Gonzalez, 140 Cal. App. 4th at 28, 43 Cal. Rptr. 3d at 870 (denying summary judgment on statute of limitations grounds, despite years of no contact between attorney and client, where the client was told the case would "take very long," the attorney never informed the client that he was withdrawing from her representation, and the client never told the attorney not to proceed).

Hogue cites only two cases in which a California court refused to toll the statute of limitations on grounds of continuous representation, both of which are distinguishable. Shapero v. Fliegel, 191 Cal.App.3d 842, 848, 236 Cal.Rptr. 696, 699-700 (Ca. Ct. App. 2d Dist. 1987), refused to find continuous representation where the facts conclusively showed that the client was aware that the attorney-client relationship had terminated. There, the attorney expressly terminated the relationship and the client sought other legal representation. Similarly, Village Nurseries, L.P. v. Greenbaum, 101 Cal.App.4th 26, 45, 123 Cal.Rptr.2d 555, 568 (Ca.

Ct. App. 4th Dist. 2002), refused to find continuous representation where the defendant attorneys had been substituted out as counsel and the evidence that the attorney-client relationship had ended was uncontradicted.

Unlike Shapero and Village Nurseries, there is no uncontradicted evidence of Hogue's alleged termination of his attorney-client relationship with plaintiffs and there is certainly no evidence that plaintiffs had any understanding of such termination. Rather, as shown above, the evidence proves that the attorney-client relationship was continuing -- Hogue agreed in his retainer to "secur[e] protection for your inventions" and never rescinded or otherwise modified that agreement. Nor did Hogue ever comply with the procedure for written withdrawal set forth in his retainer agreement (Pl. Exh. 29; Pl. Exh. 90, 58:8-12). By the terms of the retainer agreement, Hogue could not have terminated it in June 2001, years before a patent could have ever issued. Furthermore, Hogue admitted at his deposition that his retainer was not for a single, isolated task, but gave plaintiffs the opportunity to request additional services of him, beyond preparation of the patent application (Pl. Exh. 90, 207:17-208:2).

As the court explained in Gurkewitz, where there is continuous representation, it tolls both  the one year and four year statutes of limitations provided for in Cal. Code Civ. Proc. §340(6)(a).  137 Cal. App.3d at 336, 187 Cal. Rptr. at 20.  Thus, regardless of when Hogue committed the malpractice, or when plaintiffs purportedly learned of it, the limitations period under California law has been tolled and plaintiffs' claims against Hogue in this action are timely.

Under New York, Virginia or California law the statute of limitations thus has been tolled by defendants continuing representation of plaintiffs. At a minimum, triable issues of fact preclude summary judgment.

34

C.   Defendants Actively Concealed Their Malpractice And Therefore The
     Doctrine Of Equitable Estoppel Bars Their Statute Of Limitations Defense

After defendants made the defective filing with the PTO, they lulled plaintiffs into

believing that the application process was moving along and concealed their errors.  Defendants

June 27, 2001, letter to plaintiffs' New York corporate counsel advised that the PCT application

had been filed, but failed to disclose that the United States was not designated (Pl. Exh. 59).

Suspiciously, a copy of the PCT application forwarded by defendants on June 27 was missing the

page indicating in which countries patent protection was being sought (compare Pl. Exh. 59 with

Pl. Exh. 55), thereby concealing defendants' error from plaintiffs.  It was not until January 2008,

after repeated requests that ATS&K finally disclosed this page to plaintiffs (Moskin Decl.¶5; Pl.

Exh. 79).

Further concealing of their error, on August 21, 2001, defendants wrote to

plaintiffs' outside corporate attorney, advising that ATS&K had received a routine "invitation to

correct defects" for the application in late July and asking that plaintiffs provide a power of

attorney (Pl. Exh. 65).  This letter continued the concealment by failing to disclose the error of

not designating the United States and by failing to disclose the deadline by which their error in

failing to designate the United States needed to be corrected  (Pl. Exh. 65).

