UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X
PROTOSTORM, LLC and PETER FAULISI,

               Plaintiffs,                                    **MEMORANDUM & ORDER**

        -against-                                        **08-CV-931 (NGG) (JO)**

ANTONELLI, TERRY, STOUT & KRAUS, LLP,
DALE HOGUE, FREDERICK D. BAILEY,
CARL I. BRUNDIDGE, and ALAN SCHIAVELLI,

               Defendants/Third-Party Plaintiffs,

        -against-

KATHY WORTHINGTON,

               Third-Party Defendant/Cross-Claimant,

        -against-

DUVAL & STACHENFELD LLP and JOHN J. GINLEY, III,

               Third-Party Defendants/Cross-Defendants.[1]
--------------------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Despite the voluminous record, this is a relatively simple case. Plaintiff Peter Faulisi

("Faulisi") along with non-party Courtland Shakespeare ("Shakespeare") wanted to market and

patent an invention they believed would be very valuable through their company

Protostorm.com, LLC ("Protostorm").[2] They enlisted the help of several lawyers—the

Defendants and Third-Party Defendants. As a result of some combination of negligence and

---

[1] Plaintiffs' claims against Dale Hogue are currently stayed pending arbitration. (Docket Entry # 205.) Hogue, as a third-party plaintiff, also brought claims against Duval & Stachenfeld LLP and John J. Ginley, III. (Am. 3d Party Compl. (Docket Entry # 135).) However, those claims were dismissed by stipulation. (Docket Entry # 208.) Therefore, this memorandum and order does not address any of the claims by or against Hogue.

[2] Protostorm.com, LLC changed its name to Protostorm, LLC. (Pls.' Local Rule 56.1 Statement (Docket Entry # 309) ¶ 3.)

miscommunication the patent application was abandoned. Plaintiffs, invoking the court's

diversity jurisdiction, bring claims for legal malpractice and breach of fiduciary duty against

Antonelli, Terry, Stout & Kraus, LLP ("ATS&K"), Frederick D. Bailey ("Bailey"), Carl I.

Brundidge ("Brundidge"), and Alan Schiavelli ("Schiavelli") (collectively, "Defendants"). (See

2d Am. Compl. (Docket Entry # 114).)[3] Defendants, in turn, as Third-Party Plaintiffs, bring

claims for indemnification and contribution against Third-Party Defendants Kathy Worthington

("Worthington"), Duval & Stachenfeld LLP ("D&S"), and John J. Ginley, III ("Ginley"). (See

Am. 3d Party Compl. (Docket Entry # 133).) Worthington cross-claims against D&S and

Ginley, also bringing claims for indemnification and contribution. (See 2d Am. 3d Party Answer

& Cross-Cl. (Docket Entry # 226).) Every party has moved for summary judgment under

Federal Rule of Civil Procedure 56. (Docket Entry ## 277, 281, 296, 313.) For the reasons

stated below, those motions are granted in part and denied in part.

## I.      SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the

court may not "make credibility determinations or weigh the evidence," but instead "must draw

all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 149, 150 (2000). "Summary judgment is inappropriate when the

admissible materials in the record make it arguable that the claim has merit." Kaytor v. Elec.

---

[3] Plaintiffs originally claimed breach of contract as well. (2d Am. Compl. ¶ 59.) However, they make no
argument in support of that claim in their briefs, and do not refer to it in their cross-motion for summary
judgment. (See Pl. Mem. (Docket Entry # 308); Pl. Reply (Docket Entry # 319); Pl. Cross-Mot. (Docket
Entry # 313).) The claim is therefore deemed abandoned and is dismissed. See Hardy v. City of New
York, 732 F. Supp. 2d 112, 125 (E.D.N.Y. 2010).

Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (internal quotation marks omitted).  The burden of showing the absence of any genuine dispute as to a material fact rests on the movant.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight."  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

The party opposing summary judgment is not entitled to rely on unsworn allegations in the pleading, but must instead "show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion."  Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001).  Even where a statement is sworn, a genuine issue of material fact is not "created merely by the presentation of assertions that are conclusory."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).

## II.    BACKGROUND[4]

### A.    The Initial Retainers

Protostorm is a limited liability company with offices in New York.  (See Faulisi Decl.
(Docket Entry # 304) ¶ 2.)  Faulisi, who lives in New York, co-founded the company with his
co-inventor, Shakespeare, and continues to be a member of the company.  (Id. ¶¶ 1, 3; Pls.' Local
Rule 56.1 Statement ("Pl. 56.1") (Docket Entry # 309) ¶¶ 3, 4.)  The other current member is
non-party Alan Rummelsburg ("Rummelsburg"), who was Protostorm's main investor at the
time of the events in question.  (Pl. 56.1 ¶ 5; Rummelsburg Dep. (D&S Ex. I) at 12-13.)[5]  Faulisi,
Shakespeare, and Rummelsburg will be referred to as Protostorm's "principals."  In February
2000, the principals asked D&S, Protostorm's corporate counsel, to oversee Protostorm's
interactions with other attorneys, in particular billing and correspondence.  (Faulisi Decl. ¶ 15;
Faulisi Dep. (D&S Ex. F) at 262; Duval Dep. (D&S Ex. H) at 22.)

When the principals informed D&S that they wanted to obtain a patent for an online
computer game and related software (the "Invention"), D&S advised them to obtain patent
counsel.  (Duval Dep. at 99; Faulisi Decl. ¶¶ 6-11.)  Ginley, a lawyer at D&S, introduced them to
Worthington, who was not a patent lawyer, but who was knowledgeable about intellectual
property matters, and whom the principals then retained to advise them in connection with
obtaining the desired patent.  (Faulisi Decl. ¶ 16; Worthington Dep. (Def. Ex. 14)[6] at 4-5, 234-
35, 240; Ginley Dep. at 14.)  According to Rummelsburg, Protostorm hired Worthington "to help
write the patent application."  (Rummelsburg Dep. (D&S Ex. I) at 31.)  Worthington submitted

---

[4] Because the court does not rely on the declaration submitted by Defendants' counsel, Plaintiffs' motion
to strike it (Docket Entry # 313) is moot.

[5] D&S's exhibits can be found at Docket Entry ## 284-85.

[6] Many of Plaintiffs' and Defendants' exhibits were not filed on the Electronic Case Filing system.

her invoices for Protostorm-related work to D&S, which paid her. (Worthington Dep. (D&S Resp. Ex. 35) at 382, 395-96.)[7]

In May 2000, Worthington introduced the principals to ATS&K, a Virginia-based law firm that specialized in patent work, and Dale Hogue ("Hogue"), who was of counsel to ATS&K. (Faulisi Decl. ¶ 17; Pl. 56.1 ¶¶ 7, 16-17.) According to Faulisi, "[n]o specific limits on the professional roles of ATS&K or Mr. Hogue were discussed, and it was and is my understanding these attorneys were eager to assist Protostorm with respect to any and all appropriate forms of intellectual property protection." (Faulisi Decl. ¶ 18.) Faulisi further states that, "[a]lthough we continued to work with Ms. Worthington during this period, we understood that, because of the specialized nature of patent law, we would be relying primarily on Mr. Hogue and his firm, ATS&K, to prepare and file any patent applications and to oversee the process to completion." (Id. ¶ 19.)

