UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────────────────────────────x

PROTOSTORM, LLC and PETER FAULISI,

               Plaintiffs,

      −against−

                            **MEMORANDUM & ORDER**

ANTONELLI, TERRY, STOUT & KRAUS, LLP,   08−CV−931 (PKC) (JO)
FREDERICK D. BAILEY, CARL I.
BRUNDIDGE, and ALAN E. SCHIAVELLI,

               Defendants.

───────────────────────────────────────x

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Protostorm, LLC ("Protostorm") and Peter Faulisi ("Faulisi") filed the present

action on March 4, 2008, alleging that defendant Antonelli, Terry, Stout & Krauss, LLP

("ATS&K") and individual defendants Frederick D. Bailey ("Bailey"), Carl I. Brundidge

("Brundidge"), and Alan E. Schiavelli ("Schaivelli") committed legal malpractice in connection

with Protostorm's patent application. (Dkt. 1.) A jury trial was held between July and August

2014, and a verdict was rendered on August 15, 2014 for Protostorm against ATS&K, Bailey,

and Brundidge. (Dkts. 532, 534 at 28−33 ("Verdict Sheet").) On February 6, 2015, an Amended

Judgment in Protostorm's favor was issued against ATS&K in the amount of $6,696,000 in

compensatory damages, $900,000 in punitive damages, and $1,050,720.60 in prejudgment

interest, and against Brundidge in the amount of $100,000 in punitive damages. (Dkt. 639.) The

Court, however, stayed enforcement of the judgment until the resolution of the instant motions.

(Dkts. 612, 619.)

      Pending before the Court are motions to set aside the jury verdict pursuant to Federal

Rule of Civil Procedure 50(b) filed by ATS&K, Brundidge, and Bailey (collectively,

"Defendants"). (Dkts. 626, 627, 645).[1] For the reasons set forth below, Defendants' Rule 50(b)

motions are denied.

## BACKGROUND

The Court assumes the parties' familiarity with the background of this case. *See, e.g.*,

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 834 F. Supp. 2d 141 (E.D.N.Y. 2011).

Only those facts necessary for disposition of the instant motions will be set forth herein as part of

the Discussion section.

### I.      Trial, Verdict, and Judgment

Trial in this matter began on July 28, 2014. (*See* Dkts. 507−11, 513, 516, 518, 524−28,

530, 532.) On August 15, 2014, the jury returned a verdict for Protostorm against ATS&K,

Brundidge, and Bailey for legal malpractice. (Verdict Sheet at 1−2.)[2] The jury, however, did

not find that Plaintiffs had established by a preponderance of the evidence that an attorney−client

relationship existed between ATS&K and Faulisi, or that an attorney−client relationship

persisted between Protostorm and Schiavelli of ATS&K after September 2001. (*Id.*)

Accordingly, Faulisi and Schiavelli are not parties to the instant post−trial motions.

The jury awarded Protostorm $6,975,000 in compensatory damages, apportioning 75% of

the fault to ATS&K, 15% to Brundidge, 6% to Bailey, and 4% to Protostorm. (*Id.* at 5.) The

jury also awarded Protostorm punitive damages in the amount of $900,000 against ATS&K and

$100,000 against Brundidge. (*Id.* at 5−6.)

---

[1] ATS&K's and Bailey's initial motions moved alternatively for a new trial, pursuant to Federal Rule of Civil Procedure 59. (*See* Dkts. 627−7 ("ATS&K Mem.") at 37, 626−1 ¶ 6). ATS&K and Bailey have since withdrawn their Rule 59 motions and proceed only under Rule 50. (Dkts 653-6 ("ATS&K Reply") at 25 n.21, 655.) Protostorm's cross−motion seeking to correct the judgment, pursuant to Federal Rule of Civil Procedure 60(a) (Dkt. 648), was denied by the Court by docket order dated April 6, 2015.

[2] The Court refers to the internal pagination of each document rather than the pagination assigned by the ECF system.

Following post−trial briefing on the allocation of damages, the Court assigned all compensatory damages to ATS&K for the acts of its attorneys, including Schiavelli, Brundidge, and Bailey, and reduced the amount of compensatory damages based on the jury's findings that Protostorm was 4% at fault. (Dkts. 565 at 9−10, 610 at 3.) The Court accordingly entered judgment for Protostorm against ATS&K in the amount of $6,696,000 in compensatory damages and $900,000 in punitive damages, and against Brundidge in the amount of $100,000 in punitive damages. (Dkt. 611.) ATS&K was also assessed $1,050,720.60 in pre-judgment interest as part of the final judgment. (Dkt. 639.)

## II.     Defendants' Rule 50(b) Motions

ATS&K's Rule 50(b) motion asserts that Protostorm failed to establish at trial proximate cause because its invention was unpatentable under 35 U.S.C. §§ 101 and 103. (ATS&K Mem. at 10, 24.) ATS&K further asserts that Protostorm failed to prove damages or show that ATS&K had a duty to draft the hypothetical claims prepared by Protostorm's expert, Irving Rappaport ("Rappaport"). (*Id.* at 18, 26.) In addition, ATS&K contends that the evidence was insufficient to show that an attorney-client relationship persisted between ATS&K and Protostorm after March 4, 2005 (three years before Protostorm commenced this action) and that the action was thus timely, and that an award of punitive damages was justified. (*Id.* at 31, 35.)

Brundidge's Rule 50(b) motion challenges the sufficiency of the evidence with respect to the tolling of the statute of limitations as to him through August 25, 2006, the date he was added as a defendant in the Second Amended Complaint. (Dkt. 645−1 ("Brundidge Mem.") at 6.) Brundidge also contends that the record does not support his individual liability for malpractice because Protostorm failed to make a showing that Brundidge was individually responsible for prosecuting the patent application and that his representation continued to the national phase of patent prosecution after September 2001. (*Id.* at 12, 13.) Brundidge further asserts that any

breach of duty to Protostorm did not cause ascertainable damages. (*Id.* at 15, 17.) Finally, Brundidge argues that there was no basis for the jury's award of punitive damages against him individually. (*Id.* at 19.) Throughout his motion papers, Brundidge claims that the jury made factual findings based on the collective actions of ATS&K's lawyers, not Brundidge individually. (*E.g.*, *id.* at 7 n.2, 10, 11 n.3; Dkt. 654 ("Brundidge Reply") at 1.)

Bailey joins in ATS&K's Rule 50(b) motion in its entirety (Dkt. 626−1 ¶ 6) and also in the portion of Brundidge's motion that relates to the statute of limitations defense (*id.* ¶ 7).

## *DISCUSSION*

### III.   Legal Standard

Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges: prior to submission of the case to the jury under Rule 50(a), and after the verdict and entry of judgment under Rule 50(b). *Unitherm Food Sys., Inc. v. Swift−Eckrich, Inc.*, 546 U.S. 394, 399−400 (2006). Under Rule 50(b), if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the Court may either order a new trial or direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b); *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 172 (E.D.N.Y. 2012).

A Rule 50 motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair−minded [persons] could not arrive at a verdict against [it].'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)) (alterations in original). The issue on a Rule 50 motion is whether "'the evidence is such that, without weighing the credibility of the witnesses or

otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (quoting *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir. 1994)) (alterations in original); *see Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (the court may not decide a Rule 50 motion by evaluating the credibility of witnesses or the relative weight of the evidence). "Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" *This is Me*, 157 F.3d at 142 (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

When ruling on a Rule 50(b) motion, "[a] court 'must give deference to all credibility determinations and reasonable inferences of the jury[.]'" *Caruolo*, 226 F.3d at 51 (quoting *Galdieri−Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)); *see also Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (the court must "'consider the evidence in the light most favorable to the [non moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence'") (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)) (alterations in original). As the Supreme Court has explained, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). Thus, a movant seeking to set aside a jury verdict faces "a high bar," *Lavin–McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001), and such motions "should be granted cautiously and

sparingly" *Welch*, 871 F. Supp. at 173 (quoting 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995)); *see Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey*, 178 F.3d 103, 112 (2d Cir. 1999).

## IV. Whether Defendants' Rule 50(b) Arguments Were Properly Preserved

Rule 50(a) provides that a motion for judgment as a matter of law made before the case is submitted to the jury "shall specify . . . the facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). A post−trial Rule 50(b) motion is properly made only if a Rule 50(a) motion has been made before submission of the case to the jury. *Bracey v. Bd. of Ed. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). Because a motion pursuant to Rule 50(b) "is in reality a renewal of a motion" pursuant to Rule 50(a), *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir. 1993) (citation omitted), the grounds on which a party may rely in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." *Galdieri–Ambrosini*, 136 F.3d at 286; *see Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."). "[T]he movant is not permitted to add new grounds after trial" in a Rule 50(b) motion. *Galdieri–Ambrosini*, 136 F.3d at 286. Arguments not raised in a preceding Rule 50(a) application are not properly preserved for review in a subsequent Rule 50(b) motion. *See Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012); *Holmes v. United States*, 85 F.3d 956, 963 (2d Cir. 1996). "[T]he burden is upon the non−moving party to raise the issue; otherwise it is waived." *United States ex rel. Maris Equipment Co. v. Morganti, Inc.*, 163 F.Supp.2d 174, 181 (E.D.N.Y. 2001).

Thus, before determining whether Defendants are entitled to judgment as a matter of law under Rule 50(b), the Court must first consider whether they preserved the bases of their Rule 50(b) motions by making a sufficiently specific Rule 50(a) motion prior to submission of the

case to the jury. *See Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 211 (E.D.N.Y. 2009). "Although Rule 50(a) does not define how specific the motion must be, the purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Galdieri–Ambrosini*, 136 F.3d at 286 (citations and internal quotation marks omitted). The specificity requirement serves the further important purpose of informing the trial court of the precise issues it must decide in ruling on the motion. *See, e.g.*, *Gordon v. County of Rockland*, 110 F.3d 886, 887 n.2 (2d Cir. 1997). Accordingly, to preserve an argument for a Rule 50(b) motion, the preceding Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri–Ambrosini*, 136 F.3d at 286; *id.* at 287 ("[t]he ultimate question is whether the [Rule 50(a)] motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in [their] proof"); *see Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1308 (Fed. Cir. 2011) (district court and non−moving party were sufficiently alerted to issues raised in movant's post−trial motion because pre−verdict "motion identified both the legal grounds for the motion as well as the underlying references for each ground"). "[T]his procedural requirement may not be waived as a mere technicality[.]" *Cruz*, 34 F.3d at 1155.

The Second Circuit, however, recognizes an exception to the specificity requirement, permitting the district court to grant a Rule 50(b) motion even absent a properly−made Rule 50(a) motion if necessary to prevent "manifest injustice" or to correct "purely legal error." *Malmsteen v. Berdon, LLP*, 369 Fed. App'x 248, 249 (2d Cir. 2010) (citing *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004)); *Barkley v. United Homes, LLC*, 04 CV 875, 2012

WL 2357295, at *4 (E.D.N.Y. June 20, 2012) (A court "may reach a forfeited issue only if ignoring the issue would 'result in manifest injustice' or if the issue involved is 'purely legal error.'") (quoting *AIG Global Secs. Lending Corp. v. Banc of Am. Secs., LLC*, 386 Fed. App'x 5, 6 (2d Cir. 2010)). What constitutes "manifest injustice" turns on the specifics of each case. *Welch*, 871 F. Supp. 2d at178. "Of course, a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion." *Id.* "Such an argument would, of course, obviate the need for the procedural requirement in the first place." *Health Alliance Network, Inc. v. Continental Cas. Co.*, 245 F.R.D. 121, 124 (S.D.N.Y. 2007). "However, 'where the argument presents a question of law and there is no need for additional fact−finding,' and manifest injustice may arise, then exercise of this discretion is warranted." *Welch*, 871 F. Supp. 2d at 178 (quoting *Malmsteen*, 369 Fed. App'x. at 251).