Even after the September 27, 2001 deadline had passed, defendants continued to

conceal errors.  Although plaintiffs did not receive this letter until June 2007, defendants contend

that on October 1, 2001, they sent to plaintiffs and their New York corporate counsel a letter

requesting execution of a power attorney (ATS&K Exh. 17).  Even if sent as alleged, the letter

was a further cover-up by defendants of their errors.  It failed to explain why the power of

attorney was needed, failed to disclose that the deadline to designate the United States had

already passed, failed to disclose that they had not sought a further extension of time to file a

power of attorney, and failed to disclose that all rights to pursue patent protection in the United States based on the June 27, 2000 provisional application had already been lost (ATS&K Exh. 17).[7]

Months later, on December 12, 2001 in response to concerned inquiries from plaintiffs on the status of the application, defendants advised plaintiffs that the PCT Application was filed, assured plaintiffs that the filing was OK, that the application sought protection in the United States and that some "procedural" things needed to be done but that defendants would take care of them (Faulisi Dec. ¶¶38, 39; Pl. Exh. 13 at 12/12/01; Pl. Exh. 89, 84:1-20). Plaintiffs were told that the application was pending review by the patent office (Faulisi Dec. ¶¶38, 39, 41; Pl. Exh. 13 at 12/12/01), a process which plaintiffs had been told by defendants would take many years (Faulisi Dec. ¶ 41; Pl. Exh. 90., 73:13- 75:3; Pl. Exh. 92, 107:7- 108:1).

Defendants' assurances led plaintiffs to believe that their patent rights were pending and secure, and that there was nothing left to be done barring further news from counsel (Faulisi Dec. ¶41). Confident in the pending patent rights, plaintiffs sought out additional investors and continued to develop a market for the Invention (Faulisi Dec. ¶ 41). Even after plaintiffs becoming suspicious of a problem, defendants refused for months to answer plaintiffs phone calls and then concealed their error from plaintiffs' counsel. It was not until January 2008 that defendants finally revealed that all patent rights to the Invention had been lost because of their failure to designate the United States in the PCT Application (Faulisi Dec. ¶¶45-50; Moskin Decl. ¶6).

Just as defendants concealed their errors from plaintiffs, they show the same propensity in failing to address these facts with the Court. Defendants Hogue, ATS&K and

---

[7]    Tellingly, ATS&K also refused in response to Protostorm's specific and repeated requests in discovery to produce any metadata confirming when the October 1, 2001 letter was created (Moskin Decl. ¶9).

Bailey, who covered up their malpractice for years, should not now be permitted to assert a statute of limitation defense and benefit from that cover-up, and  New York, Virginia and California law so holds.

       1.     New York's Equitable Estoppel Law
                Bars The Statute Of Limitations Defense

Given defendants' acts of concealment, New York law prohibits defendants from asserting a limitations defense. The courts of New York "have long had the power, both at law and equity, to bar the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing . . . which produced the long delay  between the accrual of the cause of action and the institution of the legal proceeding." General Stencils Inc. v. Chiappa, 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340 (1966).  Furthermore, it is well-settled in New York that "[w]hether or not the equitable estoppel doctrine precludes dismissal on the grounds of limitations is a triable issue" not appropriately decided on summary judgment. Id. 272 N.Y.S.2d at 340; Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 2005 U.S. Dist. LEXIS 5484, *24 (S.D.N.Y. 2005), adhered to on reconsideration, 2005 U.S. Dist. LEXIS 12983 (S.D.N.Y. 2005).

New York law strictly prohibits a lawyer from using a statute of limitations defense to defeat a malpractice claim where his "cover-up" of the malpractice caused the plaintiff's delay in commencing the action.  Under New York law, even if the defendant attorney took no affirmative steps to cover up his malpractice, a court can bar a statute of limitations defense on equitable estoppel grounds. Bank Brussels, 2005 U.S. Dist. LEXIS 5484, *11.