## B. The Provisional Patent Applications

On June 19, 2000, Worthington emailed documents relating to the preparation of a provisional, non-final patent application to Brundidge, an attorney and member of ATS&K. (Pl. 56.1 ¶¶ 11, 20.) On June 27, 2000, Bailey, an ATS&K associate, signed the first provisional patent application, dated that day, and submitted it to the United States Patent and Trademark Office ("PTO"). (Id. ¶¶ 22-23.) Faulisi and Courtland were listed as the "inventors" on the first provisional application and ATSK was listed as the contact for "correspondence." (Pl. Prior Ex. 3.)[8] The provisional application permitted Faulisi and Shakespeare to disclose key elements of

---

[7] The exhibits D&S filed in response to Worthington's submissions can be found at Docket Entry # 289. Also, different parties refer to different portions of Worthington's deposition, as is the case with other depositions referred to herein. Where that is the case, each citation to the deposition will also contain a citation to the corresponding party submission.

[8] "Pl. Prior Ex." refers to exhibits currently incorporated into Defendants' Exhibit 16.

the Invention and thereby to secure their priority as inventors; it also permitted them to take an additional year to submit a final application. (Faulisi Decl. ¶ 20.) Brundidge and Bailey informed Ginley and Worthington that the provisional application had been filed and that the final application was due by June 27, 2001. (Pl. 56.1 ¶¶ 24-25.)

In February 2001, an attorney at D&S "review[ed]" Protostorm's "patent application." (See Billing Record (D&S Ex. J) at DS00148.)

In or about April 2001, Worthington filed a second provisional patent application, in order to cover new features of the Invention. (Worthington Dep. (Def. Ex. 14) at 271-72; Pl. 56.1 ¶ 28.) Faulisi and Courtland were again listed as the "inventors," and Worthington was listed as the contact. (Protostorm Prior Ex. 35.)[9]

### C. The Final Patent Application

On May 8, 2001, Worthington wrote to Shakespeare, Faulisi, and Ginley to advise them that the final patent application was due on June 27, 2001, and that, if they missed that deadline, they would lose their June 27, 2000 priority date (established by the filing of the first provisional application). (Pl. 56.1 ¶¶ 29, 30.) On May 14, 2001, Bailey from ATS&K contacted Ginley to remind him of the same thing, and asked that Ginley advise him as soon as possible as to whether the principals wanted to proceed. (Id. ¶ 26.)

On May 17, 2001, Protostorm entered into a written retainer with Hogue—the only written retainer in the record—for Hogue's services in "securing patent protection." (Pl. Ex. 21 at 1.) The retainer specified, among other terms, that

> [t]he patent application may be physically filed by the Antonelli, Terry, Stout & Kraus firm in Arlington, VA., the firm that filed your provisional patent application. . . . [Hogue] will perform the work necessary to prepare and file the

<hr/>

[9] "Protostorm Prior Ex." refers to exhibits currently incorporated into Defendants' Exhibit 17.

application. Antonelli will render a separate bill for the cost of filing fess [sic]
and its representation.

(Id. at 2.) According to Faulisi, the retainer "simply reaffirmed [Protostorm's] prior working

relationship with Hogue and ATS&K, with ATS&K's role remaining unchanged." (Faulisi Decl.

¶ 23.) In late 2000—that is, by the time he signed the retainer—Hogue had created his own law

practice and had ceased to be of counsel to ATS&K. (Defs.' Local Rule 56.1 Statement ("Def.

56.1") (Docket Entry # 297) ¶ 27; Pl. 56.1 ¶ 27; Faulisi Decl. ¶ 23.) Although Faulisi was aware

at the time that Hogue's relationship with ATS&K had changed, he did not think the change

"could have any consequences with respect to the continued representation of Protostorm by Mr.

Hogue and ATS&K." (Faulisi Decl. ¶ 23.)[10]

On June 20, 2001, Hogue emailed Brundidge and Bailey of ATS&K, attaching various

documents and drawings necessary for the preparation of the final patent application, and stating

that Worthington would "instruct[]" ATS&K "separately on foreign filing" of the application.

(Pl. Ex. 23.) Hogue added: "At this point, you have the final patent application. I will add

nothing further and any changes will be made by you to eliminate confusion." (Id.) The same

day, Hogue emailed Worthington and Shakespeare, informing them that the materials for the

final application had been sent to ATS&K, and that "[a]ny further changes need to be directed to

Fred Bailey" of ATS&K. (Pl. Ex. 24.) Hogue testified that he expected that ATS&K would

"prepare and file the application and prosecute it" and that he would have no further

responsibilities. (Hogue Dep. (Pl. Ex. 64) at 257-58.)

In June 2001, Worthington, upon instructions from Ginley, directed ATS&K to file an

international patent application under the Patent Cooperation Treaty ("PCT"), instead of a

---

[10] One difference was that Hogue would now be paid directly, whereas all bills had previously been paid
directly to ATS&K. (Faulisi Decl. ¶ 23.)

domestic patent application. (Pl. 56.1 ¶ 43; Worthington Dep. (D&S Resp. Ex. 35) at 279, 299-300.)[11] Worthington testified that she "believe[d]" she also sought authorization from Rummelsburg to proceed, after communicating with both Ginley and Shakespeare. (Worthington Dep. (D&S Resp. Ex. 35) at 305-06.) In emails she sent to Brundidge and Bailey of ATS&K on June 21, 22, and 25, 2001, Worthington made clear that Protostorm wanted to designate for patent protection every PCT signatory country. (Pl. Exs. 26, 27, 29.)

On June 25, 2001, Bailey contacted Faulisi and Shakespeare and told them they needed to assign their rights in the patent to Protostorm. (Faulisi Decl. ¶ 33.) Faulisi and Shakespeare signed an assignment of rights and faxed it to Bailey. (Id.; Pl. Ex. 31.)

The same day, ATS&K filed the final PCT patent application. (Pl. 56.1 ¶ 45.) The application was filed with the United States Receiving Office and listed Protostorm as the "applicant" and Shakespeare as the "inventor." (Pl. Prior Ex. 47 at 2.) Bailey and Brundidge of ATS&K were listed as the "agent[s] or common representative[s]." (Id.) One page of the application included a list of over one hundred PCT signatory countries, next to which were boxes to be checked off to indicate interest in patent protection. (Id. at 4.) The boxes corresponding to approximately one hundred countries were checked, leaving only three unchecked: Mongolia, Zimbabwe, and the United States. (Id.)

Bailey testified that he filed the PCT application, on Brundidge's instruction. (Bailey Dep. (Worthington Ex. 17) at 222.)[12] He knew that the United States was meant to be included as one of the designated PCT jurisdictions. (Bailey Dep. (Pl. Ex. 61) at 161-62.) He testified that he did not recall whether he had checked to make sure it was so designated (id.), but

---

[11] Faulisi states that the principals decided to file an international application so that patent protection could be secured not only in the United States, but also in Mexico, Canada, and Japan. (Faulisi Decl. ¶ 31.)

[12] Worthington's exhibits can be found at Docket Entry # 277.

acknowledged that it was part of his job to review the application prior to filing (Bailey Dep. (Worthington Ex. 17) at 66).

Significantly, the page of the PCT application that included the country designations also included a pre-printed "Precautionary Designation Statement," which read:

> In addition to the designations made above, the applicant also makes . . . all other designations which would be permitted under the PCT [with exceptions not applicable here]. The applicant declares that those additional designations are subject to confirmation and that *any designation* which is not confirmed before the expiration of 15 months from the priority date is to be regarded as withdrawn by the applicant at the expiration of that time limit.

(Pl. Prior Ex. 47 at 4 (emphasis added).) Fifteen months from the priority date of June 27, 2000 (established by the filing of the provisional application) was September 27, 2001.