Here, Defendants' trial counsel[3] made oral motions under Rule 50(a) on several grounds at the close of Plaintiffs' case-in-chief and again before closing argument. (Tr. 1277, 2824.)[4] Defendants contended that the evidence failed to demonstrate that they were responsible for drafting the final patent application. (Tr. 1277−79, 1280, 2824.) Defendants further asserted that they were entitled to judgment as a matter of law on their statute of limitations defense because there was no evidence that Defendants concealed malpractice or that Protostorm had a reasonable expectation of representation after 2001. (Tr. 1279, 2824−25.) Additionally, Defendants claimed that there was no showing of malicious or willful intent to warrant an award

---

[3] At trial, ATS&K, Bailey, and Brundidge collectively were represented by the L'Abbate, Balkan, Colavita & Contini firm ("Defendants' trial counsel"). On August 26, 2014, following the verdict, Defendants' trial counsel filed a letter stating that because attribution of fault would impact all defendants, the L'Abbate firm had an "inherent conflict" and thereafter would only represent ATS&K, and that the other defendants would retain individual counsel. (Dkt. 536 at 1.) Bailey and Brundidge each have retained separate counsel for post−trial motions.

[4] Citations to "Tr." refer to the trial transcript.

of punitive damages. (Tr. 1280.) Finally, Defendants asserted that Protostorm's proof on patentability was deficient because prior art anticipated the Protostorm invention. (Tr. 2824.)

Defendants' post−trial Rule 50(b) motions similarly assert that: (1) Protostorm failed to establish that Defendants had a duty to draft or prosecute the patent application or that the attorney-client relationship continued after 2001 (ATS&K Mem. Point IV; Brundidge Mem. at 12−14); (2) the action is time−barred by the statute of limitations for lack of continued representation or concealment (ATS&K Mem. Point V; Brundidge Mem. at 5−10); (3) the jury award of punitive damages was against the weight of the evidence and should be vacated (ATS&K Mem. at Point VI; Brundidge Mem. at 19); and (4) Protostorm failed to meet its burden on anticipation under 35 U.S.C. § 102 (ATS&K Mem. at 25 n.13). Since these three points were sufficiently encompassed in Defendants' Rule 50(a) motions, they are properly preserved for review as part of Defendants' Rule 50(b) motions.

Conversely, the Court finds that Defendants are procedurally barred from raising their remaining arguments, namely, that: (1) Protostorm cannot show patentability under 35 U.S.C. §§ 101 and 103, which is necessary to establish proximate cause (ATS&K Mem. at Points I and III; Brundidge Mem. at 16−17); and (2) Protostorm failed to prove damages (ATS&K Mem. at Point II; Brundidge Mem. at 17−19).

## A. Defendants Failed to Preserve Proximate Cause Patentability Arguments Under Sections 101 and 103

ATS&K's Rule 50(b) motion contends that Protostorm did not carry its burden to show proximate cause because it offered insufficient proof on two requirements for patentability. Under Point I of its motion, ATS&K asserts that as a matter of law, the hypothetical claims drafted by Protostorm's expert, Irving Rappaport, were directed to an unpatentable abstract concept under Section 101, as recently discussed by the Supreme Court in *Alice Corp. Pty, Ltd.*

*v. CLS Bank International*, 134 S.Ct. 2347 (2014). (ATS&K Mem. at 10−18.)[5] Second, ATS&K contends that Protostorm did not satisfy its burden of establishing nonobviousness under Section 103. (ATS&K Mem. at 24−25; ATS&K Reply at 19−21.)[6] Bailey's Rule 50(b) motion adopts both of ATS&K's unpatentability arguments (Dkt. 626-1 ¶6), and Brundidge's motion briefly argues that Protostorm's claims are unpatentable abstract ideas (Brundidge Mem. at 3, 17). Defendants' oral Rule 50(a) motion, however, did not specifically raise Sections 101 or 103.

Although Defendants' oral Rule 50(a) motions at trial challenged the patentability of the Protostorm invention, the grounds stated by their trial counsel were altogether different from the Section 101 and 103 arguments raised in the Rule 50(b) motion. At the close of Plaintiffs' case, Defendants argued that Plaintiffs had failed to prove patentability because (1) Rappaport's expert report did not include a prior art analysis; and (2) the hypothetical claims drafted by Rappaport would have been considered "new matter" that would have lost priority with the United States Patent and Trademark Office ("PTO"). (Tr. 1280−81.)[7] Upon renewal of the 50(a) motion before closing arguments, Defendants added two additional grounds with respect to patentability:

---

[5] Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.

[6] Section 103 provides that a patent "may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C § 103.

[7] Defendants' trial counsel, however, did not explain whether "losing priority" with the PTO would necessarily result in no patent being issued for the Protostorm invention based on Rappaport's hypothetical claims. (Tr. 1280.)

(1) Rappaport's hypothetical claims were not supported by Protostorm's Patent Cooperation Treaty ("PCT") application; and (2) prior art anticipated the Protostorm invention. (Tr. 2824.)

With the exception of Defendants' arguments on anticipation, these arguments are not the same ones that Defendants now raise in their Rule 50(b) motion, nor did Defendants Rule 50(a) motions sufficiently apprise Plaintiffs of these arguments. First, nowhere in Defendants' Rule 50(a) motions did they argue that a directed verdict was appropriate because Protostorm's invention was an "unpatentable abstract concept." Second, to the extent Defendants challenged a particular element of patentability in their Rule 50(a) motions, they focused on anticipation and not obviousness. It is well−established that "anticipation" and "obviousness" are separate conditions of patentability, requiring different tests and different elements of proof. *Minkin v. Gibbons, P.C.*, 680 F.3d 1341, 1351 (Fed. Cir. 2012); *see also Duro–Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003) ("obviousness and anticipation are related, but are legally distinct and separate challenges to a patent's validity").[8] Thus, Defendants' failure to raise obviousness in their Rule 50(a) motion, focusing instead on anticipation, is fatal to their post-trial obviousness claim. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188 (Fed.Cir. 2002) (pre−verdict Rule 50 motion regarding anticipation by prior public knowledge did not support post−verdict motion on obviousness).

Furthermore, raising patentability as a general issue is not enough to satisfy Rule 50's requirement that the specific grounds for a Rule 50(b) motion be articulated in a Rule 50(a) motion. (*See* ATS&K Mem. at 8.) Patentability is a multi-faceted inquiry, with the various

---

[8] While Second Circuit precedent controls the application of Rule 50 to this case, Federal Circuit law is instructive regarding patent law issues. *See Sjolund v. Musland*, 847 F.2d 1573, 1576 (Fed. Cir. 1988); *Panduit Corp. v. All States Plastics Mfg. Co.*, 744 F.2d 1564, 223 (Fed. Cir. 1984).

grounds for patent validity requiring separate analyses.[9]  For instance, the Supreme Court has recognized that "[t]he § 101 patent−eligibility inquiry is only a threshold test," after which the claimed invention must also satisfy other tests, including that the invention be novel, *see* § 102, nonobvious, *see* § 103, and fully and particularly described, *see* § 112.  *Bilski v. Kappos*, 561 U.S. 593, 602 (2010).  Given the distinct nature of the various challenges to patentability, a Rule 50(a) motion directed towards patentability broadly does not provide sufficient notice for purposes of Rule 50(b).  *See i4i Limited Partnership v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010) (pre-verdict Rule 50 motion on anticipation was insufficient to preserve right to post-verdict motion on obviousness or on another prior art), *aff'd*, 131 S.Ct. 2238 (2011); *Junker v. Eddings*, 396 F.3d 1359, 1364 (Fed. Cir. 2005) (Rule 50(a) motion "was not sufficiently detailed in describing the facts and [] features" on which the movant based its claim of invalidity); *Duro−Last*, 321 F.3d at 1107–08(improper for district court to rule on patent unenforceability and invalidity defenses raised in Rule 50(b) that differed from those raised in prior Rule 50(a) motion).

Accordingly, the Court holds that Defendants' Rule 50(a) motions, which were directed at patentability broadly and at different non−patentability grounds than those raised post-trial, did not supply a sufficient predicate for Defendants' present Rule 50(b) motions.  Furthermore,

---

[9] To receive patent protection, a claimed invention must, among other things, fall within one of the express categories of patentable subject matter (§ 101) and be novel (§ 102) and nonobvious (§ 103).  *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).  Additionally, the claimed invention must fulfill a host of technical requirements, including the requirements that a patent be supported by a sufficiently detailed written description (§ 112) and have a priority filing date (§§ 119, 120).  *See also* 35 U.S.C. § 102(b) and (d) (establishing statutory one−year bars to patentability); § 111(a)(2)(C) (requiring submission of an oath by the applicant); § 111(a)(3) (requiring submission of a fee with the application); § 116 (requiring joint inventors to apply for a patent jointly).

as discussed below, there is no basis for finding that Defendants did not forfeit the arguments they failed to raise in their Rule 50(a) motions.

### 1. Defendants Forfeited Their Section 101 Non−Patentability Argument

Defendants' Section 101 non−patentability argument is premised on the Supreme Court's decision in *Alice Corp. Pty, Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), and its progeny. (ATS&K Mem. at 10−18; Brundidge Mem. at 3, 17.) ATS&K contends that it should be permitted to make a Rule 50(b) motion based on *Alice* because: (1) Protostorm was on notice of the principles established in *Alice*; (2) significant case law applying *Alice* was only decided after the trial in this case; (3) *Alice* presents a purely legal issue; and (4) allowing Protostorm to recover based on an unpatentable concept would result in manifest injustice.

In *Alice*, the Supreme Court held that a computer−implemented method of mitigating "settlement risk" between contracting parties in foreign−currency transactions did not constitute a patentable invention, but rather amounted to an unpatentable abstract idea. 134 S. Ct. at 2351−52, 2359−60. More specifically, the Court ruled that "the claims at issue are drawn to the abstract idea of intermediated settlement, and that merely requiring generic computer implementation fails to transform that idea into a patent-eligible invention." *Id*. at 2352.

In reaching this conclusion, the Supreme Court applied the two−step analysis established in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.* ("*Mayo*"), 132 S. Ct. 1289 (2012), which assists courts in "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent−eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. The first step in the *Mayo/Alice* test is to determine "whether the claims at issue are directed to one of those patent−ineligible concepts", *i.e.*, law of nature, natural phenomena, abstract idea. *Id.* Courts look to the elements of each claim both

individually and in "'an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent−eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297–98). Assuming that the claims are directed at a patent−ineligible concept, step two is "a search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (internal quotation marks and alterations omitted).

At step one, the *Alice* Court concluded that the patent's claims "were drawn to the abstract idea of intermediated settlement," *i.e.*, using a third party to reduce settlement risk. *Id.* at 2355−56. The Court further found that this concept was "a fundamental economic practice long prevalent in our system of commerce." *Id.* at 2356 (internal quotation marks omitted). The Court accordingly proceeded to step two, looking for some inventive concept beyond the abstract idea that would transform it into a patentable invention. *Id.* at 2357. The Court noted that this step requires more than an abstract idea with the words "apply it" added on. *Id.* at 2358. In *Alice*, the additional element beyond the abstract idea was the computer program that applied the abstract idea. But the Court noted that "wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Id.* (internal quotation marks omitted). Analyzing the steps claimed in the patent, the Court concluded that the computer application involved nothing more than "well−understood, routine, conventional activities previously known to the industry." *Id.* at 2359 (internal quotation marks and alterations omitted). The Court reached the same conclusion when it analyzed the patent's steps as an ordered combination. *Id.* ("Viewed as a whole, petitioner's method claims simply recite

the concept of intermediated settlement as performed by a generic computer."). Thus, under applying the *Mayo* test, the Court held that the patent at issue in *Alice* was invalid.