As pleaded in the Amended Complaint and detailed above, defendants ATS&K, Bailey and Hogue took affirmative steps far more pervasive than in Bank Brussels to cover-up their malpractice.  Specifically, defendants sent plaintiffs a copy of the patent application without

the one page that showed that the United States had not been designated (Pl. Exh. 59). Defendants then falsely assured plaintiffs that the application had been properly filed (Faulisi Dec. ¶¶ 38, 39; Pl. Exh. 13 at 12/12/01) and was awaiting review by the patent office (Faulisi Dec. ¶¶ 41; Pl. Exh. 13 at 12/12/01), a process which defendants themselves indicated, takes many years (Faulisi Dec. ¶ 41; Pl. Exh. 90., 73:13- 75:3; Pl. Exh. 92, 107:7- 108:1). Furthermore, by failing to inform plaintiffs that the filing was defective and that the patent rights for the Invention had been lost, defendants "concealed material facts which [they] had a duty to reveal," a fact which weighs heavily in favor of barring a statute of limitations defense. Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan, 2008 U.S. Dist. LEXIS 47613, *12-13 (S.D.N.Y. 2008), modified on other grounds, 2008 U.S. Dist. LEXIS 54783 (S.D.N.Y. 2008). Defendants' actions also cost plaintiffs the ability to file a new U.S. application or obtain patent protection abroad.  Based on the foregoing, defendants should be barred by equitable estoppel from benefiting from the delay they created.[8]

Finally, despite ATS&K's refusal to answer squarely plaintiffs many inquiries in 2006 and 2007, plaintiffs brought this action in a reasonable time after confirming the malpractice and that they had lost all rights to the Invention.  Plaintiffs commenced suit on March 4, 2008, less than two months after uncovering defendants' malpractice by ATS&K's January 25, 2008 letter (Pl. Exh. 79).  This delay is reasonable, considering the relevant statute of limitations for a malpractice claim is three years in New York and three or five years in Virgina. See Simmons v. Carnival Cruise Lines, 2003 U.S. Dist. LEXIS 19034, *8-10 (J. Garaufis) (looking to the statute of limitations period to determine whether plaintiff brought his action

---

[8]  Even while concealing the needless abandonment of plaintiffs' patent rights, defendants continued to report to plaintiffs on the status of the trademark proceedings, thus furthering the false impression that the patent was still awaiting review by the PTO.

"within a reasonable time after the facts giving rise to the estoppel have ceased to be operational").

          2.      Virginia's Equitable Estoppel Law
                  Bars The Statute Of Limitations Defense

For the reasons discussed above, Plaintiffs contend that New York law is controlling and the statute of limitations is tolled. Under Virginia law the result should be the same. Under Virginia law, the essential elements of equitable estoppel applied to toll a statute of limitations, are: a representation, reliance, a change of position and detriment. Barry v. Donnelly, 781 F.2d 1040, 1042-43 (4th Cir. 1986). It applies to bar a statute of limitations defense "where the aggrieved party reasonably relied on the words and conduct of the person to be estopped in allowing the limitations period to expire." Id. at 1042.

To their detriment, plaintiffs relied on defendants' expertise as patent attorneys and, specifically, defendants' representations on December 12, 2001 that the application was properly filed that the application had been properly filed (Faulisi Dec. ¶¶ 38, 39; Pl. Exh. 13 at 12/12/01) and was awaiting review by the patent office (Faulisi Dec. ¶¶ 41; Pl. Exh. 13 at 12/12/01). Plaintiffs believed they did not need to do anything further with respect to prosecution of the patent until further notice from the lawyers (Faulisi Dec. ¶41). These facts support finding equitable estoppel under Virginia law, where "[a]s applied to the statute of limitations, the central premise [of equitable estoppel] is that one cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." Barry, 781 F.2d at 1042.