On June 27, 2001, Bailey sent a letter to Ginley, with copies to Hogue and Worthington, enclosing—according to Bailey—a copy of the completed PCT application, "as filed." (Pl. 56.1 ¶ 47; Pl. Prior Ex. 48.) Notably, Bailey stated in this letter that, "[i]f any amendments are necessary, we will make them . . . ." (Pl. Prior Ex. 48 at 1.) He also told Ginley, Worthington, and Hogue that a further submission would have to be sent to the European Patent Office by January 27, 2002, and asked them to "forward [their] instructions for same, before the aforementioned deadline date." (Id.) He also stated that ATS&K would keep Ginley, Hogue, and Worthington "abreast of further developments in this application, as they occur." (Id.)[13]

On July 2, 2001, an attorney at D&S spent almost two hours "[r]eview[ing]" the "patent application" and forwarding it to Rummelsburg. (See Billing Record (D&S Ex. J) at 171.)[14]

---

[13] Plaintiffs, Worthington, and D&S all assert that the copy of the PCT application enclosed with Bailey's June 27, 2001 letter was missing the page that showed that the box for the United States had not been checked. (Pl. 56.1 ¶ 47; Worthington's Local Rule 56.1 Statement ("Worthington 56.1") (Docket Entry # 279) ¶¶ 23, 26; D&S's Local Rule 56.1 Statement ("D&S 56.1") (Docket Entry # 286) ¶ 27.)

[14] D&S also billed for a half hour spent on July 13, 2001 in connection with "[c]all[ing] Ms. Worthington" and "review[ing] patent application confirmation."

### D.     Things Fall Apart

On July 2, 2001, Worthington sent an email to Shakespeare and Faulisi, on which Hogue and Ginley were copied, informing them that "Protostorm should make a decision about where it wants to pursue patent protection in Europe . . . .  A filing is due January 27, 2002." (Worthington Prior Ex. 16.)[15]

According to Plaintiffs' expert, after a PCT application is filed, the applicant must pursue patents in each individual country—the so-called "national phase"—within twenty to thirty months of the "priority filing date" established by the initial, provisional patent application. (Genova Decl. (Docket Entry # 307) ¶ 8.)  Since, in this case, the priority filing date was in June 2000, "national phase" submissions would have been due between early 2002 and early 2003.

Indeed, ATS&K maintained a docket sheet with "PCT deadlines" applicable to the Protostorm application.  (Pl. Ex. 6.)  This docket sheet indicated that the deadline for confirming national designations was September 27, 2001—as per the Precautionary Designation Statement on the PCT application, discussed above.  (Id.)  It also indicated that the "national phase" would begin on January 27, 2002 and that the "national phase deadline" was January 27, 2003.  (Id.) The parties agree that no filing securing patent rights in the United States could have been made after January 2003.  (Pl. 56.1 ¶ 123.)

There is nothing in the record to show that submissions were made to meet any of those deadlines.  Plaintiffs admit that they did nothing further to meet the deadlines and that they did not ask their attorneys about them.  (Pl. 56.1 ¶ 48; Faulisi Dep. (Def. Ex. 8) at 138-39.)  There is no evidence that ATS&K followed up with Protostorm as to further submissions.  ATS&K admitted that it took no action with regard to the non-designation of the United States.  (Pl. Ex.

---

[15] "Worthington Prior Ex." refers to exhibits currently incorporated into Defendants' Exhibit 18.

59.)  According to Defendants' expert, while it might have been possible to correct the failure to designate the United States after the September 27, 2001 deadline, it "would have been much more difficult," and may have been "impossible."  (Nixon Dep. (Pl. Ex. 72) at 124-25.)

According to Faulisi, Hogue explained to him, in June 2001, that, once the patent application was filed, "it would take a long time before anything happened, and that most of the developments in the PTO would likely be purely technical for some time, thus not requiring any particular involvement by [Faulisi] and Mr. Shakespeare."  (Faulisi Decl. ¶ 29.)  Hogue told Faulisi that the application could "meander[]" for two to four years "through the patent office." (Id.)  Plaintiffs' expert further states that "prosecuting a patent application typically takes many years," during which there is typically "considerable back and forth" between the patent office and the applicant's counsel.  (Genova Decl. ¶ 11.)[16]

On July 23, 2001, the United States Receiving Office—to which the PCT application had been sent—sent to ATS&K an "Invitation to Correct Defects in the International Application" ("Invitation").  (Pl. Prior Ex. 51.)  The Invitation specified that Protostorm's patent application was "signed by what appears to be an agent/common representative" but was "not accompanied by a power of attorney ["POA"] appointing him."  (Id. at 2.)  The Invitation also noted that the pages of the accompanying drawings were "not numbered in consecutive Arabic numerals."  (Id. at 3.)  The Invitation warned that "[f]ailure to correct the defects will result in the international application being considered withdrawn by this receiving Office."  (Id. at 1.)

On August 8, 2001, the World Intellectual Property Organization ("WIPO") sent a form to ATS&K notifying them that the PCT application had been received and that several countries

---

[16] Plaintiff's current counsel states that he conducted a search of PTO records for issued patents for which Hogue was the identified agent.  (Moskin Decl. ¶ 7.)  The review time for these patent applications ranged from two to five years.  (Id.)

had been designated.  (Pl. Ex. 34.)  The countries were designated with two-letter codes—"US" was not among them.  (Id.)

In an August 20, 2001 submission to the PTO, Bailey submitted corrected drawings.  (Pl. Ex. 35.)  Bailey also requested that the deadline for submission of the POA, which had been August 23, 2001, be extended to September 23, 2001.  (Id.)

On August 21, 2001, non-party Kim Baecht ("Baecht"), a legal assistant at ATS&K, forwarded the Invitation to Worthington, enclosing with it a POA to be signed by a Protostorm principal.  (Pl. Prior Exs. 56, 57.)  The next day, Worthington wrote to Faulisi, Shakespeare, and Ginley, informing them that ATS&K had sent her a POA that Protostorm had to execute.  (Worthington Prior Ex. 2.)  Worthington also stated: "I am sorry, but I will not do any further work for Protostorm, until my bill has been paid.  Once I receive payment, I will be happy to continue to represent you."  (Id.)

According to Faulisi, after Worthington informed him that the POA was needed, he and/or Shakespeare signed it and sent it to ATS&K in late August or early September 2001.  (Faulisi Decl. ¶ 35.)  Plaintiffs submit as an exhibit two POA forms, appointing Bailey as Protostorm's agent, one signed on August 27, 2001 and the other signed on December 12, 2001.  (Pl. Ex. 11.)  As evidenced by the communications discussed below, ATS&K apparently did not receive this POA.

On September 13, 2001, non-party Portia Price-Sawyer ("Price-Sawyer") of ATS&K wrote an email to Hogue stating that ATS&K had contacted Worthington in order to obtain the POA.  (Pl. Ex. 39.)  On a printout of this email, Price-Sawyer added a handwritten note, dated September 20, 2001, in which she wrote: "Per a conversation with Carl [Brundidge] (on today) Protostorm.com has not paid their bill.  Therefore, DON'T DO ANY FURTHER WORK ON

THIS CASE." (Id. (capitals in original).) Brundidge testified that, at around this time, he had ATS&K stop all work for Protostorm. (Brundidge Dep. (Def. Ex. 12) at 54, 57-58.)