Here, Defendants contend that "[t]he 'Protostorm Invention' is directed at the abstract concept of selecting advertising based on a customer's interaction with an advertiser's content", which is an unpatentable marketing concept under post-*Alice* case law. (ATS&K Mem. at 13−16; *see also* Brundidge Mem. at 3, 17.) ATS&K further contends that the Protostorm invention does not satisfy the second step of the *Mayo/Alice* analysis because the hypothetical claims drafted by Rappaport "merely describe[] conventional computer interactions of the type numerous courts have held are insufficient to supply an inventive concept," and "the application of a long−established business concept in an internet gaming context . . . supplies no inventive concept." (ATS&K Mem. at 16-17.) ATS&K relies in particular on *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 712 (Fed. Cir. 2014), in which the Federal Circuit determined that a patent claiming a method for offering consumers free media over the internet in exchange for viewing an advertisement was directed at "the abstract idea of showing an advertisement before delivering content.". At the second step of the *Mayo/Alice* analysis, the court held that certain limitations in the claims "such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet" did not transform the abstract idea into patent−eligible subject matter because the "claimed sequence of steps comprises only 'conventional steps, specified at a high level of generality,' which is insufficient to supply an 'inventive concept.'" *Id.* at 716 (quoting *Mayo*, 132 S. Ct. at 1294, 1297, 1300).[10]

---

[10] Among the cases on which ATS&K relies are *Tuxis Techs., LLC v. Amazon.com, Inc.*, 13 CV 1771, 2014 WL 4382446, at *1 (D. Del. Sept. 3, 2014) (idea of "upselling" or "offering something to a customer based on his or her interest in something else" was abstract, and the patent was not sufficiently limited to prevent its claims from covering the full abstract idea itself); *Open Text S.A. v. Alfresco Software Ltd.*, 13 CV 04843, 2014 WL 4684429, at *4 (N.D.

ATS&K acknowledges that Defendants "did not press an argument under *Alice* and its progeny until after trial." (ATS&K Mem. at 9.) None of the Defendants offers any explanation for why they did not raise the *Alice* argument at any point prior to or during the trial, given that *Alice* was decided a month before trial commenced. Furthermore, *Alice* did not, as ATS&K would have the Court believe, announce a previously−unknown framework for analyzing patent eligibility under Section 101.[11] The Supreme Court's analysis in *Alice* builds on prior Supreme Court precedent, including *Bilski*, 561 U.S. at 609, in which the Court held that a method for hedging the risk of changing energy prices was too abstract a concept to be patentable, and *Mayo*, 132 S. Ct. at 1293, in which the Court decided that a patent claim to a method of medical diagnosis was directed at "natural law" and that a step that merely said "apply it" was, without "significantly more," ineligible for a patent. *Alice*, 134 S. Ct. at 2355-57; *see also DDR Holdings, LLC v. Hotels.com, L.P. ("DDR")*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (*Mayo* sets forth the analytical framework under Section 101 for determining whether a patent claim is ineligible subject matter). As noted above, the Supreme Court applied the analysis set forth in *Mayo* to reach its conclusion in *Alice*. Since *Bilski* and *Mayo* were decided in 2010 and 2012, respectively, and *Alice* was decided a month before trial, there was no reason that Defendants

Cal. Sept. 19, 2014) ("very simple computer−driven method to engage in the commonplace and time−honored practice of interacting with customers to promote marketing and sales" was directed at an abstract idea and did not contain significant limitations); and *Morsa v. Facebook, Inc.*, 14 CV 161, 2014 WL 7641155, at *9 (C.D. Cal. Dec. 23, 2014) (claims drawn to the abstract idea of "displaying advertisements to consumers based on their demographic information" that did not contain an "inventive concept" were patent−ineligible). (ATS&K Mem. at 1 n.1, 13−17.)

[11] Indeed, the Supreme Court noted in *Mayo* that "[t]he Court has long held that [Section 101] contains an important implicit exception. [L]aws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo*, 132 S.Ct. at 1293 (internal quotation marks omitted) (citing cases dating back to 1841). On this issue, Defendants inconsistently argue that *Alice* essentially announced a new rule regarding the unpatentability of abstract ideas and yet Plaintiffs were sufficiently on notice of this concept before trial because it was based on principles previously established in decisions such as *Mayo*.

could not have raised its Section 101 argument before the case was submitted to the jury. The fact that decisions applying *Alice* were issued after the conclusion of trial (*see* ATS&K Mem. at 9) does not excuse Defendants' failure to present the argument prior to or during the trial that Protostorm's claims were directed at patent−ineligible, abstract subject matter. If anything, the fact that arguments based on *Alice* were raised in other pending cases only underscores the point that Defendants could, and should, have raised its *Alice* argument before or during trial.[12]

Nor can Defendants seriously contend that Protostorm was on notice to the now-asserted deficiencies in its proof regarding patent eligibility under Section 101. (*Id.* at 8−9). ATS&K has not pointed to *any* instances in the trial record in which Defendants' counsel raised Section 101. Protostorm's counsel's brief acknowledgement during a trial sidebar that Defendants disputed whether Protostorm would have been granted a patent under Section 101 in the Pretrial Order (*see id.* at 9 (quoting Tr. 1911)[13]) is insufficient to satisfy *Defendants'* obligation to provide Protostorm notice of their Section 101 challenge in a sufficiently specific pre−verdict Rule 50(a) motion. *See, e.g.*, *Bracey*, 268 F.3d at 117 (holding that district courts may not excuse the Rule 50(a) requirement); *Cruz*, 34 F.3d at 1155 (barring certain claims on Rule 50(b) motion where moving party failed to specifically preserve those issues in a prior motion for directed verdict); *Lambert*, 10 F.3d at 53–54 (noting that "the specificity requirement is obligatory" when examining the correlation between Rule 50(a) and 50(b) motions. Furthermore, the fact that Plaintiffs might have been aware of a potential *Alice* issue before trial does not absolve

---

[12] There is a glaring contradiction in ATS&K's position—on the one hand, they seek to be excused for not timely raising *Alice* because case law applying *Alice* had not been decided at the time of trial in this case, while at the same time arguing, as discussed *infra*, that no patent would have issued on the Protostorm invention because the PTO, when examining the patent between 2001 and 2006, should have applied the *Alice* test.

[13] Notably, this comment was made in the course of an objection by Protostorm that ATS&K's expert was seeking to raise new issues outside the scope of his expert report.

Defendants of their responsibility to raise the issue and thereby put Plaintiffs on notice of Defendants' intent to rely on this defense.

ATS&K next argues that because patent eligibility is a pure question of law, it may be raised for the first time in a Rule 50(b) motion. ATS&K asserts that because the question of patent eligibility can be answered by reference to the language of the hypothetical claims alone, there were no additional facts that Protostorm could have presented at trial to remedy deficiencies in its proof on causation and patent eligibility, and therefore Protostorm is not prejudiced by the Court addressing the issue at this late stage. (ATS&K Mem. at 9−10.) The Court disagrees.

Preliminarily, it bears emphasis that in this legal malpractice action, the issue of patent eligibility is only relevant to the element of proximate cause, which is generally decided by the finder of fact under New York Law. *See Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 668 (N.Y. 1980). In ruling on the parties' motions for summary judgment, the Court previously held that there existed triable issues of fact regarding proximate cause based on competing expert opinions "as to whether the [Protostorm patent] application would have led to a valid, and valuable, patent[.]" *Protostorm*, 834 F. Supp. 2d at 159.

While the question of whether a claim is directed at patent−eligible subject matter is one of law, that determination will often entail the resolution of underlying factual questions. *VS Techs, LLC v. Twitter, Inc.*, 11 CV 43, 2012 WL 1481508, at *4 (E.D. Va. Apr. 27, 2012) (addressing Section 101 and noting that although the ultimate question of validity of patent is a question of law, "there may be underlying factual questions that the jury must answer") (citing *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055–56 (Fed. Cir. 1992)); *see also Microsoft Corp*, 131 S. Ct. at 2242−43 ("While the ultimate question of patent validity

is one of law, the same factual questions underlying the PTO's original examination of a patent application will also bear on an invalidity defense in an infringement action.") (internal marks and citations omitted); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273−74 (Fed. Cir. 2012) ("it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter"). Courts accordingly have declined to decide the issue of patent eligibility as a matter of law (*i.e.*, prior to fact−finding or claim construction) when the issue depends upon the resolution of a factual dispute. *See Card Verification Solutions, LLC v. Citigroup Inc.*, 13 CV 6339, 2014 WL 4922524, at *5 (N.D. Ill. Sept. 29, 2014); *Genetic Techs. Ltd. v. Glaxosmithkline, LLC*, 12 CV 299, 2014 U.S. Dist. LEXIS 156473, at *2−4 (M.D.N.C. Aug. 22, 2014); *see also VS Techs*, 2012 WL 1481508, at *4. *Cf. Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, 12 CV4878, 2014 WL 4162765, at *5−6 (D.N.J. Aug. 19, 2014) (citing cases and noting that courts have adjudicated patent eligibility prior to claim construction where there are no factual disputes, there was no reasonable construction that would bring claims within patentable subject matter, or the construction most favorable to the patentee are still patent−ineligible).

Here, the parties disputed, through dueling expert testimony, how Protostorm's claims should have been formulated in its patent application  and how those claims might have evolved during the patent examination process, which sometimes involves the submission of additional or revised information to the PTO.  Because the jury returned a verdict in Protostorm's favor, the Court assumes that at least one valid and enforceable patent would have been issued based on the hypothetical claims drafted by Protostorm's expert, Rappaport.  Thus, the question at this stage of the proceedings is whether the Court can decide, as a matter of law based on the evidence

adduced at trial, that none of Protostorm's hypothetical claims would survive the *Mayo/Alice* patentability test, *i.e.*, whether each of these claims is directed at an abstract idea and lacks an inventive concept. *Alice*, 134 S. Ct. at 2355.

The Court declines to decide, as a matter of law, whether Protostorm's hypothetical claims are directed to an unpatentable marketing concept of targeted, in−game dynamic advertising (*see* ATS&K Mem. at 13), because even accepting this contention, the Court cannot determine whether these claims lack an inventive concept without additional development of the record. Courts have recognized that inventive concept analysis is the "heart of every post−*Alice* dispute." *In re TLI Commc'ns LLC Patent Litig.*, 14 MD 2534, 2015 WL 627858, at *10 (E.D. Va. Feb. 6, 2015). In the context of patent infringement cases, several courts have found that the question whether claims contain an inventive concept cannot be resolved at the motion to dismiss stage without claim construction and a more developed factual record. *See Card Verification Solutions*, 2014 WL 4922524, at *5; *Genetic Techs*, 2014 U.S. Dist. LEXIS 156473, at *2−4; *Data Distrib. Techs.*, 2014 WL 4162765, at *12−13. The Federal Circuit also has recognized that not all claims in software−based patents will necessarily be directed to an abstract idea. *Ultramercial*, 772 F.3d at 715.