Defendants ATS&K and Bailey do not even address the substance of the December 12, 2001 calls much less the many months in 2006 and 2007 when they refused to

respond to plaintiffs' inquiries.  Nor do they cite any authority as to why this Court ought not apply equitable estoppel here. In Lockney v. Vroom, 61 Va. Cir. 359, 2003 Va. Cir. LEXIS 263 (Va. Cir. Ct. Norfolk 2003), the only case defendants cite on Virginia's law of equitable estoppel in the context of legal malpractice, the court refused to toll the statute of limitations upon its finding that plaintiff made no allegations that the defendant law firm took any steps to conceal its malpractice.  61 Va. Cir. at 366.  As defendants highlight in their moving papers, Lockney is distinguishable because there "[t]he record fail[ed] to reflect that the firm did anything after the relationship terminated to conceal its malpractice." Id.  At bar, plaintiffs Faulisi and Protostorm, however, have clearly alleged defendants' acts of concealment, and have provided extensive factual support for these allegations.

Finally, at a minimum, plaintiffs' allegations raise genuine issues of material fact regarding defendants' actions concealing their malpractice, making summary judgment inappropriate. Barry, 782 F.2d at 1043 (denying defendant's motion for summary judgment on statute of limitations grounds where there were factual issues regarding whether the limitations period was tolled by Virginia's equitable estoppel doctrine).

> 3.    Under California Law, The Statute Of Limitations
>        Has Been Tolled And/Or Hogue Is Estopped From Asserting
>        A Statute Of Limitations Defense

Hogue's concealment of his malpractice similarly tolls the California statute of limitations.  California statutory law expressly provides that the statute of limitations for a legal malpractice claim is tolled while "[t]he attorney willfully conceals the facts constituting the wrongful act or omission when such facts are known to the attorney." Cal. Code Civ. Pro. § 340.6(a)(3). Not only did Hogue participate in the false representations in the December 12, 2001 phone calls with plaintiffs, he had expressly assured Protostorm that he would keep it appraised of all developments, a duty he completely abandoned.  He had also advised plaintiffs it

40

would be 3-4 years for the application to meander its way through the PTO (a conservative estimate), but now incredibly (if not dishonestly) contends that he is aware of no application taking more than 2 years despite PTO records that most of the cases he has handled for clients in the past ten years required 4-5 years (Pl. Exh. 90, 73:13-75:3;  Genova Decl.¶ 12; Moskin Decl. ¶7).  Such facts are the exact circumstances contemplated by § 340.6(a)(3).

        In addition to § 340.6(a)(3), general principles of equitable estoppel under California law similarly bar Hogue from now asserting a statute of limitations defense.  It is well settled that equitable estoppel is "a remedial judicial doctrine employed to insure fairness, prevent injustice, and do equity.  It stems from the venerable judicial prerogative to redress unfairness." Leasequip, Inc. v. Dapeer, 103 Cal. App. 4th 394, 403, 126 Cal.Rptr.2d 782, 789 (Ca. Ct. App. 2d Dist. 2002), pet. review denied, 2003 Cal. LEXIS 250 (2003).  To establish an equitable estoppel under California law, "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." Id. at 403-04, 126 Cal. Rptr 2d at 789.

        Retained for his expertise in patent law and for the very purpose of advising plaintiffs on the protection of their intellectual property and obtaining an issued patent for the Invention (Pl. Exh. 29; Pl. Exh. 90, 51:8- 52:16),   Hogue and ATS&K misrepresented to plaintiffs the true status of the patent application (Faulisi Dec. ¶¶37, 38; Pl. Exh. 13 at 12/12/01) leading directly to plaintiffs' loss of all patent rights.  On nearly identical facts in Leasequip, the court equitably estopped an attorney from asserting a statute of limitations defense.  The court there explained that the attorney "rendered legal advice; [he] intended this advise to be relied

41

upon or [the client] had a right to believe [he] intended the advice to be relied upon; [the client] was ignorant of the true facts as it was unaware of the legal ramifications of the failure to file the appropriate documents; and [the client] relied on [his] advise as its attorney to its detriment." Id. at 404, 126 Cal. Rptr 2d at 790.  Leasequip made clear that an attorney "cannot claim that the statute of limitations expired when reliance on his advice led to the statute's expiration.  To hold otherwise … would permit [the attorney] to hide behind his own erroneously rendered legal advice." Id. at 405, 126 Cal. Rptr 2d at 790.