On September 25, 2001, Worthington emailed Baecht of ATS&K, copying Bailey, Price-Sawyer, Ginley, and Shakespeare, and stating, "Kindly advise us of the status of the Protostorm patent application. Does anything need to be done at this stage?" (Worthington Prior Ex. 7.) Brundidge of ATS&K responded the same day—copying Bailey, Price-Sawyer, and Baecht, but not Shakespeare or Ginley—stating that the POA was "now due." (Id.) Brundidge added:

> From a previous conversation I recall that you indicated Protostorm has not paid any of your bills and their future was questionable. After this conversation I checked our records and discovered we also have not been paid. . . . Under the circumstances we can not perform any further work for Protostorm unless the outstanding balance is paid or a substantial payment significantly reducing the unpaid balance is provided.

(Id.) On September 27, 2001, Worthington responded to Brundidge's email, copying Bailey, Price-Sawyer, and Baecht, and writing,

> Thanks for your email. I understand and support your position. I was just wondering if Protostorm has responded to your request for the Powers of Attorney (I gather they did not) and whether they were at risk of forfeiting their application if they don't respond by a certain time.
>
> I'll reiterate to them that Antonelli will not do any further work until they pay their bills and provide a retainer.

(Id.) Brundidge wrote back the same day, stating, "Thanks for your understanding. If we have not already done so we confirm that Protostorm is notified of the risk of their non-response." (Id.)

On October 1, 2001, Brundidge wrote to Ginley, copying Shakespeare and Faulisi, informing them that the POA was "now due" and that

> [i]f no action is taken the application will become **ABANDONED**. We have received no response to our requests for the signed document, nor have we received payment for services to date. Please be informed that under the

circumstances, no further action will be taken in connection with the above-identified matter.

(Faulisi Prior Ex. 64 (emphasis in original).)[17]  On October 3, 2001, Ginley forwarded this letter to Worthington and Rummelsburg.  (Pl. 56.1 ¶ 93.)

Shakespeare kept contemporaneous notes, which both Plaintiffs and Defendants submit as exhibits.  ("Notes" (Pl. Ex. 13; Def. Ex. 20); Handler Decl. (Docket Entry # 303) ¶ 14; Pl. 56.1 ¶¶ 96-97.)  A November 19, 2001 note indicates that Shakespeare was aware that the "[a]ttorneys who have not been paid are not doing any more work."  (Def. Ex. 25 (Docket Entry # 321-25) at P000362.)  However, the events of December 11 and 12, 2001 muddy the waters.

On those dates, Faulisi and Shakespeare, concerned about the status of the application, contacted Hogue and Brundidge by telephone.  (Pl. 56.1 ¶ 94; Faulisi Decl. ¶ 40.)  These conversations are described in Shakespeare's contemporaneous notes.  On December 11, Hogue told Shakespeare and/or Faulisi that "some procedural thing" still needed to be done in connection with the patent application, but that it could be done at any time.  (Notes 12/11.)  On December 12, Brundidge told Faulisi that the application was filed but was "in limbo."  (Id. 12/12.)  Faulisi testified that Brundidge also said that the application was "fine, but he needed some stuff done to it.  Same thing we got from Dale [Hogue], the procedural routine."  (Faulisi Dep. (Def. Ex. 8) at 468.)  Also on December 12, 2001, Hogue told Shakespeare and Faulisi that the application was pending and that Brundidge or Bailey could answer any further questions.  (Id. at 471-72; Faulisi Dep. (Pl. Ex. 63) at 84; Notes 12/12.)  According to the Notes, Hogue also said that "there are some procedural issues that need to be resolved—but Carl [Brundidge] + Fred [Bailey] have had no response . . . .  We need to take care of that too."  (Notes 12/12.)  Faulisi testified that this note referred to Hogue's warning that Protostorm needed to execute the

[17] "Faulisi Prior Ex." refers to exhibits currently incorporated into Defendants' Exhibit 20.

POA. (Faulisi Dep. (Def. Ex. 8) at 471-72.) Another note indicates that, on December 12, 2001, Rummelsburg stated that the "lawyers still need to be paid." (Notes 12/12.)[18]

According to Faulisi, after his December 12, 2001 conversation with Hogue, he sent a POA to ATS&K—purportedly for the second time. (Faulisi Decl. ¶ 43.) As noted above, Plaintiffs submit as an exhibit two POA forms, one signed on August 27, 2001 and the other on December 12, 2001. (Pl. Ex. 11.) Defendants deny that they ever received a POA from Protostorm (Def. 56.1 ¶ 115) and there is nothing in the record to indicate actual receipt.

## E. The Aftermath

Reassured by what Hogue and Brundidge had said on December 12, 2001—namely, as Faulisi puts it, "that the patent application was secure and they [Hogue and ATS&K] were attending to all administrative details going forward"—Rummelsburg advised Shakespeare and Faulisi that they could hold off on further investments in Protostorm until they "had further developments regarding the patent application." (Faulisi Decl. ¶ 46; Rummelsburg Decl. (Docket Entry # 303) ¶ 2.) Therefore, the principals entered into an agreement to cease "distributing [the Invention] on the internet." (Rummelsburg Dep. (Def. Ex. 9) at 99; Pl. Ex. 44.) At this point, Protostorm ceased operations and closed its office. (Rummelsburg Dep. (Def. Ex. 9) at 98-100.) This decision was based on the principals' belief "that the patent was okay," since the patent application "was the most valuable thing that [they] had." (Id. at 100; see also Rummelsburg Decl. ¶ 2.) Protostorm never resumed operations. (Id. at 101.) However, it

---

[18] Plaintiffs admit that an ATS&K bill for over $3,000 remained unpaid at the time this litigation began, but state that ATS&K never made any effort to collect it, and further state that they believed the amount to be covered by an initial retainer Protostorm paid to D&S, to distribute to other lawyers. (Pl. 56.1 ¶ 124; Faulisi Decl. ¶ 58; Faulisi Dep. (D&S Ex. F) at 277-78.) D&S also was unable to collect some of its debt from Protostorm. (Duval Dep. (Def. Ex. 28 (Docket Entry # 321-28)) at 125-26.) Protostorm— via D&S, which paid Worthington's bills—also failed to pay Worthington $8,865 out of a total of $11,640 in billings. (Worthington 56.1 ¶ 33; D&S's 2d Local Rule 56.1 Statement (Docket Entry # 291-2) ¶ 33.)

maintained its corporate existence, and its principals continued to seek capital.  (Pl. Exs. 2-3; Faulisi Decl. ¶ 57.)

No one took any further action with respect to the patent application.  Faulisi "understood that there was nothing for us to do pending receipt of further news from counsel."  (Faulisi Decl. ¶ 45.)  According to Faulisi, ATS&K never notified him or Shakespeare that it was withdrawing as counsel.  (Faulisi Dep. (Pl. Ex. 63) at 220-21; Faulisi Decl. ¶ 38.)

In early 2006, Faulisi learned that Google Inc. was beginning to test its Gmail email system, which incorporated several features of the Invention—in particular, the ability to target advertising based on the content of users' messages.  (Faulisi Decl. ¶ 50.)  Believing that this infringed on Protostorm's patent, Faulisi attempted several times to contact Hogue and ATS&K, throughout 2006.  (Id. ¶ 50, 53.)  Faulisi was unable to locate Hogue and his message with ATS&K went unreturned.  (Id. ¶ 51-53.)  Faulisi finally reached Schiavelli of ATS&K in June 2007.  (Id. ¶ 55.)  Schiavelli told Faulisi that an international application had been filed, but that it had been deemed "withdrawn," because no POA or "national stage" submissions had been filed.  (Id. ¶ 55; Schiavelli Dep. (Def. Ex. 13) at 122; Pl. 56.1 ¶ 122.)  According to Schiavelli, Faulisi seemed "surprised" by this.  (Schiavelli Dep. at 124.)