Here, because Defendants did not pursue an *Alice* non−patentability argument with respect to proximate cause, they neither presented any evidence on inventiveness nor sought a finding from the jury on this issue. The trial record is devoid of expert testimony on whether Protostorm's hypothetical claims included a sufficiently inventive concept at the time a patent was sought to render the claim unpatentable. Similarly, the jury was never instructed to consider whether the patent claims were sufficiently inventive at the time such that a patent would likely issue. Indeed, ATS&K implicitly acknowledges that there is a factual predicate to the

inventiveness inquiry by citing prior art evidence in support of its Rule 50(b) argument that Protostorm's invention does not supply an inventive concept. (*See* ATS&K Mem. at 17 (arguing that the Protostorm invention merely incorporates advertising in an internet gaming context).)

At the very least, the trial record does not contain sufficient evidence on the issue of whether features of the Protostorm invention added sufficient limitations to supply an inventive concept. In *DDR* the Federal Circuit declined to invalidate a computer−implemented invention for keeping users on a host website by retrieving data from other websites and displaying dynamically constructed web pages with the same "look and feel" as the host site. 773 F.3d at 1248−49. The court noted that rather than "merely recit[ing] the performance of a business practice known from the pre−Internet world along with the requirement to perform it on the internet," the solution was rooted in computer technology "to overcome a problem specifically arising in the realm of computer networks" that users were transported away from a host site upon the click of an advertisement for a third−party product displayed on a host's website. *Id.* at 1257. The court distinguished the case from *Ultramercial* on the basis that the patent claims at issue in *DDR,* rather than "broadly and generically claim[ing] 'use of the Internet' to perform an abstract business practice (with insignificant added activity)", "specif[ied] how interactions with the Internet [were to be] manipulated to yield a desired result . . . that overr[ode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. In addition, the court found that the claims included additional features to ensure that the claims were more than a drafting effort to monopolize an abstract idea because they recite a specific way to achieve the result. *Id.* at 1529.

Here, Plaintiffs introduced evidence strongly suggesting that the features of the Protostorm invention were similar to those of the invention in *DDR*, and did more than simply tie

an abstract marketing idea to a general purpose computer or the internet. The Protostorm invention created a "secure and private online game environment" that recreated sponsor websites, required game players to analyze sponsor websites to advance in the game play, and set in place an apparatus for dynamically tracking activity and delivering targeted sponsor content in real time. As set forth in Rappaport's hypothetical claims, the Protostorm invention claimed "an interactive computer game system incorporating sponsor−paid commercial advertising and marketing content" directly within the game play. (Pl. Ex. 79 at 3.)[14] The invention is comprised in part of a "host" computer system that tracks the interaction of game player with sponsor advertising content (*id.* at 3; Tr. 942−44), is capable of dynamically selecting additional advertising to be provided in real−time to the player based on interactions with sponsor content (Tr. 945), and can track and report the effectiveness of ads to sponsors (Tr. 954). The invention claimed a method for dynamically updating database tables for each user to track user activity, provide additional advertising, and report activity to sponsors. (Pl. Ex. 79 at 4; Tr. 228, 945.) The system could also track the game player as he or she visited sites outside of the game until the player returned to the game or logged off the game. (Tr. 235−36.) In addition, the invention claimed an internal communications network by which gamers could chat with each other about the game play. (Pl. Ex. 79 at 5; Tr. 232.)

The game itself consists of "simulated web pages of the different [advertising] sponsors" and asks players to interact directly with sponsor content by searching for clues embedded in that content and solving tasks. (Pl. Ex. 79 at 4; Tr. 227, 944−45.) As Faulisi explained at trial, an object of the game was to uncover hidden messages in mock−ups of sponsor's live websites, and

---

[14] Citations to "Pl. Ex." in this Memorandum & Order refer to Plaintiffs' trial exhibits introduced by Plaintiffs, as attached to the Declaration of Robert S. Goodman submitted by Protostorm in opposition to Defendants' Rule 50(b) motions. (Dkt. 650 & Exs.)

use utilities and tools to find clues and "clean up" the site. (Tr. 227, 234−35.) After cleaning a site, the player received coupons or free gifts from sponsors. (Tr. 228.) According to Faulisi, this method of using sponsor content directly in the game play was a way of holding user's attention on sponsor content. (Tr. 221, 225, 236.) Faulisi testified that at the time he and Shakespeare conceived of the invention, banner and static advertisements were prevalent in internet gaming, but had low click−through rates and were further problematic in that clicking on those advertisements would transport users away from the host site. (Tr. 219−21, 229, 231−32.) Thus, beyond simply limiting the idea to a technological environment and merely "applying it," the Protostorm claims include additional features that arguably specify how interactions with the internet are manipulated and recite a specific way to achieve a desired result. These features— the in-game aspects, creation of mock versions of live sponsor sites, and built-in gamer interaction with sponsor messages—may well render the Protostorm claims far more similar to the patentable claims at issue in *DDR* than the unpatentable ones in *Ultramercial*.

However, the trial record is insufficient for the Court to resolve this issue. There remain unresolved factual disputes as to whether the computer interactions described in the Protostorm claims were considered "well−understood, routine, conventional activity" at the time the claims would have been examined by the PTO between 2001 and 2006. Just as expert testimony was necessary for the jury to determine whether a valid and valuable patent would have issued, expert testimony on the inventiveness of Protostorm's patent claims *at the time of* the PTO's examination is also necessary in determining whether these claims were patentable. *Byrne v. Wood, Herron & Evans, LLP*, 450 F. App'x 956, 962 (Fed. Cir. 2011), *cert. granted, judgment vacated on other grounds*, 133 S. Ct. 1454 (2013) ("In the context of a malpractice suit in which a plaintiff alleges that, but for the attorney's negligence, he would have obtained broader patent

claims, a plaintiff must show that broader patent claims 'would have been held patentable on examination in the [United States Patent and Trademark Office] . . . , in accordance with the criteria of patentability applied *during examination*.'" (quoting *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010)).  Accordingly, the Court finds that the resolution of the patent eligibility issue requires additional facts or expert testimony that is absent from the trial record, and that Protostorm would be prejudiced by not having had the opportunity to adduce additional evidence in response to Defendants' belated patent eligibility argument.  Since the patent eligibility causation issue is not a purely legal matter, Defendants' failure to raise it in a pre−trial motion prevents it from raising it in this Rule 50(b) motion.[15]

---

[15] In any event, were the Court to find that Defendants did not forfeit their patent eligibility argument, applying the *Alice* inquiry to the time of the patent examination, *i.e.*, 2001 to 2006, is problematic.  Although ATS&K contends that the analysis in *Alice* would have applied during that time frame (ATS&K Mem. at 2 n.2, 17−18 (citing to cases noting that as opposed to legislative changes in law for which clear intent to apply the change retroactively is required, judicial interpretations of federal law must be given retroactive effect), the Court reiterates its view from the December 23, 2014 Order that patentability is assessed with the criteria applied during examination.  (Dkt. 619 at 3 n.3.)  Indeed, the Federal Circuit has recognized that prior to *Mayo* and *Alice*, "a computer−implemented invention was considered patent−eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (quoting *State St. Bank & Trust Co. v. Signature Fin. Grp., Inc.,* 149 F.3d 1368, 1373 (Fed. Cir. 1998)).  Unlike a patent infringement case, in which an alleged infringer may challenge the patent as now ineligible under *Alice*, in this malpractice case, Protostorm claimed that but for Defendants' malpractice, the Protostorm invention *would have been* examined by a PTO patent examiner at *between 2001 and 2006*, and that one patent *would have issued by June 2006*—well before *Bliski*, *Mayo*, *Alice*, and their progeny were decided.  Thus, the only question is whether the patent application would have resulted in an issued patent in the 2001 to 2006 time period so that the patent could have been monetized through licenses during the relevant time.  Even if the patent could have been invalidated in a later infringement action under *Alice*, which was decided in June 2014, Protostorm would still be entitled to any royalty income earned until then.  As Protostorm's opposition correctly observes, money earned, and contractual rights to continue earning, under licenses are not terminated by the possibility of a future challenge to invalidate the Protostorm patent.  In fact, ATS&K recognizes that "[a]t an absolute minimum, *Alice* and its progeny make clear that Protostorm would not have been able to obtain licensing revenues after 2014[.]"  (ATS&K Mem. at 18, n.10.)

## 2. ATS&K and Bailey Forfeited Their Section 103 Non−Patentability Argument

As noted above, Defendants' oral Rule 50(a) motions failed to specifically raise, and therefore preserve, ATS&K's and Bailey's Rule 50(b) argument that Protostorm did not satisfy its burden of establishing patentability because Rappaport's testimony concerning nonobviousness under Section 103 was "conclusory and without detail." (ATS&K Mem. at 24−25; *see* ATS&K Reply at 19−21; Tr. 1280, 2824.)[16] Although ATS&K contends that its Rule renewed 50(a) motion raised the issue, ATS&K's motion, in fact, only argued that prior art *anticipated* the hypothetical claims. (*See* ATS&K Reply at 19 n.18.) As ATS&K must concede, anticipation and obviousness are distinct issues that require separate analyses (ATS&K Reply at 19), and raising one issue in a pre−verdict Rule 50 motion is insufficient to preserve the other for a post−trial motion, *see Minkin* , 680 F.3d at 1351; *Duro–Last*, 321 F.3d at 1107. Defendants thus point to no portion of the trial transcript in which Defendants addressed obviousness. Having failed to raise the issue at trial, Defendants are precluded from doing so in a Rule 50(b) motion.

To the extent ATS&K contends that its argument is not waived because obviousness is a question of law (*see* ATS&K Reply at 21), that argument is meritless. Obviousness is "based on factual underpinnings," *i4i Ltd. P'ship,* 598 F.3d at 845, that the jury was not asked to make in

---

ATS&K's attempt to establish manifest injustice is equally unavailing. ATS&K briefly contends that it would be "manifest injustice" to permit Protostorm to recover when its alleged invention is not patentable. (ATS&K Mem. at 10, n.8). However, "a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion." *Welch*, 871 F. Supp. 2d at 178.

[16] Section 103 provides that a patent "may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C § 103.

this case.  Whether an invention would have been obvious under Section 103(a) is a legal conclusion based on factual findings concerning: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; and (3) the differences between the claimed invention and the prior art.  *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006) (citing *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003).  "In review of a jury verdict on the ground of obviousness, the underlying findings of fact, whether explicit or presumed as necessary to support the verdict, are reviewed for substantial evidentiary support; and the ultimate question of obviousness is reviewed for correctness in law, based on the factual premises." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1375–76 (Fed. Cir. 2004) ("These standards are applied by the district court upon motion for judgment as a matter of law, and again by the appellate court upon grant or denial of that motion."); *see Duro−Last*, 321 F.3d at 1108.

Here, ATS&K's Rule 50(b) argument challenges the sufficiency of Rappaport's testimony to establish obviousness.  (ATS&K Mem. at 25; ATS&K Reply at 19−21.)  However, despite twice moving for a directed verdict, Defendants did not raise this issue.  Had ATS&K presented this argument at trial, Protostorm would have had the opportunity to present evidence elaborating on the claimed deficiencies in its proof as to obviousness.  ATS&K's failure to do so thus prejudiced Protostorm.  Accordingly, the Court cannot consider ATS&K's Rule 50(b) argument concerning obviousness.