Thus, under California law, Hogue's statute of limitations defense was either tolled under § 340.6(a)(3) or the defense is altogether barred by California's general principles of equitable estoppel.  At a minimum, triable issues of fact make summary judgment inappropriate.

## POINT III

### DEFENDANTS DID NOT REQUIRE A PCT POWER OF ATTORNEY

To excuse its malpractice, and its failure to correct its own errors and to continue prosecution of Protostorm's patent application, ATS&K contends that it lacked authority to act on behalf of Protostorm because it did not have a form of Power of Attorney executed by its client.  Based simply on plaintiffs' sworn statement that a power of attorney was indeed sent to ATS&K, summary judgement is inappropriate.  Laying aside that Protostorm did provide a signed POA form when it was asked to do so, and indeed that it did so twice (Faulisi Decl. ¶¶ 30, 40; Pl. Exh. 89, 87:9-88:17), ATS&K's argument conflates an administrative procedural requirement, which A TS&K conc edes was curable and without which ATS&K could have proceeded with the PCT application (Genova Decl. ¶18) and with a substantive duty as counsel. ATS&K's argument chooses to ignore that the contemporaneous business records before the Court indicate ATS&K ceased working for Protostorm, not because it lacked authority to do so,

42

but because it claims it was owed a small sum of money.[9]  Moreover, if ATS&K's interpretation of the patent office rules were correct, then it was guilty of malpractice in the very first instance when, on June 25, 2001, it filed a PCT application for Protostorm without even requesting a POA form from plaintiffs.  By its own account, ATS&K did not first seek a POA until August 21, 2001, almost two months after filing the PCT application (Pl. Exh. 65), and a full month after the PTO alerted it to the omission.  Nor  did it ever seek further extensions to file a POA, as it could have done (even retroactively) (Genova Decl. ¶ 19).

In citing PCT rules that, as of 2001, required submission of a PCT power of attorney form, ATS&K cites no precedent for the proposition that a patent application was deemed abandoned for failure to file a power of attorney or where any other adverse consequence was deemed to follow from the failure to file.  Any such result would, indeed, be contrary to general policy of the PTO and the courts that no forfeiture results from such procedural errors.  See Seiko Epson Corp. v. Nu-Kote Int'l, Inc., 190 F.3d 1360, 1367 (Fed. Cir. 1999) ("The courts have consistently rejected the notion of per se forfeiture based on non-fraudulent failure to comply with a rule of practice before the PTO.")  Just so, PCT Rule 90.4(c), cited by ATS&K as to the effects of a failure to file, reveals no substantive adverse consequences.  To the contrary, the only result is that "the power of attorney shall be considered non-existent unless the defect is corrected."  Although there is a warning on the form "Invitation to Correct Defects" that a failure to comply can lead to an application being deemed withdrawn, the form in fact refers to PCT Rule 26.5, which actually states that it is for the receiving office to make such a declaration.  Because no such declaration was issued here, ATS&K evidently concedes it unilaterally (and needlessly) elected to abandon its clients' rights.

---

[9] ATS&K's billing summary for this client for 2000-2001 shows that it was paid just over $5,300 by Protostorm and was owed $3,847 (Pl. Exh. 4).  In the end, it made essentially no effort to collect this sum, which Protostorm believes reflects ATS&K's guilty knowledge of its malpractice and hence its concern not to attract attention to itself.