## III.    CHOICE OF LAW

A federal court sitting in diversity must apply the law of the state in which it is located to determine which state's substantive law applies.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  "Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant

choices, New York courts are free to apply it." <u>IBM v. Liberty Mut. Ins. Co.</u>, 363 F.3d 137, 143 (2d Cir. 2004) (citing <u>In re Allstate Ins. Co.</u>, 81 N.Y.2d 219, 223 (1993)).

As to Plaintiffs' claims against Defendants, both Plaintiffs and Defendants acknowledge that the law of New York, where Plaintiffs reside, and the law of Virginia, where Defendants reside and where their alleged malpractice took place, are substantively the same. (Def. Mem. (Docket Entry # 302) at 3; Pl. Mem. (Docket Entry # 308) at 10 n.1, 34.) Therefore, the court will apply New York law in deciding the merits.

The same applies to the statute of limitations analysis applicable to Plaintiffs' claims. Under New York law, where plaintiffs are New York residents, New York statutes of limitations apply. N.Y. C.P.L.R. § 202. Plaintiff Faulisi resides in New York and, while Protostorm is registered in Delaware, its principal place of business is in New York, making it a New York resident for purposes of C.P.L.R. § 202. <u>See</u> <u>Investigative Grp., Inc. v. Brooke Grp. Ltd., Inc.</u>, No. 95-CV-3919 (CSH), 1997 WL 727484, at *3 (S.D.N.Y. Nov. 21, 1997); <u>Shamrock Assocs. v. Sloane</u>, 738 F. Supp. 109, 113 (S.D.N.Y.1990); <u>McMahan & Co. v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, 727 F. Supp. 833, 834 (S.D.N.Y. 1989).

As to the third-party claims, all parties have agreed that New York law applies. (<u>See</u> D&S Mem. (Docket Entry # 281-2) at 4; 3d Party Pl. Mem. (Docket Entry # 288) at 10-11; 2d Worthington Mem. (Docket Entry # 289) (citing exclusively New York law).)

Accordingly, the court will apply New York law throughout this memorandum and order.

## IV.    DEFENDANTS' AND PLAINTIFFS' CROSS-MOTIONS

### A.    Faulisi's Standing

Defendants argue that Faulisi lacks standing since any duty owed by ATS&K was owed to Protostorm, a limited liability company, and not to the company's members. (Def. Mem. at

23-25.)  Defendants rely on New York's Limited Liability Company Law § 610, under which "[a] member of a limited liability company is not a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's right against or liability to the limited liability company."  Plaintiffs respond that Faulisi does not pursue rights held by Protostorm—and thus does not contravene § 610—but instead seeks to vindicate his own rights as one of the inventors and as an independent ATS&K client.  (Pl. Mem. at 37-38.)

Since no written retainer agreement exists, the court must "look to the words and actions of the parties to ascertain if an attorney-client relationship was formed."  Huffner v. Ziff, Weiermiller, Hayden & Mustico, LLP, 55 A.D.3d 1009, 1011 (3d Dep't 2008).  In general, "[a] lawyer's representation of a business entity does not render the law firm counsel to an individual partner, officer, director or shareholder unless the law firm assumed an affirmative duty to represent that individual."  Campbell v. McKeon, 75 A.D.3d 479, 480-81 (1st Dep't 2010).  That is, "there must be an explicit undertaking to perform a specific task," agreed to between the individual and the attorney or firm.  Nelson v. Roth, 69 A.D.3d 912, 913 (2d Dep't 2010).  Stated otherwise, "[t]he formation of an attorney-client relationship hinges upon the client's reasonable belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.  No special formality is required to demonstrate the establishment of the relationship."  Merck Eprova AG v. ProThera, Inc., 670 F. Supp. 2d 201, 210 (S.D.N.Y. 2009) (citations omitted).  District courts in this jurisdiction consider six factors to determine whether an attorney-client relationship exists:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of the litigation in

order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

Id.

There is a genuine question of fact as to whether ATS&K was retained to pursue not just Protostorm's patent rights, but also Faulisi's rights as an inventor. See id. at 210-12 (law firm, which represented drug manufacturer in patent application on behalf of corporate inventor, also represented inventor, who had joint attorney-client relationship with manufacturer); see also Buechel v. Bain, 97 N.Y.2d 295, 299-300 (2001) (involving malpractice claim brought by individual inventors who had retained patent counsel and subsequently formed a corporation to exploit patent rights). When ATS&K filed the first provisional patent application, Faulisi—and not Protostorm—was listed as the applicant. Faulisi and Shakespeare subsequently transferred their rights in the patent to Protostorm. However, the assignment of a patent does not necessarily transfer the attorney-client relationship. See Tekni-Plex, Inc. v. Meyner & Landis, 89 N.Y.2d 123, 134 (1996) (citing Telectronics Proprietary v. Medtronic, Inc., 836 F.2d 1332 (Fed. Cir. 1988)). The record contains evidence based upon which a reasonable jury could find that an "informal" attorney-client relationship existed between ATS&K and Faulisi; that ATS&K "actually represented" Faulisi "in one aspect of the matter," namely, pursuing a patent on Faulisi's behalf; or that Faulisi reasonably believed ATS&K was representing him. Therefore, Defendants' motion for summary judgment on this issue is denied.

**B.** **Statute of Limitations for Malpractice**

Plaintiffs filed their original Complaint (Docket Entry # 1) on March 4, 2008, over six years after ATS&K filed the final PCT patent application. December 2001 was the last time Plaintiffs and Defendants interacted, before Faulisi contacted Schiavelli in 2007.

The statute of limitations applicable to Plaintiffs' malpractice claim is three years, N.Y. C.P.L.R. § 214(6), and it begins to run on "the day an actionable injury occurs," regardless of when plaintiffs discover such injury, McCoy v. Feinman, 99 N.Y.2d 295, 301 (2002). However, under the "continuous representation doctrine," the statute of limitations is tolled for as long as "there is a mutual understanding" between attorney and client "of the need for further representation on the specific subject matter underlying the malpractice claim." Id. at 306; see also Shumsky v. Eisenstein, 96 N.Y.2d 164, 169 (2001) (continuous representation existed where plaintiffs were "left with the reasonable impression that defendant was, in fact, actively addressing their legal needs" in connection with the specific subject matter in question).

Of course, no such continuing representation exists where the task for which the attorney was retained is complete. See, e.g., M.G. McLaren, P.C. v. Massand Eng'g, L.S., P.C., 51 A.D.3d 878, 878 (2d Dep't 2008) ("[T]here was no mutual understanding that the plaintiff required further survey work after the defendant's submission of the final survey."). Furthermore, for the continuous representation rule to apply, the record must support a finding that the client continued to have "trust and confidence" in the attorney. Piliero v. Adler & Stavros, 282 A.D.2d 511, 512 (2d Dep't 2001); Aaron v. Roemer, Wallens & Mineaux, 272 A.D.2d 752, 755 (3d Dep't 2000). Courts have declined to apply the rule where the record shows the disintegration of such trust. See, e.g., id. (declining to apply the rule where the record showed that the client "perceived that the relationship with his attorneys had been irretrievably broken," based on the attorney's motion to withdraw and the client's acknowledgment in writing of "an irreparable deterioration of the attorney-client relationship"); Hoffenberg v. Bodell, No. 01-CV-9729 (LAP), 2002 WL 31163871, at *8 (S.D.N.Y. Sept. 30, 2002) (declining to apply the rule where "plaintiff's letters undoubtedly indicate[d] that he lost trust and confidence in

defendant").  The question of whether a continuous representation existed is for the trier of fact. See id. at *7.[19]