### B.  Defendants' Rule 50(b) Damages Argument is Not Properly Before the Court

Defendants' contention that Protostorm failed to establish damages to a reasonable certainty largely rehashes arguments already rejected by the Court in the pretrial *Daubert* hearing.  Specifically, Defendants assert that Rappaport's damages analysis was insufficient as a

matter of law because (1) Rappaport did not perform an infringement analysis, and (2) Rappaport's hypothetical future licensing revenue projections were speculative and not established to a reasonable certainty. (ATS&K Mem. at 18−24; ATS&K Reply at 16−18; Brundidge Mem. at 17−19). Defendants particularly challenge Rappaport's reliance on the June 2007 Yankee Group report in forming his opinion on damages. (ATS&K Mem. at 5, 22−23.) However, Defendants did not challenge Rappaport's damages analysis in their oral Rule 50(a) motion at the close of Plaintiffs' case. (*See* Tr. 1277−81.) Although ATS&K discussed damages in its renewed Rule 50(a) motion prior to closing arguments, ATS&K's discussion was directed at another argument that Rappaport's report, *assuming it was reliable*, mistakenly assumes that everyone in the field of dynamic in−game licensing would have signed a license. (Tr. 2825.) Defendants accordingly failed to preserve a Rule 50(b) argument based on the reliability of Rappaport's report.

Furthermore, the admissibility of expert testimony is not the proper subject of a Rule 50 motion, which is a vehicle to challenge the sufficiency of the evidence presented in a case, not evidentiary rulings. *See Gierlinger v. Gleason*, 160 F.3d 858, 869 (2d Cir. 1998) (no proper post−trial motion for judgment as a matter of law when memorandum of law challenged only evidentiary rulings and jury instructions); *Martinez v. Port Auth. of N.Y. & N.J.*, 01 CV 721, 2005 WL 2143333, at *2 (S.D.N.Y. Sept. 2, 2005), *aff'd*, 445 F.3d 158 (2d Cir. 2006). As explained by the Honorable Charles S. Haight in *LNC Investments, Inc. v. First Fidelity Bank*:

> A disappointed litigant may raise such evidentiary issues in support of a motion for a new trial under Rule 59 . . . , or on direct appeal, in which event the court of appeals will consider whether the trial court's evidentiary rulings constituted reversible error. But it is inherent in the standards which govern the granting or denial of a Rule 50(b) JMOL motion that the motion must be determined on the basis of the evidence the trial judge admitted and the jury considered. It is the record made at trial, consistent with the trial judge's evidentiary rulings, to which one must look in evaluating whether a rational jury could have arrived at the

verdict reached. Conceptually, one may allow the possibility that the jury was deprived of evidence it should have heard or seen, or that it heard or saw evidence that it should not have. . . . these perceived wrongs may be complained of by means of other procedural vehicles, but they can play no part in determining whether, on the record actually made, the [Plaintiffs] are entitled to judgment as a matter of law.

126 F. Supp. 2d 778, 785 (S.D.N.Y. 2001).

Fairly read, Defendants' Rule 50(b) arguments challenge the *admission* of Rappaport's damages analysis into evidence. ATS&K acknowledges as much in its response to Protostorm's waiver argument, stating that the Court's ruling on Defendants' *Daubert* challenge to Rappaport's testimony "constituted a definitive ruling on the issue," that is reviewable on appeal. (ATS&K Reply at 16 n.13.) Thus, while ATS&K's arguments are appropriately raised in a Rule 59 motion for a new trial[17] or on direct appeal, the correctness of the admission are not relevant to the evaluation of their Rule 50(b) motion. The record on the *Daubert* hearing reflects the Court's reasons for admitting Rappaport's testimony, and the Court will not revisit that ruling here.[18] Accordingly, Defendants' arguments regarding claimed deficiencies in Rappaport's damages testimony are neither preserved nor properly before the Court on a Rule 50(b) motion.

---

[17] Although the Court may, in its discretion, view ATS&K's arguments under the Rule 59 new trial rubric, it declines to do so here, given that ATS&K has explicitly withdrawn its motion for a new trial.

[18] To the extent that Defendants' damages arguments can be viewed as challenging the credibility and weight the jury accorded Rappaport's testimony, Defendants' argument still fails. The weighing of the experts' testimony is a matter for the jury and will not be disturbed by this Court. *See Nwanji v. City of New York*, 98 CV 4263, 2000 WL 1341448, at *6 (S.D.N.Y. Sept. 15, 2000) (denying plaintiff's motion for judgment as a matter of law where the case rested largely on the credibility of the witnesses who testified at trial). Additionally, viewing the evidence in the light most favorable to upholding the jury's verdict, the Court finds that the record evidence was sufficient to enable Protostorm to prove its damages with reasonable certainty and to provide the jury with a reasonable basis for calculating the damage award. Rappaport testified at length regarding his thought process and methodology in determining the range of damages suffered by Protostorm, based on what he believed were conservative estimates of the royalty base and the royalty rate. (Tr. 966−70, 977−81, 993−1008.) Rappaport

**V.**     **Sufficiency of the Evidence to Support the Jury's Verdict**

Accordingly, Defendants' Rule 50(b) motions are restricted to Defendants' challenge to the sufficiency of the evidence regarding Section 102 anticipation, their duty to prosecute the patent application, the statute of limitations, and punitive damages. As set forth above, the Court is compelled to deny the motions unless, when viewing all of the evidence in the light most favorable to the plaintiff, there is "such a complete absence of evidence supporting the verdict . . . . , or the evidence in favor of the movant is so overwhelming that reasonable and fair−minded persons could not arrive at a verdict against it." *Kinneary*, 601 F.3d at 155 (citation and alterations omitted); *accord Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir. 1988) (stating that the standard for granting a motion for judgment as a matter of law is "appropriately strict"). This stringent standard has not been met here.

**A. The Jury's Verdict Regarding Anticipation Is Supported By the Evidence**

ATS&K briefly contends that Protostorm failed to meet its burden to show patentability under Section 102 because Rappaport's testimony distinguishing the draft hypothetical claims from prior art was flawed, and was thus insufficient to rebut the testimony of Defendants' expert, Larry Nixon, that the Protostorm invention was anticipated by prior art. (ATS&K Mem. at 25 n.13; ATS&K Reply at 19, n.17; *see* Tr. 2824.) The Court disagrees. At trial, Rappaport

---

explained that based on his experience, the most direct way Protostorm would have earned money from the patented invention was from licensing the patent to third parties interested in practicing the invention. (Tr. 968−70.) Rappaport testified extensively regarding the 2007 Yankee Group Report, its findings and forecast for the in−game advertising market, what inferences and estimates he drew from the report, and how he arrived at his damages calculations therefrom. (Tr. 977−79, 993−96.) Rappaport further testified that he conducted additional research online for in−game advertising, which confirmed the numbers shown in the Yankee Group Report. (Tr. 979−81.) Rappaport also explained that to determine the royalty rate, he also relied on his experience, specific video game situations in which he was involved and the royalty rates used in those situations, and a 2011 consumer products survey by the Licensing Executive Society. (Tr. 997−1001.) This evidence was not contradicted by Defendants, who offered no alternative damage amount at trial.

testified that the subject matter of Protostorm's patent application could have been patentably distinguished over prior art, including the "Miles" reference that Nixon claimed anticipated the Protostorm invention. (Tr. 938, 946, 955, 1147−48; *see* Pl. Ex. 79 at 3.) Although ATS&K now suggests that Rappaport impermissibly distinguished the Protostorm invention on the basis of features that are not recited in the claims (ATS&K Mem. at 26 n.13; ATS&K Reply at 19 n.17 ("Anticipation challenges . . . must focus only on the limitations actually recited in the claims" (citing *DDR*, 773 F.3d at 1252)), Rappaport specifically explained that all "of the elements set forth in [the hypothetical] claims" were "not found or disclosed or suggested in the Miles patent" (Tr. 1147). The jury was entitled to, and presumably did, credit Rappaport's testimony over that of Nixon. Neither legal precedent nor overwhelming conflicting evidence compels the conclusion that the Protostorm invention was anticipated by prior art or that a patent would not have been issued to Protostorm on that basis.

## B. The Jury's Verdict Regarding the Duty and Breach Elements of Protostorm's Legal Malpractice Claim Was Supported By the Evidence

### 1. Defendants' Duty to Draft Rappaport's Hypothetical Claims

The Court preliminarily addresses Defendants' Rule 50(b) argument that the evidence was insufficient to show that Defendants had a duty to draft the hypothetical claims in Rappaport's report. ATS&K's Rule 50(b) motion asserts, for instance, that Protostorm failed to establish a duty to draft the hypothetical claims because the claims were not supported by the PCT application specifications, and Rappaport's formulation of the hypothetical claims was speculative and conjectural. (ATS&K Mem. at 26−31.) Brundidge presses a similar theory, asserting that the question of ATS&K's duty to conceive of, modify, and prosecute the hypothetical claims drafted by Rappaport should have never reached the jury, and impermissibly

expanded the scope of the summary judgment rulings.  (Brundidge Mem. at 15−16.)  Such contentions fundamentally misstate the issues tried before the jury, the jury instructions, and the verdict sheet.

As the Court noted during the oral presentation of Rule 50(a) motions at trial, the summary judgment decision of the previously assigned judge, the Honorable Nicholas G. Garaufis, narrowed the questions to be decided by jury at trial.  Significantly, Judge Garaufis ruled that if the jury found that Plaintiffs retained Defendants to fully and substantively prosecute the patent application to completion and that the attorney−client relationship between Plaintiffs and ATS&K persisted after September 2001, as a matter of law, Defendants failed to exercise ordinary skill.  *Protostorm*, 834 F. Supp. 2d at 158.[19]  Consistent with this ruling, the Court instructed the jury *not* to "consider whether Defendants failed to meet the standard of care with respect to the *drafting* of the PCT application, in deciding whether the breach element had been proven."  (Dkt. 529 at 13.)  The jury was instead instructed that to resolve the breach issue, it had only to determine whether (1) "Defendants were retained to substantively prosecute the patent application," and (2) "the attorney−client relationship persisted after September 2001."  (*Id.*)  The Court explained to the jury that "if you find that Defendants were retained to do more than physically file the PCT Application and that the attorney−client relationship persisted after September 2001, then you must find that Plaintiffs have met their burden of proof with respect to the breach element of their legal malpractice claim."  (*Id.*)[20]

---

[19] Although Brundidge argues that Judge Garaufis's ruling was "clear error" (Brundidge Mem. at n.4), a Rule 50 motion is not an occasion to revisit summary judgment rulings that determined the course of the trial.  If Brundidge preserved his objection, such arguments may be presented on appeal.

[20] Brundidge's motion takes issue with this jury instruction as confusing, contending that more is required to establish a responsibility to prosecute a patent.  (Brundidge Mem. at 13.)

Defendant's assertion that the jury was tasked with determining whether Defendants had a duty to draft Rappaport's hypothetical claims is belied by these instructions. As discussed, the Court specifically instructed the jury *not* to consider whether ATS&K met the standard of care with respect to drafting Protostorm's PCT application. Instead, the jury was instructed that it need only decide two issues, *i.e.*, whether Defendants were retained to shepherd Protostorm's application through the patent prosecution process and whether there was an attorney-client relationship between the parties after September 2001. Juries are presumed to follow their instructions, and there is no indication that the jury impermissibly departed from their instructions. Additionally, as Protostorm correctly observes, Defendants failed to object to the Court's instructions to the jury regarding breach and duty.[21]

ATS&K's additional argument that Protostorm failed to establish a duty and breach of duty to draft the hypothetical claims since "Rappaport's testimony was the only basis for

_____

Specifically, Brundidge contends that Protostorm was required to show that he was responsible for the national phase of patent prosecution after September 2001, which would have required Protostorm to choose countries, authorize a local agent to file applications with the national offices, and pay fees. (*Id.* at 8−9, 13.) Brundidge's trial counsel, however, failed to raise any such issue at trial regarding the jury instructions. Brundidge also asserts that there is no evidence that ATS&K or Brundidge ever received the information upon which Rappaport based his hypothetical patent claims. (*Id.* at 16.) Brundidge's arguments again misconceive Protostorm's theory of liability and the nature of the jury instructions, which focuses on whether the scope of the attorney−client relationship included prosecution, and whether its duration persisted after September 2001. As discussed below, the evidence introduced at trial supports the jury's verdict on both questions. For now, the Court notes that Worthington's June 25, 2001 email to ATS&K and Brundidge instructed them that Protostorm wished to designate all PCT countries. (Pl. Ex. 37.) Based on the jury's finding of continued representation to prosecute the application, it follows that ATS&K and Brundidge had a duty to confirm the country designations and confirm the correctness of the patent application with the co−inventors. The evidence at trial established that ATS&K and Brundidge did neither.