43

This case reveals the complete lack of adverse consequences from the failure by ATS&K to file the power of attorney Protostorm signed. It was able to file the PCT application itself on June 25, 2001. It received an Invitation to Correct Defects dated July 23, 2001 (Pl. Exh. 65) and was able to respond thereto on August 20 by filing corrected drawings and a worldwide assignment of rights form signed by the applicants (Pl. Exh. 64). As part of the same filing, it requested an extension of time in which to file a power of attorney. If ATS&K felt the power of attorney was so important, it could have, but did not, file further formal requests to extend the time to file a power of attorney. (That it did not, no doubt reflects its recognition that it had fatally blundered by not designating the United States, and so determined to minimize its role in the case and thus seek to sweep the entire matter under the rug.) Nor did the lack of a power of attorney lead to any abandonment of the PCT application, which was never declared withdrawn by the PTO. On September 20, 2001 the PCT issued to counsel of record, ATS&K, its Declaration of Non-establishment of International Search Report (Pl. Exh. 69). On January 3, 2002, the application was published, and a notice of publication was sent to counsel of record, ATS&K (Pl. Exh. 72). The abandonment of the application only followed sometime after January 27, 2002 from ATS&K's failure to proceed to the national stage examinations (or to file a demand for international preliminary examination).

ATS&K does not dispute that as a matter of <u>fact</u> it had authority as counsel to act on behalf of Protostorm and in fact did take action on behalf of Protostorm. ATS&K filed a provisional application for Protostorm in the PTO on June 27, 2000 (Pl. Exh. 19) and filed a PCT application in the PTO Receiving Office on June 25, 2001 (Pl. Exh. 55)[10]. Under Patent Office Rule 1.34, 37 CFR 1.34, ATS&K became attorney of record. Rule 1.34 provides:

---

[10] Because the PCT application claimed priority from the provisional application, they should, as a matter of law, be deemed stages of one application (not two or three separate applications, as ATS&K contends). See <u>Harris v. Dobrusin</u>, 73 U.S.P.Q.2d 1537, 1539 (B.P.A.l. 2004).

Acting in a representative capacity.   When a patent practitioner acting in a representative capacity appears in person or signs a paper in practice before the United States Patent and Trademark Office in a patent case, his or her personal appearance or signature shall constitute a representation to the United States Patent and Trademark Office that under the provisions of this subchapter and the law, he or she is authorized to represent the particular party on whose behalf he or she acts. In filing such a paper, the patent practitioner must set forth his or her registration number, his or her name and signature. Further proof of authority to act in a representative capacity may be required.

Having appeared as attorney of record, ATS&K remained attorney of record and never sought to withdraw pursuant to the applicable Patent Office Rule 10.40, 37 C.F.R. 1040, which states:

Withdrawal from employment: (a) A practitioner shall not withdraw from employment in a proceeding before the Office without permission from the Office (see Sec. Sec. 1.36 and 2.19 of this subchapter). In any event, a practitioner shall not withdraw from employment until the practitioner has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to his or her client, allowing time for employment of another practitioner, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules. A practitioner who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned.

It is, thus, undisputed that ATS&K not only appeared as counsel of record for Protostorm by filing the provisional application and the PCT application but that ATS&K never even attempted to withdraw.  Rather than attempt to satisfy the rule for withdrawal or take steps to avoid foreseeable prejudice to Protostorm (which only would have called attention to its own failure to designate the US or timely correct its error), ATS&K simply abandoned work on the matter.  Even assuming its October 1, 2001 letter (ATS&K Exh. 17) threatening to stop work was actually mailed (which Protostorm disputes) ATS&K does not even contend that the letter satisfies Rule 10.40.  Although Hogue was not counsel of record in the PTO, he similarly admits he simply abandoned his duty to supervise, as promised in his retainer letter, and indeed takes the

45

position in moving to dismiss that he thoroughly washed his hands of the matter after June 20, 2001 (Hogue Aff., ¶3).

POINT IV

HOGUE'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED

Plaintiffs' claims for malpractice are properly before this court and not subject to arbitration.  Hogue did inject into his retainer agreement a California choice of law and California arbitration provision (Pl. Exh. 29); However, he did so unfairly (and perhaps unethically) without any advice to plaintiffs that they should seek guidance from outside counsel regarding its potentially harsh implications, without any explanation of the rights the clients were surrendering and despite a complete lack of connection between the parties, their attorney-client relationship, and California.  Nonetheless, California law does not require plaintiffs to arbitrate their malpractice claims.