At various points in their papers, Defendants assert that they were *never* retained to represent Plaintiffs or, alternatively, that their retainer was limited to completing ministerial tasks, namely physically filing submissions, and nothing else.  (See Def. Reply (Docket Entry # 311) at 12.)  As the recitation of facts above makes clear, however, there is at the very least a question of fact as to whether ATS&K was retained to represent Plaintiffs both in filing the patent application *and* in prosecuting it to completion.  This is evidenced by, inter alia, ATS&K's designation as Protostorm's agent on the PCT application; ATS&K's docket sheet marking deadlines after the filing of the PCT application; the June 27, 2001 letter in which Bailey stated that ATS&K would make necessary amendments and that Ginley, Hogue, and Worthington should instruct ATS&K as to any subsequent submissions ATS&K should make; and Hogue's statement to ATS&K, upon submitting the materials for the final PCT application, that Hogue would "add nothing further" and that "any changes [would] be made by [ATS&K] to eliminate confusion."

The next question is whether that attorney-client relationship was ever severed.  In the months after the PCT application was filed, ATS&K warned that it would do no further work if it did not receive a POA from Plaintiffs.  There is a question of fact as to whether Plaintiffs ever

_____

[19] To the extent that a continuous attorney-client relationship existed between Plaintiffs and ATS&K, it is of no moment that Brundidge and Bailey both left the firm in 2004.  (Pl. 56.1 ¶¶ 9, 12.)  The continuous representation doctrine "is rooted in recognition that a client cannot be expected to jeopardize a pending case or relationship with an attorney during the period that the attorney continues to handle the case." Waggoner v. Caruso, 68 A.D.3d 1, 7 (1st Dep't 2009).  For the same reason, a client cannot be expected to bring a malpractice suit against a law firm's ex-partner while the client is still represented by the firm in the same matter.  See New Kayak Pool Corp. v. Kavinoky Cook LLP, 74 A.D.3d 1852, 1853 (4th Dep't 2010); Waggoner, 68 A.D.3d at 7; HNH Int'l, Ltd. v. Pryor Cashman Sherman & Flynn LLP, 63 A.D.3d 534, 535 (1st Dep't 2009); Pollicino v. Roemer and Featherstonhaugh P.C., 260 A.D.2d 52, 55 (3d Dep't 1999); Antoniu v. Ahearn, 134 A.D.2d 151, 152-53 (1st Dep't 1987).

sent the POA and, if they did, whether ATS&K received it.  Thus, summary judgment cannot be granted to Defendants based on the POA issue.

Even if a jury were to find that Plaintiffs did *not* send the POA, this would not necessitate the dismissal of Plaintiffs' claims on timeliness grounds.  The record makes clear that it was possible for ATS&K to continue representing Plaintiffs even in the absence of a POA.  Defendants' own expert admitted that ATS&K, as Protostorm's agent, could have continued to request extensions of time to file the POA.  (See Nixon Dep. at 49, 120.)  Further, while it appears that a POA was ultimately necessary, there does not seem to have been a set deadline for its submission.  As Defendants' expert testified, it is "a little bit indefinite as to when" the lack of a POA would have resulted in the reviewing office deeming the PCT application abandoned; this could have happened at the time of the "national phase"—i.e., between early 2002 and early 2003—or the patent office could have decided to issue a "formal notice of abandonment" at some other point.  (Id. at 50-53.)  There is no such notice of abandonment in the record.  (See id. at 51; Pl. 56.1 ¶ 59; Defs.' 2d Local Rule 56.1 Statement ("Def. 56.1-2") (Docket Entry # 317) ¶ 111.)[20]

The record shows that Defendants did not know when the lack of a POA would result in the abandonment of the patent application, if ever.  Plaintiffs cannot be expected to have known something their lawyers didn't.  Therefore, even if the jury were to find that Plaintiffs failed to execute the POA in late 2001, this would not necessarily have constituted an abandonment of the

---

[20] The testimony of Defendants' expert is consistent with that of Brundidge, who admitted that ATS&K could have continued to request extensions to file the POA, and that it would have been possible to do so "up until a decision [was] made by the receiving office that the application [was] withdrawn." (Brundidge Dep. (Pl. Ex. 62) at 184, 205.)  Indeed, a "PCT Applicant's Guide" published by the WIPO indicated that the deadline for correcting defects—such as a missing POA—could be extended "even after the time limit fixed in the invitation [to correct defects]," as long as the patent office had not yet taken a decision as to "whether the applicant ha[d] submitted the correction within the time limit" or as to whether the "application so corrected [was] to be considered withdrawn."  (Pl. Ex. 60 ¶ 244.)

project for which ATS&K was retained. Nor do Defendants cite any authority for the proposition that an *attorney* can unilaterally end an attorney-client relationship when a client fails to perform a task the attorney has requested.

However, there is evidence in the record based upon which a reasonable jury could find that *Plaintiffs* unilaterally ended the relationship, sometime in the months after September 2001. ATS&K warned Plaintiffs more than once in that period that it would stop working on their behalf if they did not pay down their outstanding balance and send ATS&K an executed POA. A jury could find that Plaintiffs' failure to do these things evidenced their intention to abandon the project and, with it, their relationship with ATS&K.

A jury could just as well find, however, that no such abandonment occurred, particularly in light of the evidence that Brundidge, on December 12, 2001, led Plaintiffs to believe that ATS&K's work was continuing, and that it would take care of whatever "procedural" issues remained in prosecuting the patent. Plaintiffs submit evidence that Hogue told Faulisi a patent prosecution could take years. They also submit evidence that Protostorm's principals were counting on the eventual success of the patent application, and relied on ATS&K to shepherd the application to its conclusion. A jury could find that such assumptions were reasonable up until June 2007, when Schiavelli told Faulisi that the patent application had been abandoned. Because Plaintiff's Complaint was filed less than three years after June 2007, the court denies Defendants' motion for summary judgment on statute of limitations grounds.[21]

_____

[21] Plaintiffs, in their original March 2008 Complaint, did not name as Defendants Brundidge or Schiavelli, who were first named in the August 2009 Second Amended Complaint. Defendants argue that Plaintiffs' claims against Brundidge and Schiavelli do not "relate back" to the original complaint, and therefore should be dismissed as untimely. (Def. Mem. at 13-15.) However, the "relation back" doctrine only applies to claims that are "otherwise . . . untimely." See Wilson v. Fairchild Republic Co., Inc., 143 F.3d 733, 738 (2d Cir. 1998), rev'd on the grounds, Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006). Because a jury could reasonably find that the attorney-client relationship between Plaintiffs and Defendants—including Brundidge and Schiavelli—continued until June 2007, and because Plaintiffs'

## C.     The Merits of the Malpractice Claim

To survive summary judgment on a claim of attorney malpractice, a plaintiff must

produce evidence

> that the attorney failed to exercise the ordinary reasonable skill and knowledge
> commonly possessed by a member of the legal profession and that the attorney's
> breach of this duty proximately caused plaintiff to sustain actual and ascertainable
> damages.  To establish causation, a plaintiff must show that he or she would have
> prevailed in the underlying action . . . but for the lawyer's negligence.

Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer, 8 N.Y.3d 438, 442 (2007) (internal quotation

marks omitted).