[21] ATS&K now objects to the admission of testimony that it contends prejudicially suggested that ATS&K had a duty to draft the hypothetical claims. (*See* ATS&K Mem. at 27, n.14 (citing Tr. 956, 1041).) ATS&K failed to timely object to the testimony and cannot do so now. The Court further reiterates that a Rule 50(b) motion is not a proper vehicle for complaints about evidentiary rulings.

Protostorm's assertion that ATS[&]K had a duty to draft the hypothetical claims and that testimony should have been excluded" (ATS&K Mem. at 30−31; *see id.* at 27−28) is similarly misguided.[22]  Aside from the fact that the jury was asked to determine a duty to prosecute rather than a duty to draft claims, the Court notes that Rappaport's testimony regarding the hypothetical claims was directed at the *causation* element of Protostorm's legal malpractice claim rather than the duty and breach elements.  The jury was asked to determine separately if, by a preponderance of the evidence, Protostorm showed "that, 'but for' Defendants' negligence, [it] would have obtained at least one issued, subsisting, valid and enforceable U.S. patent or corresponding foreign patent on the Protostorm inventions." (Dkt. 529 at 13−14.)  Rappaport's testimony about the hypothetical claims thus was part of Protostorm's proof that the Protostorm invention would have been patentable.  (*See id.* at 14 (instructing jury to consider Rappaport's hypothetical claim testimony in connection with causation element).)  Moreover, ATS&K's arguments about Rappaport's testimony simply repeat those made during the *Daubert* hearing concerning the admissibility of that testimony.  As previously noted, challenges to the admissibility of evidence

---

[22] ATS&K objects that Rappaport never explained how he derived his hypothetical claim language, and that the hypothetical claims differ substantially from the claim language in the PCT application and June 2001 draft application.  (ATS&K Mem. at 27−28; *see id.* at 30, n.15.)  Rappaport, however, testified at length regarding how he formulated the hypothetical claims.  (*E.g.*, Tr. 933−38).  Rappaport specifically identified language in the second provisional application that should have been included, but was omitted in the PCT application that ATS&K filed.  (Tr. 934−36; *see* Pl. Ex. 86 at 00140−41.)  Rappaport further opined that the first and second provisional patent applications and the material in the June 2001 draft application should all have formed part of the specification that ATS&K filed.  (Tr. 937−38, 956−57; *see* Pl. Ex. 79 at 2−3.)  Rappaport also compared the hypothetical claims he drafted to the language of the June 2001 draft application, and explained that while his claim closely tracks the June 2001 draft language and captures the same elements, he expanded on the language for clarity so that it could be more easily understood by the examiner.  (Tr. 947−49, 956.)  Finally, Rappaport testified to his belief that with the typical back and forth from the PTO, competent patent lawyers would have been able to draft claims substantially similar to his hypothetical claims, which resemble the June 2001 draft.  (Tr. 955−57.)

are not relevant to a Rule 50(b) analysis.[23]  In any event, the Court declines to reconsider its

ruling to admit Rappaport's testimony for the reasons set forth at the *Daubert* hearing.

### 2. Defendants' Duty to Prosecute the Patent Application

Brundidge's 50(b) motion contends that the record evidence made clear that neither

ATS&K nor Brundidge individually were responsible for prosecuting Protostorm's patent

application.  (Brundidge Mem. at 12−15.)[24]  Upon reviewing the trial record, the Court finds that

there existed ample evidence to support the jury's conclusion that ATS&K, Brundidge, and

Bailey all owed a duty to Protostorm to fully prosecute its patent application.

Among the evidence admitted at trial was a June 20, 2001 email from attorney Dale

Hogue ("Hogue")[25] to Brundidge and Bailey transmitting documents and drawings necessary for

the preparation of the final patent application, and stating that "[a]t this point you have the final

patent application.  I will add nothing further and any changes will be made by you to eliminate

confusion."  (Pl. Ex. 31; Tr. 623, 681.)  Hogue testified that when he sent that letter, he

understood that he had "finished as much as [he] could finish" and "ha[d] nothing further to do"

on the application, and that he expected that "the filing and prosecuting attorney would decide

whether [the attached application] was a sufficient application" and "could change it if they felt

---

[23] ATS&K acknowledges that the Court ruled on the admissibility of Rappaport's testimony at the *Daubert* hearing and that ATS&K's Rule 50(b) challenge "is not a pure sufficiency of the factual evidence argument" but rather an argument that "[w]ith Rappaport's testimony properly excluded, Protostorm cannot establish that ATSK had a duty to draft the hypothetical claims." (ATS&K Reply at 22.)

[24] ATS&K's motion on the sufficiency of Protostorm's evidence on duty focuses on its argument that Protostorm failed to prove that it had a duty to draft the hypothetical claims.  (ATS&K Mem. at 26−31.)

[25] Prior to the events at issue in this case, Hogue was of counsel to ATS&K.  However, by the time the Protostorm patent application was being prepared, Hogue had ended his of counsel relationship with ATS&K and had created his own law practice.

it was necessary." (Tr. 623.)[26]  Hogue further testified to his understanding that ATS&K was "going to prepare and file the application and prosecute it" and that he had no further responsibilities. (Tr. 627.) On June 25, 2001, Kathy Worthington, an attorney who was assisting Protostorm's corporate counsel in obtaining the desired patent, sent an email to Brundidge and Bailey directing ATS&K to file an international patent for Protostorm under the PCT instead of a domestic application, and specifying that Protostorm wanted to designate every PCT signatory country. (Pl. Ex. 37.)

Also admitted into evidence was a June 27, 2001 letter from Bailey to Protostorm's corporate counsel John J. Ginley ("Ginley"), copying Worthington and Hogue, which reported that the Protostorm PCT application was filed on June 25, 2001. (Pl. Ex. 41.) Significantly, Bailey's letter advised of upcoming procedural steps, confirming that "[i]f any amendments are necessary, we [ATS&K] will make them . . .", and assured Ginley that ATS&K would keep Ginley, Hogue, and Worthington "abreast of further developments in this application, as they occur." (Pl. Ex. 41 at AN 00196−97; Tr. 607−10, 1477, 1544−45.) Bailey and Brundidge each acknowledged at trial that according to the letter, ATS&K would have made any necessary amendments. (Tr. 779, 1477, 1544−45.)

In addition to these letters, the jury's finding was supported by records demonstrating that ATS&K maintained a docket sheet that recorded future "PCT deadlines" applicable to the Protostorm application, and generated periodic reminders to attorneys of upcoming deadlines. (Pl. Exs. 5−9; Tr. 600−02, 654, 658, 889−91, 897, 906, 1524−25.) The docket sheet indicated a September 27, 2001 deadline for confirming country designations for the Protostorm PCT application with the PTO. (Pl. Exs. 6, 7; Tr. 601−02, 692, 889−91.) The docket sheet also

_____

[26] Hogue's deposition testimony was read into the trial record.

indicated that the "national phase" for the Protostorm PCT application would begin on January 27, 2002 and that the "national phase deadline" was January 27, 2003. (Pl. Exs. 6, 7.)

ATS&K, Brundidge, and Bailey were also listed as Protostorm's representative in various filings before the PTO. (Pl. Ex. 24 at 000021; Tr. 818, 881−84, 887−89, 899−900, 930−31.) Bailey, on behalf of ATS&K, signed the first provisional application after adding a claim and a figure. (Pl. Ex. 24 at 00021; Tr. 1456, 1516.) Bailey signed the PCT application filed with the United States Receiving Office on June 25, 2001 as well as the application transmittal letter on behalf of ATS&K. (Pl. Ex. 36 at AN 00072; Tr. 1473−75, 1522.) In addition, both Brundidge and Bailey were listed on Protostorm's PCT application as the "agent[s] or common representative[s]" for Protostorm. (Pl. Ex. 36 at AN 00073; Tr. 1473−75, 1522.)

Testimony elicited from Defendants further supports this inference. Bailey testified that ATS&K was the attorney of record for Protostorm before the PTO. (Tr. 1549.) Brundidge also testified that as of the filing of the PCT application, the PTO would consider him to be a representative of Protostorm. (Tr. 686.) Bailey acknowledged that any PTO notices or office actions regarding the application would have been sent to ATS&K because the firm was listed as the correspondence address. (Tr. 1485; *see* Pl. Ex. 36 at AN 00073.) Indeed, as Brundidge testified, notices to Protostorm were, in fact, received by the firm (Tr. 1674−75, 1690−91; *see* Pl. Exs. 54, 84 at W00077), and PTO actions from the receiving office would be handled by ATS&K (Tr. 780.)

In sum, there was more than adequate evidence in the record to support the jury's verdict as to Defendants' duty to prosecute the patent application on behalf of Protostorm.

### 3. Protostorm's and ATS&K's Attorney−Client Relationship Persisted After September 2001

The Court also finds that, contrary to Brundidge's arguments, there was sufficient evidence to support the jury's finding that his and/or ATS&K's representation of Protostorm persisted after September 2001. (*See* Brundidge Mem. at 13−16.)

The evidence detailed above, together with evidence that the patent prosecution process could take several years (*See* Tr. 269−70, 327, 332; Pl. Ex. 16), supports this conclusion. The jury's verdict finds further support from Faulisi's testimony and Protostorm's business notebooks reflecting communications between Protostorm and Brundidge in December 2001 regarding the status of the patent application. Faulisi testified, and the notebooks reflect, that at that time, Brundidge provided advice regarding procedural matters in pursuing patent protection. (Tr. 301−02, 306, 308−13; *see* ATS&K Exs. AAAAAA at P002763−64, BBBBBB.) [27] Also supporting the jury's verdict were ATS&K's docketing records that noted deadlines after September 2001 in the patent prosecution process. (Pl. Exs. 5−9; Tr. 600−02, 654, 658, 889−91, 897, 906, 1524−25.) As previously noted, PTO notices or actions regarding the application would have been sent to the ATS&K. (Tr. 1485; *see* Pl. Ex. 36 at AN 00073.) ATS&K continued to receive notices after September 2001 regarding the patent application. (Tr. 1690−91; *see* Pl. Ex. 54 (January 3, 2002 notice).) Brundidge acknowledged that ATS&K would be responsible for handling office actions. (Tr. 780.) The jury's conclusion is further supported by Brundidge's and Schiavelli's testimony that ATS&K did not file anything with the PTO to end their representation of Protostorm before the agency. (Tr. 641, 725−26, 731, 1406, 1694−95.) That testimony was substantiated by evidence of bibliographic information retrieved

---

[27] Citations to "ATS&K Ex." in this Memorandum & Order refer to ATS&K's trial exhibits as attached to the Declaration of Robert S. Goodman submitted by Protostorm in opposition to Defendants' Rule 50(b) motions. (Dkt. 650 & Exs.)

as late as March 2008 from the World Intellectual Property Organization ("WIPO") that reflected ATS&K, and specifically Bailey, as the agent on Protostorm's PCT application. (Pl. Ex. 63; Tr. 1693.) Based on this record, a reasonable jury could conclude that Defendants' attorney-client relationship with Protostorm persisted after September 2001.