A.      There Is No Agreement To Arbitrate Legal Malpractice Claims

The threshold issue is whether an agreement to arbitrate the claim actually exists. Lawrence v. Walzer & Gabrielson, 207 Cal.App.3d 1501, 1506, 256 Cal.Rptr. 6, 6-7 (Ca. Ct. App. 2d Dist. 1989), pet. review denied, 1989 Cal. LEXIS 4710 (1989).  Here, plaintiffs never agreed to arbitrate malpractice claims.  The mere placing of an arbitration clause in a retainer agreement does not necessarily require arbitration of malpractice claims.  Id.  Such self-serving conduct by an attorney must be "closely scrutinized with the utmost strictness for any unfairness." Hawk v. The State Bar of California, 45 Cal.3d 589, 599, 247 Cal. Rptr. 599, 604 (1988).

Where, as here, the retainer primarily addresses attorneys fees and other financial matters, an arbitration clause governs fees disputes, not malpractice claims.  In Lawrence, the

46

court held that a retainer agreement providing that "[i]n the event of a dispute between us regarding fees, costs or any other aspect of our attorney-client relationship, the dispute shall be resolved by binding arbitration" did not govern a claim for legal malpractice. 207 Cal.App.3d at 1504. The court in Lawrence explained that since the retainer agreement dealt primarily with financial matters, regarding the payment of attorneys fees and costs, the arbitration clause therein governed only disputes arising out of those financial matters. Id. at 1506.

Similarly, the Hogue retainer agreement does not call for arbitration of legal malpractice claims (Pl. Exh. 29). The Hogue retainer agreement, like that in Lawrence, primarily addresses financial matters. Discussion of "billing policies," "fees," "billing rates" "disbursements and other charges," "retainer of $15,000," "invoices," "interest [rate of] ½% per month" and "third party expenses" constitutes nine of the twelve paragraphs of the retainer agreement (Pl. Exh. 29, ¶¶ 1, 3, 4, 5, 6, 7, 8, 10, 12). By its terms, only "dispute[s] arising out of" the retainer agreement, which is predominantly concerned with establishing the manner and rate at which Hogue will bill for his services, are subject to arbitration (Pl. Exh. 29). As in Lawrence, the scope of the arbitration clause in the Hogue retainer agreement is limited to fee disputes.

It is well settled that to compel arbitration of a legal malpractice claim, the arbitration clause must unambiguously call for arbitration of such claims. In Powers v. Dickson, Carlson & Campillo, 54 Cal.App.4th 1102, 63 Cal.Rptr.2d 261 (Ca. Ct. App. 2d Dist. 1997), the court held that a retainer agreement's arbitration clause governed claims for legal malpractice because it unambiguously included such claims -- the clause called for arbitration of "dispute[s] relating to attorney's fees" and "[a]ny other dispute (other than attorney's fees) between the parties hereto arising out of or relating to this contract or attorney's professional services." Id. at

47

1106-07, 63 Cal.Rptr.2d at 263.   Unlike the arbitration clause in <u>Powers</u>, Hogue's retainer agreement does not call for arbitration of claims arising out of "attorney's professional services" or contain comparable language indicating inclusion of malpractice claims.   At a minimum, the Hogue arbitration clause's scope is ambiguous and all ambiguities must be construed against Hogue as the agreement's drafter (Pl. Exh. 90, 53:11-54:4).   <u>Powers</u>, 54 Cal.App.4th at 1112, 63 Cal.Rptr.2d at 267; <u>Lawrence</u>, 207 Cal.App.3d at 1507, 256 Cal.Rptr. at 11.   This Court should therefore deny Hogue's motion to compel arbitration.

B.      It Is Inappropriate Under California Law To Compel Arbitration Of
        <u>Plaintiffs' Claims Which Are The Subject Of This Pending Action</u>

        Even if the arbitration clause in Hogue's retainer letter were to govern malpractice claims, which plaintiffs adamantly deny, California law strongly disfavors arbitration of this matter.   The arbitration agreement calls for the application of California law and is thereby governed by the California Arbitration Act (the "CAA").   See <u>Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University</u>, 489 U.S. 468, 470, 109 S.Ct. 1248, 1251 (1989).   Under the CAA, a court may deny a motion to compel arbitration where:

> "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue or law or fact."