First, there is a question of fact as to the scope of ATS&K's attorney-client relationship

with Plaintiffs.  It is clear that ATS&K was retained to, at the very least, physically file the PCT

application and accomplish other ministerial tasks.  There is a question of fact, however, as to

whether ATS&K was retained to do more—that is, to fully and substantively prosecute the

patent application to completion.  As discussed above, there is also a question of fact as to

whether the attorney-client relationship persisted after September 2001.

Were a reasonable jury to resolve these questions in Plaintiffs' favor, it would necessarily

find that ATS&K failed to exercise "ordinary skill."  The June 25, 2001 PCT application that

ATS&K reviewed and submitted did not designate the United States for patent protection.  That

failure was not final, however.  As per the "Precautionary Designation Statement" on the

application form, a presumption existed that the applicant intended to include *all* possible PCT

jurisdictions—until the applicant verified such designations, which, in this case, had to happen

by September 27, 2001.  (See Pl. Prior Ex. 47 at 4.)  ATS&K did nothing to verify the country

designations by this date, or thereafter.  ATS&K then did nothing to further the application at the

---

claims against Brundidge and Schiavelli were brought within three years of June 2007, the relation back
doctrine is not implicated.

"national phase"—during which further submissions were required—which was scheduled for some point between the beginning of 2002 and the beginning of 2003. To the extent ATS&K continued to be retained to prosecute the patent over this period, these lapses clearly constituted a failure to exercise ordinary skill. See, e.g., Baker v. Dorfman, No. 978-CV-7512 (DLC), 1998 WL 642762, at *4 (S.D.N.Y. Sept. 17, 1998) (failure to file claims in a timely manner constituted negligence as a matter of law). Plaintiffs' motion for summary judgment on this limited point (Pl. Cross-Mot. at 2)—insufficient by itself to establish Defendants' liability—is therefore granted.

Under New York law, "it is for the finder of fact to determine" the existence of proximate cause, "once the court has been satisfied that a prima facie case has been established." Derdiarian v. Felix Contr. Corp., 51 N.Y.2d 308, 315 (1980). "To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." Id. A jury could certainly find that ATS&K's lapses were a substantial cause of the abandonment of the patent application. The parties, who have submitted competing expert reports on the issue, have also created a question of fact as to whether the application would have led to a valid, and valuable, patent.

Defendants insist that they cannot be held liable because Plaintiffs failed to execute a POA, which was necessary for the prosecution of the patent, despite repeated warnings from their lawyers. First, as noted above, there is a question of fact as to whether Plaintiffs did, in fact, send ATS&K one or more executed POAs. Even if Plaintiffs failed to do so, this would not automatically absolve Defendants of liability. The record shows that ATS&K could have requested extensions to file the POA for some indefinite period of time. Moreover, to the extent Defendants remained Plaintiffs' counsel, a jury could find that it was their responsibility to make

sure the POA was filed.  Thus, even if Plaintiffs failed to execute the POA, this would not negate

Plaintiffs' prima facie showing of proximate cause.[22]  The court therefore grants Plaintiffs'

motion for summary judgment (Pl. Cross-Mot. at 2) on the limited issue of whether their

purported failure to execute a POA requires the dismissal of their malpractice claim.

### D.    The Breach of Fiduciary Duty Claim

Where a claim for breach of fiduciary duty is duplicative of a claim for legal malpractice

because it is premised on the same facts and alleges similar damages, it must be dismissed.  See

Waggoner v. Caruso, 14 N.Y.3d 874, 875 (2010); Putnam Cnty. Temple & Jewish Ctr., Inc. v.

Rhinebeck Sav. Bank, 87 A.D.3d 1118, 1120 (2d Dep't 2011); Bernard v. Proskauer Rose, LLP

87 A.D.3d 412, 416 (1st Dep't 2011).  Such is the case here.  In their Second Amended

Complaint, after setting forth the alleged facts, Plaintiffs alleged that "the foregoing"—referring,

without differentiating, to all facts previously stated in the Second Amended Complaint—

constituted both legal malpractice and breach of fiduciary duty.  (2d Am. Compl. ¶¶ 58, 60.)  Nor

does the damages claim differentiate between the two claims.  (See id. at 14.)  This makes clear

that the fiduciary duty and malpractice claims are premised on the same facts and seek the same

relief.  In their opposition to Defendants' motion, Plaintiffs claim that the fiduciary duty claim is

in fact based on different facts, specifically ATS&K's "unilateral decision to stop working on

---

[22] Defendants pleaded, as an affirmative defense, Plaintiffs' contributory negligence—presumably referring to their purported failure to execute the POA.  (Def. Answer (Docket Entry # 251) ¶ 66.)  The question of Plaintiffs' contributory negligence, or lack thereof, is to be resolved at the damages stage, and not here.  The New York Court of Appeals has noted that "[t]he culpable conduct of a plaintiff client in a legal malpractice action may be pleaded by the defendant attorney, by way of affirmative defense, as a mitigating factor in the attorney's negligence."  Arnav Indus., Inc. Ret. Trust v. Brown, Raysman, Millstein, Felder & Steiner, L.L.P., 96 N.Y.2d 300, 305 n.2 (2001).  That is, "[a]ny negligence on plaintiff's part in reviewing the documents is merely a factor to be assessed in the mitigation of damages." Ableco Fin. LLC v. Hilson, 81 A.D.3d 416, 417 (1st Dep't 2011); see also Caiati v. Kimel Funding Corp., 154 A.D.2d 639, 639 (2d Dep't 1989) ("[T]he culpable conduct of the plaintiff client in a legal malpractice action, including contributory negligence or assumption of risk, may be pleaded by the defendant attorney, by way of affirmative defenses, as mitigating factors with respect to the amount of damages otherwise recoverable." (internal quotation marks and alterations omitted)).

plaintiffs' application." (Pl. Mem. at 35.) Defendants correctly point out that Plaintiffs cannot "amend their pleadings" in this manner. (Def. Reply at 21.) See Fed. R. Civ. P. 15(a)(2). Plaintiffs' fiduciary duty claim is therefore dismissed.

## V.  THIRD-PARTY CLAIMS

Defendants/Third-Party Plaintiffs bring contribution claims against Worthington, D&S, and Ginley, and Worthington brings a similar claim against D&S and Ginley. (See Am. 3d Party Compl. ¶¶ 57-59; 2d Am. 3d Party Answer & Cross-Cl. ¶¶ 27-29.) Defendants/Third-Party Plaintiffs and Worthington also seek indemnification. (See Am. 3d Party Compl. ¶¶ 53-55; 2d Am. 3d Party Answer & Cross-Cl. ¶¶ 30-32.) Finally, Worthington seeks indemnification and reimbursement based on her contention that she was acting as D&S's and Ginley's agent. (See 2d Am. 3d Party Answer & Cross-Cl. ¶¶ 24-26.) As discussed below, summary judgment is denied as to the parties' contribution claims and granted as to their indemnification claims.

### A.  Contribution

Under New York law, "two or more persons who are subject to liability for damages for the same [injury] . . . may claim contribution among them whether or not an action has been brought . . . against the person from whom contribution is sought." N.Y. C.P.L.R. § 1401. Accordingly, a claim for contribution lies

> whether or not the culpable parties are allegedly liable for the injury under the same or different theories and whether or not the party from whom contribution is sought is allegedly responsible for the injury as a concurrent, successive, independent, alternative, or even intentional tort-feasor. . . . The critical requirement . . . is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought.

Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 71 N.Y.2d 599, 603 (1988) (citations omitted). In other words, "[c]ontribution is generally available as a remedy when two or more tort-feasors share in responsibility for an injury, in violation of duties they respectively

owe to the injured person."  Trump Vill. Section 3, Inc. v. N.Y. State Hous. Fin. Agency, 307

A.D.2d 891, 896 (1st Dep't 2003) (internal quotation marks and alterations omitted).

Third-Party Plaintiffs' and Worthington's contribution claims shall go forward.  As with

ATS&K, there are no written retainers in the record to indicate the precise contours of

Worthington's and D&S's duties to Plaintiffs.  However, the record shows that D&S and Ginley

were responsible for managing Plaintiffs' relationships with the other lawyers hired to prosecute

the patent application.  The record also shows that D&S and Ginley reviewed the PCT

application, served as a conduit for communications between Plaintiffs and the other lawyers,

and were aware of at least some of the relevant deadlines, in particular the deadline for entry into

the "national phase."  As to Worthington, the record indicates that she was hired to oversee the

patent application process.

While Worthington wrote to Plaintiffs on August 21, 2001 to say she would do no further

work until her bill was paid, a jury could reasonably find that this did not end the attorney-client

relationship between Worthington and Plaintiffs.  First, Worthington did not state that she was

definitively terminating the attorney-client relationship, and she did not specify when payment

would have to be received for the relationship to continue.  Furthermore, Worthington's

September 25, 2001 communication with ATS&K, in which she asked ATS&K to advise her on

the status of Protostorm's patent application, is evidence of the continuity of the relationship.

See Matter of Tierra C., 227 A.D.2d 994, 995 (4th Dep't 1996) ("A purported withdrawal

without proof that reasonable notice was given is ineffective."); Bucaro v. Keegan, Keegan,

Hecker & Tully, 126 Misc. 2d 590, 592 (N.Y. Sup. Ct. 1984) ("The notice of withdrawal to the

client should be clear and unambiguous.  Here, [the client] obviously did not believe that the

attorney-client relationship had ended, as evidenced by her continued dialogue with [her attorneys] concerning her case.").

A reasonable jury could find that Worthington, D&S, and Ginley all failed to exercise ordinary skill as lawyers when they permitted Plaintiffs' patent application to fall through the cracks without making any required submissions after June 2001 or ensuring that such submissions were made and that the application moved forward. A jury could also find that the neglect of the Third-Party Defendants was a substantial cause of the abandonment of the patent application.[23]

### B. Indemnification

Summary judgment is granted as to all indemnification claims. Nothing in the record indicates that there were any contracts requiring indemnification between the parties. Therefore, the law of common-law indemnification applies.

> The principle of common law, or implied, indemnification permits one who has been compelled to pay for the wrong of another to recover from the wrongdoer the damages it paid to the injured party. Common law indemnification is warranted where a defendant's role in causing the plaintiff's injury is solely passive, and thus its liability is purely vicarious. Thus, a party which has actually participated in the wrongdoing is not entitled to indemnification.

Bedessee Imports, Inc. v. Cook, Hall & Hyde, Inc., 45 A.D.3d 792, 796 (2d Dep't 2007) (citations omitted). To the extent the Defendants/Third-Party Plaintiffs or Worthington are found liable for malpractice, such liability would be neither "purely vicarious" nor "solely passive." Therefore, their common-law indemnification claims must be dismissed.

---

[23] Third-Party Plaintiffs' base their claim for contribution against Worthington in part on their contention that she violated the law by filing a provisional patent application in April 2001. This argument is meritless. Even if this purported violation would have doomed an otherwise complete patent prosecution, it is clear that it did not proximately cause the actual abandonment of Plaintiffs' application, which was instead caused by the inaction of the parties. See Fahey v. A.O. Smith Corp., 77 A.D.3d 612, 616 (2d Dep't 2010) (intervening act that causes the injury in question eliminates proximate cause for a previous act where the intervening act was "extraordinary under the circumstances" or "not foreseeable" at the time the initial act was committed).

### C.    Principal-Agent Relationship

Finally, Worthington asserts an indemnification claim against D&S based on what she claims was a principal-agent relationship between them.  "New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act."  N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001).  "The basic tenet of a principal-agent relationship is that the principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal."  William Stevens, Ltd. v. Kings Vill. Corp., 234 A.D.2d 287, 288 (2d Dep't 1996).

Nothing in the record indicates that D&S gave Worthington consent to act on its behalf or that Worthington's work on the patent application was subject to D&S's control.  Instead, the record shows that Worthington was retained to act as *Plaintiffs'* agent, in pursuing Plaintiffs' application for a patent.  Indeed, this was the understanding of Protostorm's principals.  Faulisi testified that he retained Worthington (Faulisi Dep. (D&S Ex. F) at 264) and Rummelsburg similarly confirmed that he "ha[d] an agreement with Ms. Worthington to represent Protostorm," under which "[s]he was going to help write the patent application" (Rummelsburg Dep. (D&S Ex. I) at 30-31).  This accords with the recollection of Ginley of D&S, who testified that he "did not retain Worthington.  Protostorm retained Kathy Worthington."  (Ginley Dep. at 15.)  Indeed, Worthington herself stated, in her November 13, 2008 deposition: "I was counsel for Protostorm."  (Worthington Dep. (D&S Ex. L) at 4.)

In a subsequent deposition, dated May 10, 2010—after Worthington brought her cross-claim against D&S in April 2010 (see Docket Entry # 226)—she testified that D&S retained her,

"[t]o assist them in helping their clients identify intellectual property assets and how to protect them." (Worthington Dep. (Worthington Resp. Ex. 35) at 243-44, 381-82.)[24] According to Worthington's May 2010 testimony, D&S "directed [her] to proceed or not to proceed on any matter." (Id. at 395-96.) The court declines to credit this conclusory claim, in light of Worthington's prior testimony and the understanding of the other parties. See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.").

Worthington gives specific examples meant to illustrate D&S's authority over her as her principal. (See 2d Worthington Mem. at 4.) She notes that "D&S and Ginley were at the initial meeting Worthington had with Protostorm, requested that a patent search be ordered, had discussions with Worthington about where Protostom [sic] would seek patent protection, and had discussions with Worthington about authorizing the filing of the non-provisional patent application at issue, among other things." (Id. (citations omitted).) None of these examples support Worthington's claim that she was acting as D&S's agent, that is, subject to D&S's control. Nor is the fact that D&S paid Worthington's bills sufficient to demonstrate a principal-agent relationship. See, e.g., Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 395 (1982) ("That the employers fund the activities of the JATC does not render the JATC the employers' servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. The employers must also enjoy a

---

[24] The exhibits Worthington submitted in response to D&S's motion for summary judgment can be found at Docket Entry # 289.

right to control the activities of the JATC, and there is no record basis for believing that to be the case.").  Therefore, D&S's motion for summary judgment is granted as to this claim.

## VI.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' breach of fiduciary duty claim but DENIED as to Plaintiffs' malpractice claim. Plaintiffs' motion for summary judgment as to certain elements of its malpractice claim is GRANTED, as set forth above.  Third-Party Defendants' motions for summary judgment are GRANTED as to Third-Party Plaintiffs' indemnification claims, but DENIED as to Third-Party Plaintiffs' contribution claims.  Similarly, D&S's and Ginley's motion for summary judgment as to Worthington's indemnification claims are GRANTED, but summary judgment is DENIED as to Worthington's contribution claim.  In sum, malpractice claims against the Defendants and Third-Party Defendants, in connection with the abandonment of Plaintiffs' patent application, shall go forward.

SO ORDERED.

/S/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
Dated:  Brooklyn, New York                    United States District Judge
        November 29, 2011