Although Defendants points to evidence supporting their position that the attorney−client relationship between Protostorm and ATS&K was terminated in 2001, this evidence was not so "overwhelming" that reasonable and fair minded persons could not arrive at a verdict against Defendants. *Kinneary*, 601 F.3d at 155. For instance, evidence that Protostorm did not follow−up with ATS&K regarding its patent application between December 2001 and mid−2006 does not require the jury to conclude that the attorney client−relationship was terminated (*see* Brundidge Reply at 2; Tr. 319−21, 449−51), especially in light of evidence that Protostorm's principals understood that the patent approval process could take several years (Tr. 269−70, 327, 332; Pl. Ex. 16), and were counting on ATS&K to shepherd the application to its conclusion (Tr. 258, 288, 332). Additionally, contrary to Brundidge's assertions that Protostorm's principals halted the company's business operations and closed its office thereby terminating any legal representation by ATS&K in about December 2001 (Brundidge Mem. at 8−9, 14), there was evidence that Protostorm maintained its corporate existence and that its principals continued to seek capital for the company (*see, e.g.*, Tr. 317).

Brundidge's October 1, 2001 letter stating that ATS&K would take no further action on the application until Protostorm made a payment to reduce its balance also does not compel a finding that the attorney−client relationship was severed. (*See* ATS&K Mem. at 32−33; Brundidge Mem. at 14; Pl. Ex. 84; Tr. 705.) First, the jury was permitted to credit Faulisi's testimony that he did not receive the letter until after he spoke to Schiavelli in June 2007, which

followed multiple attempts to reach ATS&K about the status of the patent application. (Tr. 301, 321−24). Second, even assuming that ATS&K sent the letter to Faulisi in October 2001, a reasonable trier of fact could conclude that the language of the letter did not sever the attorney−client relationship, but only threatened to stop work if Protostorm did not pay outstanding bills. Brundidge himself testified that the purpose of the letter was to "offer[] [Protostorm] the opportunity to pay their bills and give us a retainer." (Tr. 706.)[28] Third, as noted above, there was more than adequate evidence in the record to support the jury's finding that an attorney−client relationship continued after the letter, including evidence of communications between ATS&K and Protostorm regarding the status of the patent application in December 2001. (Tr. 301−02, 306, 308−13; *see* ATS&K Exs. AAAAAA at P002763−64, BBBBBB.)[29] The evidence of conversations between Brundidge and Protostorm's principals in December 2001 also supports an expectation that ATS&K, through Brundidge and Bailey, would continue to work to prosecute the application.

---

[28] On this issue, the jury also could have found some support in the testimony of the defense's legal ethics expert, John Steele, for the conclusion that more was needed to sever an attorney-client relationship than Brundidge's October 1, 2001 stop-work letter. Although Steele opined that Protostorm's non-payment of certain fees owed to ATS&K as of October 1, 2001 justified ATS&K's termination of the attorney-client relationship with Protostorm, he acknowledged, on cross-examination that the letter did not explicitly state that the relationship was terminated and suggested that if Protostorm took certain actions, such as paying the fees that were due, the relationship would continue. (Tr. 2574, 2576-77, 2632-34.) Steele also acknowledged that ATS&K's records appeared to show that Protostorm had, in fact, made a payment on or about October 1, 2001 and that the only amount still owing on that date was slightly less than $4,000. (Tr. 2638-39.)

[29] Brundidge confirmed that according to billing records, at the time he stopped work on September 20, 2001, Protostorm had been making payments on other invoices and the invoice of $3,847 was less than 90 days old. (Tr. 712−13, 748; *see* Pl. Ex. 4.) Brundidge also acknowledged that on October 1, 2001, the same date as the letter to Ginley, Protostorm made a payment of $1,092.70 to ATS&K on a trademark matter. (Tr. 719−20; *see* Pl. Ex. 4.)

In light of the above evidence, Brundidge's contention that the jury did not make findings as to his individual liability is without merit. (*See* Brundidge Mem. at 12−13.) The Court additionally notes the jury was instructed that Plaintiffs must establish the elements of their legal malpractice claim "as to each Defendant separately." (Dkt. 529 at 10.) To that end, the verdict sheet requested that the jury answer the question of whether Protostorm retained Defendants to substantively prosecute the patent application as to each defendant separately. (Verdict Sheet at 2.) Contrary to Brundidge's contention that "Protsotorm confused the jury as to Brundidge's individual liability and defenses" (Brundidge Reply at 1), the verdict sheet reflects the jury's attention to the differences in proof between ATS&K and the individual defendants, and in fact found that Schiavelli was not retained to prosecute Protostorm's patent application and thus did not have an attorney−client relationship with Protostorm that persisted after September 2001. (Verdict Sheet at 1−2.)

### C. The Jury's Verdict Regarding the Statute of Limitations was Supported by the Evidence

Defendants contend that Protostorm's malpractice action is time−barred because Protostorm did not commence the action within three years after the cause of action accrued, and because there was insufficient evidence at trial for the jury to conclude that the statute of limitations was tolled through Defendants' continuous representation or concealment of its malpractice. (ATS&K Mem. at 31−34; Brundidge Mem. at 6−10; Dkt. 626−1 ¶ 7.) The Court disagrees.

### 1. The Record Evidence Supports The Jury's Finding of Continuous Representation

The statute of limitations applicable to Protostorm's malpractice claim is three years, N.Y. C.P.L.R. § 214(6), and it begins to run on "the day an actionable injury occurs," regardless of when the plaintiff discovers the injury, *McCoy v. Feinman*, 785 N.E.2d 714, 718 (N.Y. 2002).

Under the "continuous representation doctrine," the statute of limitations is tolled for as long as "there is a mutual understanding" between attorney and client "of the need for further representation on the specific subject matter underlying the malpractice claim." *Id.*; *see also Shumsky v. Eisenstein*, 750 N.E.2d 67, 72 (N.Y. 2001) (continuous representation existed where plaintiffs were "left with the reasonable impression that defendant was, in fact, actively addressing their legal needs" in connection with the specific subject matter in question). Accordingly, the Court instructed the jury that the statute of limitations is tolled under the doctrine of continuous representation for as long as there is a mutual understanding between the attorney and client of the need for further representation on Protostorm's patent application. (Dkt. 529 at 21.)  The Court further explained that no continuing representation exists where the task for which the attorney was retained is complete, or the evidence did not support a finding that the client continued to have trust and confidence in the attorney.  (*Id.* at 21−22.)

According to Defendants, there was no evidence that ATS&K's representation of Protostorm continued beyond March 4, 2005 (three years before this action was commenced). Rather, Defendants contend, the evidence established that the attorney−client relationship between Protostorm and ATS&K ended in October 2001, when ATS&K sent the stop-work letter to Faulisi.  (ATS&K Mem. at 31−33.)  The Court disagrees.

The trial record was replete with evidence from which the jury could reasonably infer that there was a mutual understanding of a continued need for representation on Protostorm's patent application.  The previously described evidence that supported the jury's finding that Defendants continued to represent Protostorm after September 2001 also supports the jury's verdict regarding continuous representation.  The Court highlights, in particular, Faulisi's testimony that he understood that the approval process at the Patent Office could take several years (Tr. 269-70;

327, 332), and that he relied on ATS&K to keep the application up to date until completed(Tr. 258, 288, 332). There also was testimony that ATS&K did not take steps to end their representation of Protostorm before the PTO; thus, ATS&K and Bailey were identified as the agent on Protostorm's PCT application as late as March 2008. (Tr. 641, 725−26, 731, 1406, 1693−95; Pl. Ex. 63).[30] Drawing all reasonable inferences in Protostorm's favor, the Court finds that a reasonable juror could have concluded that the statute of limitations was tolled because ATS&K continued to represent Protostorm after March 2005.

Brundidge, who was added to this case as an individual defendant when Plaintiffs filed the Second Amended Complaint on August 24, 2009, separately asserts that the jury did not find that the statute of limitations was tolled through August 24, 2006—or three years before the filing of the Second Amended Complaint—instead finding only that the statute of limitations was tolled through March 4, 2005. (Brundidge Mem. at 6; Dkt. 114.) Thus, Brundidge argues, there was no basis in the record for tolling the statute of limitations through August 24, 2006, and this action is time-barred as to him. (Brundidge Reply at 5.) Brundidge also argues that there was no basis to find continuous representation by him through August 25, 2006 because he had left the firm by then. (Brundidge Mem. at 7 n.7.) Bailey's Rule 50(b) motion joins the portion of Brundidge's motion that relates to the statute of limitations defense, and argues that because he (Bailey) left the firm in 2004, "there could not possibly have been a factual finding of

---

[30] Citing to *Piliero v. Adler & Stavros*, 723 N.Y.S.2d 91 (N.Y. App. Div. 2001), Brundidge contends that "the mere fact that ATS&K did not withdraw as attorney of record on the PCT application" does not establish continuous representation. (Brundidge Mem. at 9.) *Piliero* is distinguishable, however, because the client retained new counsel and the only evidence of a continuous relationship was the absence of a formal substitution filing in Court. 723 N.Y.S. 2d at 92. Here, there is no evidence that Protostorm retained new counsel to prosecute the application and the failure to withdraw is just one fact among others that supports the jury's finding of a continuous relationship.

any continuous representation" by him.[31]   (Dkt. 626−1 at n.2.)   The Court rejects these arguments.

First, these arguments smack of sandbagging.   Defendants never raised any of these issues at trial, nor did they seek any findings from the jury on these issues.   Defendants did not argue to the jury that it should find that Brundidge's representation of Protostorm did not continue through August 24, 2006.   Nor did Defendants argue that Brundidge and Bailey could not be held responsible for ATS&K's conduct because they had left the firm before August 24, 2006 and March 4, 2005, respectively.[32]   To the contrary, Defendants agreed to the *sole* Verdict Sheet question regarding the statute of limitations issue, namely, whether *each* of the "Defendants' representation of Plaintiff(s) continued[d] after *March 4, 2005*."   (Verdict Sheet at 3 (indicating jury's individualized findings that ATS&K's, Bailey's and Brundidge's representation continued after March 4, 2005).)   Having failed to raise these statute of limitations arguments at trial, Brundidge and Bailey cannot now attack the jury's verdict as deficient based on the absence of relevant factual findings or the jury's failure to consider legal standards on which it was never instructed.[33]

---

[31] Unlike Brundidge, Bailey was named as a defendant in the original complaint filed on March 4, 2008.

[32] Indeed, Defendants offered no evidence about the precise dates of Brundidge's and Bailey's departures from ATS&K.   Brundidge merely testified (in response to *Plaintiffs'* questioning) that he left "in 2004" (Tr. 647), and Bailey similarly testified that he "believe[d]" [his departure] was around 2004" (Tr. 1453).   Bailey's Rule 50(b) motion simply reiterates that he "left the firm in 2004." (Dkt. 626−1 ¶ 7.)