Ca. Code Civ. Proc. §1281.2(c); <u>Best Interiors, Inc. v. Millie and Severson, Inc.</u>, 161 Cal.App.4th 1320, 1329-30, 75 Cal.Rptr.3d 1, 8-9 (Ca. Ct. App.2d Dist. 2008).   This case falls squarely within the circumstances contemplated by §1281.2(c) as ATS&K and Bailey, are not bound by the arbitration agreement.   The facts and law as alleged in the Amended Complaint against Hogue, ATS&K and Bailey are nearly identical as to each defendant (Pl. Exh. 1).

Additionally, plaintiffs allege that all defendants acted together in committing the malpractice (Pl. Exh. 1, ¶ 11).

California courts frequently deny motions to compel arbitration pursuant to §1281.9(2)(c) on facts similar to the instant case. The California Supreme Court in <u>Cronus Investments Inc. v. Concierge Services</u>, 35 Cal.4th 376, 383, 25 Cal.Rptr.3d 540, 545 (2005), found that the lower court properly denied a motion to compel arbitration pursuant to §1281.2(c) where only three out of the ten defendants were parties to the arbitration agreement. Similarly, <u>Best Interiors</u>, refused to compel arbitration where two out of four defendants were not parties to the arbitration agreement, holding that the action should be litigated in a single forum for purposes of judicial economy and that "[s]eparating the claims subject to arbitration from those that cannot be arbitrated could lead to inconsistent results." 161 Cal.App.4th at 1329-30, 75 Cal.Rptr.3d at 8.

A California court presented with this case would likely find it an inefficient and ineffective use of judicial resources to allow arbitration to go forward solely against Hogue and to separate the claims to be determined by this court from those subject to arbitration. The claims against all three defendants are nearly identical (Pl. Exh. 1) and adjudicating the claims in two separate forums could lead to conflicting rulings on the many common issues of law and fact. <u>See</u> <u>Best Interiors</u>, 161 Cal.App.4th at 1329-30, 75 Cal.Rptr. at 8. This Court should exercise its discretion under the CAA and deny Hogue's motion to compel arbitration.

CONCLUSION

For the reasons set forth herein, defendants' motions to dismiss and for summary

judgment should be denied in their entirety.

Dated: New York, New York
         February 27, 2009                    Respectfully submitted,

                                              MOUND COTTON WOLLAN
                                              & GREENGRASS

                                              By: _____
                                                  Arthur M. Handler
                                                  Robert S. Goodman
                                              One Battery Park Plaza
                                              New York, New York 10004
                                              Telephone: (212) 804-4200

                                                  -and-

                                              Jonathan E. Moskin
                                              WHITE & CASE LLP
                                              1155 Avenue of the Americas
                                              New York, New York 10036
                                              Telephone: (212) 819-8200

                                              Attorneys for Plaintiffs

50

CERTIFICATE OF SERVICE

I, Robert S. Goodman, certify that copies of the plaintiffs' memorandum in opposition to motions to dismiss and for summary judgment by all defendants were served on the attorneys for the defendants in this action at the addresses set forth below by electronic mail on February 27, 2009:

> Eugene H. Goldberg
> L'ABBATE, BALKAN, COLAVITA
> & CONTINI, L.L.P.
> Attorneys for Defendants
> Antonelli, Terry, Stout &
> Kraus, LLP and Frederick D. Bailey
> 101 Franklin Avenue, Suite 300
> Garden City, New York 11550
>
> Christine A. Williams
> DURRETTEBRADSHAW PLC
> Attorneys for Defendant
> Dale Hogue
> Main Street Centre, 20th Floor
> Richmond, Virginia 23219

Dated:   New York, New York
         February 27, 2009


                                   _____
                                         Robert S. Goodman