[33] Even if Brundidge and Bailey had made a timely statute of limitations argument, the evidence at trial was sufficient to support a finding that ATS&K's representation of Protostorm continued into 2008.   The jury specifically found that ATS&K's, Brundidge's and Bailey's representation of ATS&K continued after March 4, 2005.   (Verdict Sheet at 3.)   Although there was no end date, the evidence further showed that Brundidge permitted his appearance at the PTO on behalf

Second, Brundidge's and Bailey's argument that the statute of limitations should not be tolled as to them based on their departures from the firm was specifically rejected by Judge Garaufis, in connection with the parties' summary judgment motions.  As Judge Garaufis found:

> To the extent that a continuous attorney-client relationship existed between Plaintiffs and ATS & K, it is of no moment that Brundidge and Bailey both left the firm in 2004. (Pl. 56.1 ¶¶ 9, 12.)  The continuous representation doctrine "is rooted in recognition that a client cannot be expected to jeopardize a pending case or relationship with an attorney during the period that the attorney continues to handle the case."  *Waggoner v. Caruso*, 68 A.D.3d 1, 7, 886 N.Y.S.2d 368 (1st Dep't 2009).  For the same reason, a client cannot be expected to bring a malpractice suit against a law firm's ex-partner while the client is still represented by the firm in the same matter.  *See New Kayak Pool Corp. v. Kavinoky Cook LLP*, 74 A.D.3d 1852, 1853, 902 N.Y.S.2d 497 (4th Dep't 2010);*Waggoner*, 68 A.D.3d at 7, 886 N.Y.S.2d 368; *HNH Int'l, Ltd. v. Pryor Cashman Sherman & Flynn LLP*, 63 A.D.3d 534, 535, 881 N.Y.S.2d 86 (1st Dep't 2009); *Pollicino v. Roemer and Featherstonhaugh P.C.*, 260 A.D.2d 52, 55, 699 N.Y.S.2d 238 (3d Dep't 1999); *Antoniu v. Ahearn*, 134 A.D.2d 151, 152–53, 520 N.Y.S.2d 562 (1st Dep't 1987).

*Protostorm*, 834 F. Supp. 2d at 156, n.19.  As Judge Garaufis explained, Protostorm could not be expected to sue ex-ATS&K partner Brundidge or ex-ATS&K attorney Bailey while ATS&K was still representing Protostorm.  Thus, the relevant deadline for purposes of tolling the statute of limitations was the date at which ATS&K's representation of Protostorm, ended, which as the jury found, was after March 4, 2005.

Citing no legal authority, Brundidge offers only a policy argument against Judge Garaufis's prior ruling, contending that it effectively imposes indefinite tolling of claims against professionals who leave their firms.  (Brundidge Mem. at 7 n.2 (citing *Protostorm*, 834 F. Supp. 2d at 156).)  To the extent Brundidge's argument has any merit, the Court finds it inapplicable in a case such as this, where the ex-professionals, Brundidge and Bailey, were directly involved in

---

of Protostorm to remain in effect, never withdrew from representation of Protostorm at the PTO, and gave Protostorm advice that evidenced a continuing attorney−client relationship into 2008.

the alleged malpractice, and all compensatory damages stemming from their conduct were ultimately attributed back to the firm.

Having found that the jury's verdict that the statute of limitations was tolled is supported by the evidence on the record, the Court declines to address the sufficiency of the evidence to support the jury's alternative verdict that Defendants knowingly concealed material facts that they had a duty to reveal to Plaintiffs that prevented Plaintiffs from learning of Defendants' malpractice until at least March 2005. (Dkt. 529 at 22−23.)[34] The verdict sheet instructed the jury that it need not reach a verdict on concealment if it found that the statute of limitations was tolled under the continuous representation doctrine. (Verdict Sheet at 3−4.) Nor is it appropriate to disturb the jury verdict based on ATS&K's contention that the jury improperly considered concealment despite already finding a continuous attorney−client relationship. (*See* ATS&K Mem. at 31, 34−35 n.16; ATS&K Reply at 23.) There is no indication that the jury's verdict as to other elements of Protostorm's legal malpractice claim was unduly affected by the jury considering evidence of concealment. If anything, the evidence on concealment may have informed the jury's determination on the propriety of awarding punitive damages. As discussed in the following section, the jury's decision to award punitive damages is supported by the evidence. The Court thus sees no reason to disturb the jury's verdict on the statute of limitations.

### D. The Jury's Punitive Damages Award Was Not Against the Weight of the Evidence

The Court instructed the jury that it had discretion to award Plaintiffs punitive damages if it found "by a preponderance of the evidence that Defendants acted with malicious intent to

---

[34] Defendants' motions argue that the evidence conclusively establishes that there was no concealment because ATS&K sent the patent application to Worthington and Ginley on June 27, 2001, and all parties had access to the published PCT application. (ATS&K Mem. at 31, 34−35 n.16; Brundidge Mem. at 10; *see* Pl. Ex. 41.)

violate Plaintiffs' rights or unlawfully injure them, or . . . with callous or reckless disregard of Plaintiffs' rights[.]" (Dkt. 529 at 20.) The jury returned a verdict awarding punitive damages to Protostorm in the amount of $900,000 as to ATS&K and $100,000 against Brundidge. (Verdict Sheet at 5−6.) ATS&K's Rule 50(b) motion contends that the Court erred in allowing the jury to consider punitive damages because there was no evidence that ATS&K engaged in any gross, wanton, or willful fraud or morally culpable conduct. (ATS&K Mem. at 35−36; ATS&K Reply at 24−25.) Brundidge asserts that there was no factual record that Brundidge individually committed wanton or malicious acts or that Brundidge knew of any error in Plaintiff's patent application. (Brundidge Mem. at 20−21.) [35]

Drawing all reasonable inferences in Protostorm's favor, the Court finds that a reasonable juror could have concluded that ATS&K, and Brundidge individually, acted with either malicious intent or with callous or reckless disregard of Protostorm's rights, thus supporting an award of punitive damages. The evidence at trial clearly established that Brundidge was the partner at ATS&K responsible for the Protostorm matter. Combined with Brundidge's testimony that he did not substantively review Bailey's work in filing the PCT application, nor review the materials Brundidge sent to Protostorm—especially given the inexplicable failure to designate the United States for patent protection in the PCT application—it was reasonable for the jury to infer at least callous disregard of Protostorm's rights. The jury was also permitted to infer malicious intent or reckless disregard based on (1) Brundidge's order for ATS&K to stop work

---

[35] Brundidge cites to the Court's observation in its order on allocation of damages to ATS&K that, "[w]ithout further evidence about the precise acts for which the Jury found Brundidge responsible for punitive damages, the Court cannot conclude that Brundidge's conduct was authorized or ratified by ATS&K" such that the punitive damages award against Brundidge should be re−apportioned to ATS&K. (Brundidge Mem. at 20 (citing Dkt. 565 at 9).) That there was no evidence of firm ratification tied to specific acts by Brundidge does not mean that there was no factual record of wanton or malicious acts by Brundidge.

on the PCT application on September 20, 2001 even though he was aware of an impending September 23, 2001 deadline to request an extension to file a Power of Attorney with the PTO and a September 27, 2001 deadline to correct the failure to designate the United States, (2) not alerting Protostorm to these deadlines, and (3) allowing the deadlines to pass without seeking further extensions, despite acknowledging that extensions are freely given, easily filed, and had been successfully obtained before. (Pl. Ex. 48; Tr. 692, 694−696, 704−05, 708, 733, 752−53, 771−72). As Brundidge testified at trial, his emails to Worthington on September 25 and 27, which did not copy either Faulisi or Shakespeare, did not mention the two PTO deadlines. (Tr. 702, 704, 1682−83; *see* Pl. Ex. 51.) Although Brundidge acknowledged that an attorney has an obligation to give a client sufficient time to meet deadlines or retain other counsel when stopping work on a matter, he admitted that he did not speak to Protostorm's principals before ordering ATS&K to stop work on Protostorm's pending PCT application, and that he did not speak to the principals about the two impending deadlines. (Tr. 704, 710.) Brundidge also acknowledged that his October 2001 letter did not inform Protostorm that the two September 2001 deadlines had passed without action. (Tr. 706−07; 1670−72, 1688−90; *see* Pl. Ex. 84;.)[36] There was also evidence that Brundidge communicated with Protostorm's principals in December 2001 regarding procedural matters and represented that the PCT application was proceeding. (ATS&K Exs. AAAAAA at P002763−64, BBBBB at P002770−71; Tr. 301−02, 306, 308−13.) Additionally, the jury could have inferred willful or callous disregard to Protostorm's rights based on ATS&K's failure to disclose that the United States was not designated in the PCT application until January 2008, despite Faulisi's repeated requests for information from ATS&K

---

[36] Although Brundidge's letter attached a PCT Notification of Receipt of Record Copy that contained the initials of countries designated (Pl. Ex. 84 at W00077−78, Tr. 1688−90), Brundidge did not point this out to Protostorm, and the jury was entitled to draw the inference that a layperson would not have noticed the failure to comply with the deadlines.

beginning in mid−2006. (*See* Pl. Exs. 58, 60, 61; Tr. 319−32.) In sum, the evidence was sufficient for the jury to find that ATS&K and Brundidge, at a minimum, acted with willful, callous, or reckless disregard of Plaintiffs' rights.

Finally, the Court finds that Brundidge may not prevail on his contention that there can be no punitive award when there are no underlying compensatory damages. The New York State courtdecisions cited by Brundidge stand for the proposition that no punitive damages can be awarded where the underlying claim for compensatory damages is *barred*. (Brundidge Mem. at 19−20 (citing *Prote Contracting Co. v. Bd. of Educ. of City of New York*, 714 N.Y.S.2d 36 (App. Div. 2000) (compensatory damage claim dismissed); *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940 (N.Y. 1994) (compensatory damage claim barred by release); *Hubbell v. Trans World Life Ins. Co. of New York*, 408 N.E.2d 918 (N.Y. 1980) (compensatory damage claim barred by res judicata). By contrast, in this case, there was no legal bar or impediment to Protostorm's compensatory damage claim, and the jury found that Protostorm was entitled to compensatory damages. (Verdict Sheet at 5.) The jury also specifically found that Brundidge was liable to Protostorm for legal malpractice, and apportioned 15% of the fault to Brundidge (*Id.*)[37] Post−verdict, the Court assigned all compensatory damages to ATS&K, consistent with the parties' understanding at trial that the acts of ATS&K's principals and employees are attributable to ATS&K, and fault allocated to Brundidge as part of his employment at ATS&K must be paid by the firm. (Dkts. 565 at 8−9.) The Court held Brundidge individually liable for

---

[37] On the Verdict Sheet, the jury was instructed to apportion fault among Defendants, Plaintiffs, and non−party Dale Hogue. This was necessary because the parties had requested that the jury find liability with respect to each defendant and because ATS&K asserted comparative negligence defenses. During a conference related to jury instructions, Defendants requested that the Court allocate damages post−judgment and acknowledged that because the acts of the principals are attributable to ATS&K, the 10% fault allocated to Brundidge must be paid by ATS&K. (Tr. 2838−39, *see also* Tr. 3024.)

the $100,000 in punitive damages separately awarded against him by the jury, however, because there was no evidence that ATS&K authorized any wanton or malicious conduct by Brundidge. (Dkt. 565 at 9.) Thus, Protostorm prevailed on its cause of action against Brundidge, even though ATS&K was ultimately responsible for paying Brundidge's share of compensatory damages.

## CONCLUSION

For the foregoing reasons, the motions to set aside the jury verdict pursuant to Rule 50(b) filed by defendants ATS&K, Brundidge, and Bailey are denied. Notwithstanding Rule 6.3 of the Joint Local Civil Rules of the Southern and Eastern Districts of New York, the Court will not entertain any motion for reconsideration of this Memorandum & Order. *See Somlyo v. J. Lu-Rob Enterprises, Inc.*, 932 F.2d 1043, 1048 (2d Cir. 1991) (district courts have inherent discretion to depart from Local Rules).

SO ORDERED.


/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: June 5, 2015
       Brooklyn, New York